## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

In re:

Connector 2000 Association, Inc.,

Debtor.

Case No. 2010-
Chapter 9

**MEMORANDUM IN SUPPORT OF STATEMENT OF QUALIFICATIONS UNDER 11 U.S.C. § 109(c)**

Connector 2000 Association, Inc. ("*Debtor*") submits the following Memorandum in Support of its Statement of Qualifications Under 11 U.S.C. § 109(c).[1]

## I.    BACKGROUND

### A. History of the Debtor.

The Debtor has filed a petition seeking relief under chapter 9 of the United States Bankruptcy Code ("*Bankruptcy Code*"). The Debtor, formed in 1996, is a South Carolina nonprofit corporation organized as a "public benefit corporation" under the South Carolina Nonprofit Corporation Act of 1994, as amended. The Debtor was formed to assist the South Carolina Department of Transportation ("*SCDOT*") in the financing, acquisition, construction, and operation of turnpikes, highway projects, and other transportation facilities.

Although the Debtor was formed in 1996, its first financial activity occurred during February, 1998. At that time, the Debtor entered into a license agreement (the "*License Agreement*") with SCDOT that granted the Debtor rights and obligations to finance, acquire, construct, and operate an approximately 16 mile fully controlled access toll highway (the "*Southern Connector*") and to construct the South Carolina Highway 153 Extension (the "*SC*

---

[1] This Memorandum is further supported by the Declaration of Peter Femia, Executive Vice President and General Manager of the Debtor attached hereto as Exhibit 1.

*153 Extension*") (collectively, the "*Projects*"). Under Section 13.1(a) of the License Agreement, the term of License Agreement expires 50 years after the date of substantial completion of the Projects. SCDOT executed a certificate of substantial completion dated March 29, 2001 resulting in an expiration date in 2051. SCDOT accepted the Southern Connector as a part of the State Highway System. SCDOT is the State agency generally responsible for assuring that elements of the State Highway System are safe for the travelling public and in good repair.

To finance the Southern Connector, the Debtor issued $200,177,680 original principal amount of Connector 2000 Association, Inc. Toll Road Revenue Bonds (Southern Connector Project, Greenville, South Carolina), Series 1998A, B and C (the "*Bonds*") on February 11, 1998 pursuant to a Master Indenture of Trust and a First Supplemental Indenture of Trust, each dated as of February 1, 1998 (together, the "*Trust Indenture*"[2]) between the Debtor and First Union National Bank, as predecessor in trust to U.S. Bank, National Association, as trustee (the "*Trustee*"), to finance the construction of the Southern Connector. The Debtor was only responsible for financing the Southern Connector portion of the Projects. SCDOT provided financing for the SC 153 Extension portion of the Projects.

The Bonds were sold in three series: (i) $66,200,000 principal amount of Senior Current Interest Bonds, Series 1998A (the "*Series 1998A Bonds*"), (ii) $87,385,622 original principal amount of Senior Capital Appreciation Bonds, Series 1998B (the "*Series 1998B Bonds*" and, together with the Series 1998A Bonds, the "*Senior Bonds*") and (iii) $46,592,058 original principal amount of Subordinate Capital Appreciation Bonds, Series 1998C (the "*Series 1998C Bonds*" or the "*Subordinate Bonds*"). The Series 1998A Bonds consist of two term bonds, $21,400,000 5.25% bonds maturing, subject to earlier mandatory sinking fund redemption, on

---

[2] Capitalized terms not otherwise defined herein are intended to have the meaning assigned in the Trust Indenture, if defined therein.

January 1, 2023 and $44,800,000 5.375% bonds maturing, subject to earlier mandatory sinking fund redemption, on January 1, 2038. Interest on the Series 1998A Bonds is payable semi-annually on January 1 and July 1 of each year and the principal of the Series 1998A Bonds is subject to mandatory sinking fund redemption on January 1 of each year commencing January 1, 2008 and continuing to January 1, 2038. The Series 1998B Bonds and the Series 1998C Bonds (together, the "*Capital Appreciation Bonds*") consist of zero-coupon obligations which accrete interest and mature serially starting January 1, 2008 and continuing until January 1, 2038. Interest on a Capital Appreciation Bonds is not payable until such bond matures. The Series 1998B Bonds yield between 5.30% and 5.85%. The Series 1998C Bonds yield between 6.15% and 6.30%. No interest has been paid on the outstanding Capital Appreciation Bonds. The accreted value of the Capital Appreciation Bonds has increased from the original combined principal amount of $133,977,680 to in excess of $250,000,000 today.

The Debtor was formed to develop and finance the Southern Connector. The amended Articles of Incorporation of the Debtor provide that the charitable purpose of the Debtor is to construct and operate a highway in Greenville County, South Carolina in order to promote the economic development, safety and welfare of the citizens of Greenville County and surrounding communities and for the general benefit of all citizens of the State of South Carolina. The Articles of Incorporation stipulate that upon the retirement or defeasance of any Project Debt issued by Debtor to provide the highway all property provided by such Project Debt, and any additions thereto, will be conveyed by the Debtor to SCDOT. Article 8(b) of the Articles of Incorporation states that no director of Debtor shall be deemed qualified as a director until the election or appointment of such director has been approved by the SCDOT. Further, SCDOT has the power to remove any director of the Debtor for cause and to appoint a successor for the

remainder of such director's term. The provisions of Article 8 of the Articles of Incorporation of the Debtor may not be amended without the approval of SCDOT. The rights and powers of SCDOT set forth in the Articles of Incorporation of the Debtor are confirmed in Sections 3.9 and 9.2(b) of the By-laws of the Debtor.

The Internal Revenue Service issued a letter dated October 20, 1997, determining that the Association is an exempt organization that is not a private foundation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

The License Agreement permits the Debtor to charge tolls of the users of the Southern Connector. The toll rates to be charged by the Debtor are set by SCDOT pursuant to Section 6.4 of the License Agreement. The initial approved schedule of toll rates for use of the Southern Connector throughout the term of the License Agreement is attached to the License Agreement as Exhibit 3.

The State of South Carolina Office of Comptroller General has determined that the Debtor is a component unit of the State of South Carolina and of SCDOT because (i) SCDOT controls the governing body of the Debtor since all directors are subject to prior approval by SCDOT, and (ii) SCDOT sets the toll rates for the only means of revenue of the Debtor, making the Debtor fiscally dependent upon SCDOT.[3]  In addition, all of the net assets of the Debtor will revert to SCDOT upon the payment or defeasance of the Bonds.

B.     **Financial Issues facing the Debtor.**

The sole corporate purpose of the Debtor is to design, finance, acquire, construct and operate the Southern Connector.  At the time the Bonds were issued, Wilbur Smith Associates prepared a Traffic and Revenue Study (the "*Original Study*") to estimate the future utilization of

---

[3] The Southern Connector is included as a component unit of the State of South Carolina in the Consolidated Annual Financial Report of the State of South Carolina.

4

the road and toll revenues and operating expenses of the Debtor. The actual traffic on the highway and toll revenues received by the Debtor have been substantially less than projected in the Original Study. Currently, the Debtor is not receiving sufficient toll revenues to pay debt service on the Senior Bonds or the Subordinate Bonds. Prior to January 1, 2010, such shortfalls had been covered by withdrawals from the Debt Service Reserve Accounts (funded by original sale proceeds of the Bonds plus interest earnings thereon) maintained by the Trustee under the Trust Indenture. After the interest payment was made on July 1. 2009, the Trustee determined that it would not make a transfer from the Debt Service Reserve Accounts to fund a partial payment of debt service on the Bonds due on January 1, 2010. The Trustee advised bondholders that unless a restructuring of the Bonds was implemented prior to January 1. 2010, no debt service payment would be made. On January 1, 2010 the Debtor defaulted in the payment of principal and interest on certain of the Bonds.

As it became apparent to the Trustee that an Event of Default under the Indenture was likely, the Trustee requested the Debtor enter into a Second Supplemental Indenture of Trust dated October 16. 2002 (the "*Second Supplement*") and a separate instrument appointing HSBC Bank USA, NA as standby co-trustee (the "*Subordinate Trustee*") for the Subordinate Bonds. The Second Supplement became effective January 1, 2008 and the interests of the Subordinate Bonds are represented by the Subordinate Trustee.

In compliance with the provisions of its Continuing Disclosure Agreement under the Trust Indenture, the Debtor timely filed the required "Event Notices" notifying Bondholders of the January 1. 2010 payment default. various downgrades in the published credit rating on the Bonds by Standard & Poor's Ratings Service and each withdrawal from the Debt Service Reserve Accounts which withdrawals were used to pay a portion of the interest or principal

payments. Due to the factors noted above, the Debtor has experienced a loss of ($22,181.833) and ($22,156,181) for 2009 and 2008, respectively, resulting in an increase in the Debtor's net deficit to a total of ($173,302,626.00) and ($151,120,793) as of December 31, 2009 and 2008. respectively.

Debt service on the Bonds increased sharply in January 2008 as principal began to mature. As required under the Trust Indenture, the Debtor engaged a traffic and revenue consultant to prepare a series of toll rate studies to advise the Debtor regarding the toll rates necessary to maximize toll revenue from the Southern Connector. Each such study concluded that, even if the recommendations of the consultant are effected, projected toll revenues will be insufficient to pay principal and interest on the Bonds in full.

Despite the Debtor's implementation of the scheduled toll rate increase in 2005 and an additional toll increase effective November 1, 2009, the Debtor has been unable to comply with the Revenue Covenant under the Trust Indenture. The Trustee notified the Debtor that as of January 1, 2008, the Debtor is in default under the Trust Indenture. The bond documents provide the Trustee. upon the written request of 25% or more of the bondholders, with certain specific remedies in the event of such default. Such remedies include allowing the Trustee to (a) take legal action to require the Debtor to perform covenants with respect to the Bonds, (b) take legal action to require the Debtor to account for revenues as if it were the trustee of an express trust for the senior bondholders, (c) take legal action to prohibit any acts or things that may be unlawful or in violation of the senior bondholders' rights, (d) prohibit the Debtor from withdrawing monies from any bond accounts (other than the Rebate Fund and Renewal and Replacement Fund Accounts), without the Trustee's written consent, (e) take legal action to request that a court appoint a receiver of the Trust Estate and the Debtor's income, revenues, and use of profits.

(f) take legal action to protect and enforce its rights and those of the senior bondholders to enforce payment of the principal, redemption price and interest due on the senior bonds. The bond documents do not provide any remedy that would accelerate the due date of any debt service payments due on the outstanding bonds.

### C.    Costs of Operating the Southern Connector.

The Bonds are secured by the Trust Estate, which includes (a) all bond funds except the Rebate Fund and the Renewal and Replacement Fund, (b) all Revenues as defined in the bond documents, (c) all of the Debtor's rights in its License Agreement with SCDOT, and (d) any other property assigned to the Trustee by the Debtor.

The Trust Indenture operates similarly to a "lock box" obligating the Debtor to daily transfer toll revenues to the Trustee for deposit into the Revenue Fund to be applied by the Trustee monthly to pay the Debtors obligations, including debt service. The Trustee is obligated to transfer money on a monthly basis from the Revenue Fund to the other various funds established under the Trust Indenture in the priority listed below (the *"Flow of Funds Schedule"*):

A. Operating costs budgeted for the next succeeding month shall be distributed to the Debtor.

B. The Debtor shall transfer amounts to the Rebate Fund so that the amounts deposited equal the required amounts (if any).

C. The Trustee shall transfer to the Senior Bonds Debt Service Account amounts which, when added to other amounts in the Senior Bonds Debt Service Account, and available for such purposes, will provide for the accumulation, in substantially equal monthly installments, of the amounts required to pay the sum of: (i) any interest to become due and payable on each series of outstanding Senior Bonds on the next interest payment date (within the next six months) for such Series; and (ii) any principal installments to become due and payable on any series of outstanding Senior Bonds on or before the next date (within the next 12 months) on which such principal installment is payable.

D. If the Senior Bonds Debt Service Reserve Account contains less than the Senior Bonds Debt Service Reserve Account Requirement, the Trustee shall transfer into the Senior Bonds Debt Service Reserve Account, an amount equal to 1/24 of the Senior Bonds Debt Service Reserve Account Requirement or the amount needed to attain the Senior Bonds Debt Service Reserve Account Requirement, whichever is less. The transfers shall continue until the Senior Bonds Debt Service Reserve Account contains the Senior Bonds Debt Service Reserve Account Requirement.

E. The Trustee shall transfer to the Subordinate Bonds Debt Service Account amounts which, when added to other amounts in the Subordinate Bonds Debt Service Account and available for such purposes, will provide for the accumulation, in substantially equal monthly installments, or otherwise as may be provided in any Supplemental Indenture, of the amounts required to pay the sum of: (i) any interest to become due and payable on each series of outstanding Subordinate Bonds (within the next six months) on the next interest payment date for such Series; and (ii) any principal installments to become due and payable on any series of outstanding Subordinate Bonds on or before the next date (within the next 12 months) on which such principal installment is payable.

F. If the Subordinate Bonds Debt Service Reserve Account contains less than the Subordinate Bonds Debt Service Reserve Account Requirement, the Trustee shall transfer into the Subordinate Bonds Debt Service Reserve Account, an amount equal to 1/60 of the Subordinate Bonds Debt Service Reserve Account Requirement or the amount needed to attain the Subordinate Bonds Debt Service Reserve Account Requirement, whichever is less. All transfers shall continue until the Subordinate Bonds Debt Service Reserve Account contains the Subordinate Bonds Debt Service Reserve Account Requirement.

G. After the date of Final Completion of the Southern Connector Project, the Trustee shall deposit into the Renewal and Replacement Fund the amounts included in the annual budget of the Association, which are required pursuant to the Renewal and Replacement Plan then in effect under the License Agreement.

H. The Trustee shall pay to SCDOT amounts certified by an Authorized Debtor Representative as being due SCDOT for (i) the Maintenance Costs reimbursable to SCDOT under the License Agreement, together with any accruals from prior periods and interest owed thereon under the License Agreement and (ii) any reimbursements to SCDOT for condemnation awards for rights of way for the Southern Connector Project in excess of the amounts reserved therefore on the Completion Date.

I. The Trustee shall pay amounts certified by an Authorized Association Representative as being due SCDOT for the License Fee owing to SCDOT under the License Agreement, together with any accruals from prior periods and any interest owed thereon under the License Agreement.

J. Money remaining in the Revenue Fund shall be used by the Trustee to make or provide for all deposits, payments, or transfers certified by an Authorized Association

Representative as being required by any agreement or other instrument creating or evidencing any obligation of the Debtor which is not a Senior Bond or Subordinate Bond, at the time and in the amount provided for in such instrument.

K. The Trustee shall transfer any money remaining in the Revenue Fund at the end of any fiscal year to the Program Fund.

The rights and obligations of the parties to the License Agreement which are to be satisfied from Toll Revenues are subject to the same Flow of Funds Schedule which is attached to the License Agreement as Exhibit 5.

Due to the shortfall of Toll Revenues as described above, the Debtor has defaulted on the payment of principal and interest on certain of the Bonds, the funds remaining in the Debt Service Reserve Accounts have been frozen by the Trustee, there are no funds in the Renewal and Replacement Fund or the Program Fund and no License Fees or other amounts have been paid to SCDOT.

The Trust Indenture provides that the Debtor is to receive a monthly payment equal to one twelfth of the budgeted cost of operating the Southern Connector ("*Operating Costs*"). Budgeted operating costs paid by the Debtor for 2010 total $2,940,000 resulting in a monthly distribution to the Debtor from the Trustee equal to $245,000. This amount is paid before any transfer is made for debt service on the Bonds but does not include any payment for Maintenance Costs, as defined in the Trust Indenture.

Section 6.7(a) of the License Agreement provides: "Following Substantial Completion, SCDOT shall maintain in good operating condition, reasonable wear and tear excepted, S.C. 153 and the Southern Connector in accordance with applicable State and SCDOT standards and practices throughout the term of this License Agreement." "*Maintenance Costs*" is defined in Exhibit 1 to the License Agreement as "the reasonable expenses of SCDOT incurred in repairing and maintaining the Southern Connector in good condition, reasonable wear and tear excepted,

calculated on a per mile basis in accordance with Section 6.7 hereof. Such expenses shall include, but shall not be limited to, mowing, debris removal, landscaping, planting of shrubs and vegetation, repair of and replacement of guardrails, signage, lighting, and bridge and roadway painting and repair, repairs and replacements to bridges or the roadway necessitated by damage or other casualty thereto and the costs of direct labor for such activities and any cost which would be accounted for by SCDOT as a maintenance cost for a State highway in accordance with standard SCDOT practice. Such costs shall not include any expense which is an Operating Cost.

Under the License Agreement, SCDOT is to be reimbursed for Maintenance Costs from amounts remaining after debt service on the Bonds has been paid and scheduled deposits to the Renewal and Replacement Fund have been accomplished. The Debtor has had insufficient Toll Revenues to permit such reimbursement in the recent past and owes SCDOT in excess of $775,786 for reimbursement of its past maintenance costs and interest. Section 6.7(a) of the License Agreement provides: "To the extent any SCDOT expenses for maintenance are not reimbursed when due, and Toll Revenues are not available to pay the same . . . such failure to pay shall not be deemed to be an Event of Default by the Association under Section 14.1 hereof, so long as any Project Debt remains outstanding, but the unreimbursed amounts shall bear interest at a rate equal to five (5%) percent per annum compounded annually."

The Debtor also has agreed to pay SCDOT a License Fee under Section 5.1 of the License Agreement. Again, the Debtor has had insufficient Toll Revenues to fund the License Fee payment and owes SCDOT in excess of $7,500,000 for past due License Fees plus interest. Such Section 5.1 provides that: "To the extent any portion of the License Fee is not paid when due, and Toll Revenues are not available . . . . such failure to pay shall not be deemed to be an Event of Default by the Association under Section 14.1 hereof, so long as any Project Debt

remains outstanding, but such unpaid amounts shall be deferred and shall be paid upon the next License Fee payment date with interest at a rate equal to five (5%) percent per annum compounded annually."

Section 6.11 of the License Agreement requires Debtor to prepare a renewal and replacement plan for the renewal and replacement of the Southern Connector and to establish and fund the Renewal and Replacement Fund to provide monies to pay the cost of renewal and replacement of the Southern Connector. Debtor is obligated to maintain the balance in the Renewal and Replacement Fund sufficient to pay for the costs of implementing the Renewal and Replacement plan "subject to the availability of Toll Revenues for such purpose." As described above, deposits to the Renewal and Replacement Fund are to be made only after full payment of debt service owing on the Bonds and replenishment of the reserve funds securing the Bonds. Consequently, no deposits have been made to the Renewal and Replacement Fund. The Debtor has no source of funds with which to repair or resurface the Southern Connector. The Debtor's engineers estimate that the costs of the first resurfacing of the Southern Connector, which may be necessary within the next 7 years, will exceed $15,000,000.

**D.    Insolvency of the Debtor; Forbearance Agreement.**

Under Section 14.1(d) of the License Agreement provides that SCDOT may terminate the License Agreement in the event that the Debtor is insolvent, but only if it complies with the terms of the License Agreement, including the rights of the holders of Project Debt, as defined therein. By letter dated June 12, 2009, SCDOT informed the Debtor that it was in default under Section 14.1(d) of the License Agreement. Due to its continuing financial difficulties, the Debtor requested SCDOT not to terminate the License Agreement unless SCDOT gives the Debtor at least 90 days prior notice of its intention to terminate the License Agreement. SCDOT

delivered a letter dated June 12, 2009 and supplemented October 1, 2009 (together, the "***Forbearance Letter***") agreeing to such request. The Forbearance Letter does not waive any claims that SCDOT may have against the Debtor. To date, SCDOT has not given notice of its intent to terminate the License Agreement and SCDOT does not have the right to terminate the License Agreement during the pendency of this bankruptcy proceeding without Court approval. If the License Agreement is terminated, Debtor will have no revenue and be unable to pay any creditors.

**E.      Efforts to Restructure the Debtor's Obligations.**

The Original Study forecast that the Debtor would realize approximately 21,000 paid toll transactions per day within several months after the completion of the highway. A transaction consists of a single payment by a single motorist using the Southern Connector, so a vehicle driving the length of the highway in one direction would pay two tolls, resulting in two transactions. Actual paid transactions after completion in 2001 were less than 7,500. Many reasons have been put forward for the disappointing traffic on the Southern Connector; however, it became increasingly clear to the Debtor over the years that Toll Revenues would not be adequate to meet all of the Debtor's obligations under the License Agreement and Indenture. This is compounded by the financial structure of the Bonds, which include the Capital Appreciation Bonds to "back-load" debt service. Total annual debt service on the Bonds was initially approximately $3.5 million. In 2008 it increased to approximately $9.7 million and is scheduled to increase each year to be nearly $59 million in 2038.

In 2005, the Debtor interviewed international companies engaged in the acquisition of concessions for the financing and operation of toll facilities worldwide. The Debtor executed phase one and phase two agreements with Macquarie Securities (USA), Inc. After over a year of

negotiations and joint effort, the Debtor discontinued this effort. Subsequently, the Debtor engaged Goldman Sachs & Co. ("*Goldman*") as its special financial advisor to investigate the ability of the Debtor to restructure its obligations outside of bankruptcy. Possibilities which were considered included consensual restructuring, a tender and exchange of new securities for the Bonds, and a sale of the Debtor's interest in the License Agreement to a third party. The Debtor was advised that any restructuring of its obligations within the remaining term of the License Agreement would require a substantial reduction in the principal amount of the Bonds.

After an extensive procurement process, in March 2005 the Debtor engaged URS Corporation ("*URS*") as the Debtor's traffic and revenue consultant for purposes of performing a toll rate study as required by the Trust Indenture after the first withdrawal from the Senior Bonds Debt Service Reserve Account. In 2006 and 2007, URS performed two additional annual toll rate studies for the Debtor. Goldman advised that any successful restructuring of the Bonds, either as part of a bankruptcy proceeding or otherwise, would require an "investment grade" traffic and revenue study. The Debtor undertook a qualification analysis and solicited proposals to engage a new traffic and revenue consultant to provide an investment grade traffic and revenue study. The Debtor selected Stantec Consulting Services, Inc. ("*Stantec*") which investigated the Debtor's operation of the Southern Connector, regional development trends and projected traffic growth. Stantec submitted to the Debtor its "investment grade" traffic and revenue study as of May 4, 2009 (the "*Revised Traffic Study*").

In response to the Revised Traffic Study, the Debtor petitioned SCDOT for a toll rate increase that was approved by SCDOT and implemented in November 2009. However, based on the Revised Traffic Study, Goldman's analyses, a preliminary valuation for a concession, and the decline in traffic on the Southern Connector, it became apparent that defeasance of the Bonds

was not possible, and that neither a long-term concession agreement with a new toll road operator nor a conventional refunding of the Debtor's existing Bonds by issuance of new debt was feasible. Goldman informed the Debtor that restructuring the Debtor's debt outside of bankruptcy would be extremely difficult.

Neither the Debtor nor the Trustee know the identity of all of the beneficial owners of the Bonds. The Bonds are "book entry" securities without investment certificates, the ownership of which is administered by the Depository Trust Corporation ("*DTC*") and its direct and indirect participating broker-dealers. If an individual customer of a broker or dealer requests that his or her identity not be disclosed to DTC, such information is generally not available without a subpoena. In November 2008 Goldman investigated the ownership of the Debtor's Bonds and was advised that beneficial ownership information was available for approximately 60% of the Senior Bonds and 40% of the Subordinate Bonds. Such 60% of the Senior Bonds were held by 330 different accounts. Such 40% of the Subordinate Bonds were held by 84 different accounts. The Debtor concluded that, since each of the hundreds of beneficial owners of the Bonds would be required to individually agree to a reduction in the principal amount of their holdings. a restructuring outside of bankruptcy was not feasible. This concluded Goldman's engagement.

The Trustee had undertaken an effort to locate beneficial owners of the Bonds to invite them to participate in informal discussions regarding the future restructuring of the Bonds. The Debtor negotiated confidentiality agreements among the Debtor, the Subordinate Trustee and certain beneficial owners of the Senior Bonds which permitted the Debtor to share non-public information with the Restricted Owners and engage in discussions regarding the adjustment of the Debtor's debts. Since August 2009. the Debtor has entered into confidentiality agreements with four institutional bondholders and one bond insurer (the "*Restricted Owners*") owning or

insuring, in the aggregate, approximately 68% of the outstanding principal amount or future maturity value of the Senior Bonds.[4]

The Debtor and its advisors delivered to the Trustee, the Subordinate Trustee, SCDOT and the Restricted Owners a draft debt adjustment plan (the "*Debtor's Plan*") dated August 13, 2009. The Debtor's Plan was structured to return the greatest value to the owners of the Senior Bonds as possible under the constraints of the remaining term of the License Agreement (2051), the obligation to repair and resurface the road, and the projected toll revenues and operating expenses in the Revised Traffic Study. The Debtor's Plan used the August 5, 2009 estimate provided by AECOM Technical Services, Inc. ("*AECOM*") as the basis for the projected repair and resurfacing needs of the road. Under the Debtor's Plan, since the Senior Bonds would not receive full payment, the Subordinate Bonds would receive no payment.

The Trustee and its counsel engaged Macquarie Capital (USA), Inc. ("*Macquarie*") as financial advisor to the Trustee's counsel to review the Debtor's Plan, consult with the Trustee and their representatives, and propose revisions to the Debtor's Plan. The Debtor's Plan was ultimately rejected by the Trustee, the Subordinate Trustee and the Restricted Owners.

Macquarie met with the Debtor, SCDOT and others and developed an alternative plan (the "*Macquarie Plan*"), which was presented to the Debtor, SCDOT and the Restricted Owners on October 12, 2009. The Macquarie Plan was based on the Stantec projections contained in the Revised Traffic Study, proposed to exchange two series of securities for the outstanding principal and interest owing on the Debtor's Senior Bonds, called for a 35-year extension of the License Agreement and included provisions to fund a substantial portion of the projected road resurfacing and repair costs out of Toll Revenues under the extended License Agreement.

---

[4] Debtor has been advised that the Subordinate Trustee reached out to some of its constituent bondholders to solicit their involvement in the negotiation process, including becoming subject to a confidentiality agreement, but none of the subordinate bondholders elected to participate in the process.

Although the Macquarie Plan did not address repayment of the Subordinate Bonds. implementation of that plan under the assumptions set forth therein would permit the Debtor to use toll revenues to repay a portion of the amounts currently owing to the Subordinate Bondholders during the remaining term of the extended License Agreement after the securities exchanged for the Senior Bonds were repaid.

SCDOT advised the Debtor that SCDOT required legislative clarification of its authority to grant an extension of the License Agreement's term under South Carolina law.  At the October 12, 2009 meeting, it was determined that effectuating a consensual restructuring plan would be aided by the passage of legislation in the 2010 session of the South Carolina General Assembly. Negotiations on the detailed terms of a restructuring plan were held in abeyance while the parties pursued legislation in the South Carolina General Assembly to clarify SCDOT's authority regarding the extension of the License Agreement and its ability to enter into other revisions necessary to restructure the Bonds and the Debtor's obligations to SCDOT.

The Debtor has been advised that, given the broad ownership of the Bonds, it is likely the Debtor will be required to file a bankruptcy petition to implement any plan of adjustment of its debts.  On January 20, 2010, the Board of Directors of the Debtor adopted a resolution authorizing the Debtor's management, when management so deems it appropriate, to file a petition for bankruptcy protection under the United States Bankruptcy Code and to take related actions in connection with the bankruptcy.  This resolution was authorized, among other purposes, in order for the Debtor to be in a position to effectuate a consensual restructuring plan.  Notwithstanding this vote, efforts continued to obtain a consensus among the major creditor constituents for a debt adjustment plan.

1.    In late May of 2010, Debtor was informed by the Trustee and SCDOT that they did not expect to obtain approval of legislation deemed by SCDOT to be necessary to authorize SCDOT to extend the term of the License Agreement.  Since an extension was central to the Macquarie Plan, further discussion would be fruitless. Based upon these developments, Debtor then pursued discussions with the Trustee, Macquarie and the Restricted Owners regarding a debt adjustment plan which could be implemented over the remaining term of the License Agreement without any extension. These efforts resulted in the Restricted Owners developing the terms of a debt adjustment plan as set forth in Attachment 1 hereto ("*Plan Summary*").  In an effort to obtain consent from all interested parties, the Debtor presented the Plan Summary to SCDOT.  SCDOT informed the Debtor on June 16, 2010 that SCDOT would not agree to the debt adjustment plan described in the Plan Summary.  Efforts to solicit or negotiate acceptable changes to the Plan Summary that might be acceptable to SCDOT have failed.  Notwithstanding the rejection by SCDOT of the Plan Summary, Debtor intends to proceed with assistance and input from the Restricted Owners to prepare a Disclosure Statement and Debt Adjustment Plan containing the provisions of the Plan Summary.  Upon completion of this effort and subject to approval of the final language of the Debt Adjustment Plan by the Debtor's Board of Directors, Debtor intends to file such Debt Adjustment Plan and seek approval of such plan by its creditors and the Court.  During the course of finalizing the Debt Adjustment Plan, as outlined in the Plan Summary, Debtor intends to continue its efforts to persuade the SCDOT to support the Plan Summary or, in the alternative, negotiate modifications to provisions of the Plan Summary that SCDOT, the Restricted Owners and the Trustee find acceptable and would result in a consensual plan.  It is uncertain at this time whether SCDOT will agree to the terms of the Plan Summary or any acceptable alternative thereto.

On June 24, 2010, the Debtor filed its chapter 9 petition at the direction of the Executive Vice President and General Manager, Peter Femia. In connection with its petition, the Debtor filed its Statement of Qualifications Under 11 U.S.C. § 109(c), whereby it certified that the Debtor satisfied each of the five requirements proscribed in Section 109(c). As is discussed in more detail below, the Debtor is eligible to be a debtor in a chapter 9 case.

## II.    ARGUMENT

### A.    Connector 2000 Association, Inc. is an Eligible Debtor under Chapter 9.

Section 109(c) of the Bankruptcy Code sets forth the statutory criteria for eligibility as a chapter 9 debtor. The debtor must be (1) a municipality; (2) specifically authorized to be a chapter 9 debtor; (3) insolvent; (4) willing to effect a plan to adjust its debts; and (5) must also meet one of the following four requirements: (i) the debtor has obtained the agreement of creditors holding at least a majority in the amount of claims of each class that the debtor intends to impair through its plan; (ii) the debtor has negotiated in good faith but failed to obtain the agreement of creditors holding at least a majority in the amount of claims of each class that the debtor intends to impair under its plan; (iii) the debtor is unable to negotiate with its creditors because such efforts are impracticable; or (iv) the debtor must reasonably believe that a creditor may attempt to obtain a preference. 11 U.S.C. § 109(c).

These requirements are to be construed broadly to provide relief to further the Bankruptcy Code's underlying policies. *See In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 73 (Bankr. D.N.H. 1994). The Debtor has the burden to establish its eligibility under Section 109(c). *Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.)*, 143 F.3d 1381, 1385 (10th Cir. 1998); *In re Slocum Lake Drainage Dist. of Lake County*, 336 B.R. 387, 390 (Bankr. N.D. Ill 2006). As is detailed below,

the Debtor satisfies each of the requirements of Section 109(c), and therefore is eligible to be a debtor under chapter 9.

1.      **The Debtor is a Municipality.**

Section 109(c)(1) requires that the debtor filing a petition under chapter 9 must be a municipality. A "municipality" is defined in section 101 of the Bankruptcy Code to mean "political subdivision or public agency or instrumentality of a State." 11 U.S.C. § 101(40). While the Code does not define the terms "public agency, or instrumentality of a State," a legal test to determine public agency status was established in *Ex parte York County Natural Gas Authority*, 238 F. Supp. 964, 976 (W.D. S.C. 1965), *modified on other grounds,*, 362 F.2d 78 (4th Cir. 1965), *cert. denied*, 383 U.S. 970 (1966), stating "the legal test between a private or public authority or agency is whether the authority or agency is subject to control by public authority, state or municipal." *Id.* (holding a gas authority with the power to issue revenue bonds was a "municipality" for purposes of Chapter 9). Using this public agency test in *York County*, the court in *In re Greene County Hospital*, 59 B.R. 388, 389-90 (S.D. Miss. 1986), determined that because the hospital was subject to control by a county board of supervisors, it qualified as a public agency and thus met the statutory requirement for "municipality" status. *See also In re Westport Transit District*, 165 B.R. 93 (Bankr. D. Conn 1994) (relying on public agency test set forth in *York County*, the court found the debtor transit district which provided public transportation services, could issue bonds, and had the power of eminent domain was a "municipality").

In this case, the Debtor is a non-profit corporation which is subject to the control by the State of South Carolina, because the SCDOT has the power to approve or disapprove all the members of the Board of Directors of the Debtor. In addition, SCDOT sets the toll rates, which

gives SCDOT control of the financial operation of the Debtor. Under the License Agreement,
SCDOT is obligated to maintain the Southern Connector and the Association is obligated to
reimburse SCDOT for such maintenance and pay a License Fee and fund the repair and
resurfacing of the highway. The ability or inability of the Association to provide such payments
to SCDOT will have a material affect on SCDOT's budget. The Debtor is very much like a
"highway authority" with the exception that it was formed as a privately incorporated entity
rather than a statutory corporation. Moreover, the State of South Carolina Office of Comptroller
General has determined that the Debtor should be included and reported as a component unit of
the State in the State's Consolidated Annual Financial Report. In addition to the Association, the
South Carolina Public Service Authority (Santee-Cooper, an electric utility company), the State
Ports Authority, and the South Carolina Lottery Commission are the other major component
units of the State. Accordingly, the Debtor is a public agency or instrumentality of the State of
South Carolina and is a municipality within the meaning of Section 109(c)(1).

### 2. Debtor is Specifically Authorized Under South Carolina Law to Bring Its Petition.

Section 109(c)(2) requires that a municipality be "specifically authorized, in its capacity
as a municipality or by name, to be a debtor under such chapter by State law, or by a
governmental officer or organization empowered by State law to authorize such entity to be a
debtor under such chapter." 11 U.S.C. § 109(c)(2).

South Carolina has adopted measures which expressly enable municipalities to file
bankruptcy under federal law, without further restriction. S.C. Code Ann. § 6-1-10 provides:

> Power of political subdivisions to proceed under legislation dealing with
> bankruptcy or composition of indebtedness.
>
> The consent of the State is hereby granted to, and all appropriate powers are
> hereby conferred upon, any county, municipal corporation, township, school

> district, drainage district or other taxing or governmental unit organized under the
> laws of the State to institute any appropriate action and in any other respect to
> proceed under and take advantage of and avail itself of the benefits and privileges
> conferred, and to accept the burdens and obligations created, by any existing act
> of the Congress of the United States and any future enactment of the Congress of
> the United States relating to bankruptcy or the composition of indebtedness on the
> part of the counties, municipal corporations, townships, school districts, drainage
> districts and other taxing or governmental units or any of them.

This statute is applicable to the Debtor as the Debtor is a "governmental unit." While the term "governmental unit," is not defined in Title 6 of the South Carolina Code[5] or by case law, under the Bankruptcy Code, "governmental unit" is defined to include a "municipality" and an "instrumentality of a ... State." 11 U.S.C. § 101(27). Accordingly, because the Debtor is a municipality under 11 U.S.C. § 101(40) and for purposes of 11 U.S.C § 109 as detailed above, the Debtor is a "governmental unit" for purposes of S.C. Code Ann. § 6-1-10.

Section 6-1-10 of the South Carolina Code meets the "specific authorization" requirement under 11 U.S.C. § 109(c)(2) and authorizes the Debtor to bring its petition under Chapter 9. *See In re Orange County*. 183 B.R. 594 (Bankr. C.D. Cal. 1995) (holding that under § 109(c), the enabling or other legislation governing the debtor must show such specific authorization by exact, plain and direct language). Additionally, on January 10, 2010, the Board of directors of the Debtor adopted a resolution to authorize the commencement and prosecution of this case.

---

[5] "Governmental Unit" is defined in other titles of the South Carolina Code. S.C. Code Ann. § 13-1-45, which relates to the Department of Commerce's South Carolina Water and Wastewater Infrastructure Fund. defines "Government unit" as "a municipal corporation. county. special purpose district, special service district, commissioners of public works, or another public body. instrumentality or agency of this State including combinations of two or more of these entities acting jointly to construct, own, or operate a qualified project, and any other state or local authority, board. commission, agency, department, or other political subdivision created by the General Assembly or pursuant to the Constitution and laws of this State which may construct, own. or operate a qualified project." S.C. Code Ann. § 34-26-110, which relates to the South Carolina Credit Union Act, defines "Governmental unit" as "any board, agency, department, authority, instrumentality, or other unit or organizations of the federal, state. county, or municipal level of government." S.C. Code Ann. § 36-9-102, which relates to Secured Transactions. defines "Governmental unit" as "a subdivision. agency, department, county, parish, municipality, or other unit of the government of the United States, a state. or a foreign country. The term includes an organization having a separate corporate existence if the organization is eligible to issue debt on which interest is exempt from income taxation under the laws of the United States."

### 3.     The Debtor is Insolvent.

Section 109(c)(3) requires that the chapter 9 petitioner be insolvent.   11 U.S.C.
§ 109(c)(3).  Section 101 of the Bankruptcy Code provides that a municipality is insolvent when
its financial condition is such that it is (i) generally not paying its debts as they become due
unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they
become due.  11 U.S.C. § 101(32)(C).  Insolvency is determine based on the debtor's financial
condition as of the date the petition is filed.  *In re Hamilton Creek Metropolitan Dist.*, 143 F.3d
1381, 1384 (10th Cir. 1998); *In re City of Bridgeport,* 129 B.R. 332, 337 (Bankr. D. Conn.
1991).  As described in detail above, the Debtor is unable to pay its debts as they become due.

As of the date the Debtor filed its petition, it is clear the Debtor is unable to "pay its bills
a they become due" in the upcoming year.  11 U.S.C. § 101(32)(C).  On January 1, 2010 the
Debtor defaulted in the payment of principal and interest on certain of the Bonds.  Additionally,
Debtor has had insufficient Toll Revenues to permit reimbursement to SCDOT for
reimbursement of its past maintenance costs and interest in excess of $900,000.  The Debtor has
also failed to pay SCDOT its License Fee which is in excess of $7.125.000.

In short, the Debtor is insolvent within the meaning of 11 U.S.C. §§ 101(32)(C) and
109(c)(3).

### 4.     The Debtor Desires to Effect a Plan to Adjust its Debts.

Section 109(c)(4) requires that a chapter 9 petitioner desire to effect a plan to adjust its
debts.  As certified by the Debtor in its Statement of Qualifications Under 11 U.S.C. § 109(c),
and demonstrated by the pre-petition efforts of the Debtor, the Debtor desires to effect a plan of
adjustment with respect to its debts in this case.

### 5.     The Negotiation Requirements Under Section 109(c)(5) Are Satisfied.

Section 109(c)(5) requires that a chapter 9 petitioner demonstrate that it has satisfied or is excused from certain pre-petition negotiation standards with respect to its creditors. *See* 11 U.S.C. § 109(c)(5); *In re Valley Health Sys.*, 383 B.R. 156, 165 (Bankr. C.D. Cal. 2008). A debtor must satisfy one of the following four options to satisfy Section 109(c)(5):

> (1) The debtor has obtained the agreement of creditors holding at least a majority in the amount of claims of each class that the debtor intends to impair through its plan;
> (2) The debtor has negotiated in good faith but failed to obtain the agreement of creditors holding at least a majority in the amount of claims of each class that the debtor intends to impair under its plan;
> (3) The debtor is unable to negotiate with its creditors because such efforts are impracticable; or
> (4) The debtor must reasonably believe that a creditor may attempt to obtain a preference.

11 U.S.C. § 109(c)(5). The Debtor satisfies the second and third requirements: it has negotiated in good faith with creditors but has failed to obtain an agreement; and additionally, it is unable to negotiate with its creditors because such negotiation is impracticable.

A.      Debtor satisfied the good faith negotiation standard set forth in 11 U.S.C. § 109(c)(5)(B).

As explained above, the Debtor sought to avoid filing a chapter 9 petition. Knowing that toll revenues would be insufficient to satisfy the outstanding debt obligations, in 2005, the Debtor interviewed international companies engaged in the acquisition of concessions for the financing and operation of toll facilities worldwide. Eventually, the Debtor engaged Goldman as its special financial advisor to investigate the ability of the Debtor to restructure its obligations outside of bankruptcy. Possibilities which were considered included consensual restructuring, a tender and exchange of new securities for the Bonds, and a sale of the Debtor's interest in the License Agreement to a third party. The Debtor was advised that any restructuring of its obligations within the remaining term of the License Agreement would require a substantial reduction in the principal amount of the Bonds. The Debtor was advised that, given the large

number of holders of the Bonds, it was unlikely to obtain the requisite consents of affected bondholders outside of a bankruptcy proceeding.

In August 2009, the Debtor and its advisors delivered to the Trustee, the Subordinate Trustee, SCDOT and the Restricted Owners the Debtor's Plan which proposed a method to address Debtor's insufficient revenue and inability to pay the Bonds. The Debtor's Plan was structured to return the greatest value to the owners of the Senior Bonds as possible under the constraints of the remaining term of the License Agreement, the obligation to repair and resurface the road, and the projected toll revenues and operating expenses in the Revised Traffic Study. The Debtor's Plan proposed a reduction of the principal amount of the Senior Bonds by approximately 35% and rescheduled payment through 2051. Since the Senior Bonds would not receive full payment under the Debtor's Plan, the Subordinate Bonds would receive no payment.

In response, the Trustee and their counsel engaged Macquarie financial advisor to the Trustee's counsel to review the Debtor's Plan, consult with the Trustee and their representatives, and propose revisions to the Debtor's Plan. The Debtor's Plan was ultimately rejected by the Trustee, the Subordinate Trustee and the Restricted Owners. Macquarie met with the Debtor, SCDOT and others and developed the Macquarie Plan, which was presented to the Debtor, SCDOT and the Restricted Owners on October 12, 2009. The Macquarie Plan was based on the Stantec projections, proposed to exchange two series of securities for the outstanding principal and interest owing on the Debtor's Senior Bonds, called for a 35-year extension of the License Agreement and included provisions to fund a substantial portion of the projected road resurfacing and repair costs. Although the Macquarie Plan did not address repayment of the Subordinate Bonds, implementation of that plan under the assumptions set forth therein would permit the Debtor to use toll revenues to repay a portion of the amounts currently owing to the

Subordinate Bondholders during the remaining term of the extended License Agreement after the securities exchanged for the Senior Bonds were repaid.

While Debtor accepted the Macquarie Plan, SCDOT advised the Debtor that SCDOT required legislative clarification of its authority to grant an extension of the License Agreement's term under South Carolina law. At the October 12, 2009 meeting, it was determined that effectuating a consensual restructuring plan would be aided by the passage of legislation in the 2010 session of the South Carolina General Assembly. Negotiations on the detailed terms of a restructuring plan were held in abeyance while the Senior Bond Trustee and SCDOT pursued legislation in the South Carolina General Assembly to clarify SCDOT's authority regarding the extension of the License Agreement and its ability to enter into other revisions necessary to restructure the Bonds and the Debtor's obligations to SCDOT.

In late May of 2010, Debtor was informed by the Trustee and SCDOT that they did not expect to obtain approval of legislation deemed by SCDOT to be necessary to authorize SCDOT to extend the term of the License Agreement. Since an extension was central to the Macquarie Plan, further discussion would be fruitless. Based upon these developments, Debtor then pursued discussions with the Trustee, Macquarie and the Restricted Owners regarding a debt adjustment plan which could be implemented over the remaining term of the License Agreement without any extension. These efforts resulted in the Trustee, the Restricted Owners and Debtor developing the terms of a debt adjustment plan as set forth Plan Summary. The Plan Summary was presented to SCDOT, and the Debtor was informed by SCDOT on June 16, 2010 that SCDOT would not agree to the Plan Summary. Efforts to solicit or negotiate acceptable changes to the Plan Summary that might be acceptable to SCDOT have failed.

B.      Debtor was unable to negotiate with its creditors because such negotiation was
impractical.

Section 109(c)(5)(C) excuses a debtor from satisfying a pre-petition negotiation standard
if "such negotiation is impracticable." 11 U.S.C. § 109(c)(5)(C). The Debtor meets this standard.

Negotiating with creditors pre-petition is impracticable within the meaning of 11 U.S.C.
§ 109(c)(5)(C) if there are a large number of creditors which makes negotiation a plan of
adjustment impossible. *See In re County of Orange,* 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995)
("Congress enacted § 109(c)(5)(C) specifically 'to cover situations in which a very large body of
creditors would render prefiling negotiations impracticable'") (citations omitted).

The Debtor's creditors include an unknown number of bondholders. Neither the Debtor
nor the Trustee know the identity of all of the beneficial owners of the Bonds. The Bonds are
"book entry" securities without investment certificates, the ownership of which is administered
by the DTC and its direct and indirect participating broker-dealers. If an individual customer of a
broker or dealer requests that his or her identity not be disclosed to DTC, such information is
generally not available without a subpoena. In November 2008, Goldman investigated the
ownership of its Bonds and was advised that beneficial ownership information was available for
approximately 60% of the Senior Bonds and 40% of the Subordinate Bonds. Such 60% of the
Senior Bonds were held by 330 different accounts. Such 40% of the Subordinate Bonds were
held by 84 different accounts. The Debtor concluded that, since each of the hundreds of
beneficial owners of the Bonds would be required to individually agree to an extension of their
term and a reduction in the principal amount of their holdings, a restructuring outside of
bankruptcy was not feasible.

Not being able to identify the bondholders make negotiation with these unknown creditors impossible. *See Orange County*, 183 B.R. at 607 ("the impracticality requirement may be satisfied based on the sheer number of creditors involved."); *In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) ("It certainly was impracticable for [debtor] to have included several hundred Series D bondholders in these conceptual discussions.").

Numerosity of creditors is not the only circumstance under which the impracticability requirement might be satisfied. *In re Valley Health Sys.*, 383 B.R. 156, 165 (Bankr. C.D. Ca. 2008). Negotiations may be impractical where it is necessary to file a chapter 9 case to preserve the assets of a municipality, where a delay in filing a petition to negotiate with creditors would put those assets at risk. *See Orange County*, 183 B.R. 594 at 607-08 (negotiation impractical where there was no time to enter into negotiations with its participants due to the threat of liquidation assets); *see also* 2 Collier P 109.04[3][e][iii] at 109-35 ("[W]here it is necessary to file a chapter 9 case to preserve the assets of a municipality, delaying the filing to negotiate with creditors and risking, in the process, the assets of the municipality makes such negotiations impracticable").

Even if Debtor could negotiate with the majority of its creditor, which Debtor cannot, the Chapter 9 filing is necessary to protect the Debtor's main asset- the SCDOT license. SCDOT may terminate the License Agreement pursuant to the terms of the License Agreement due to the Debtor's insolvency. While the SCDOT has agreed not to terminate the License Agreement unless SCDOT gives the Debtor at least 90 days prior notice of the effective date of any such termination, the SCDOT can deliver notice of termination at any time.

Accordingly, the impracticality standard under Section 109(c)(5)(C) is satisfied.

## III.    CONCLUSION

For all the foregoing reasons. the Debtor is eligible to be a debtor under Section 109(c) of

the Bankruptcy Code.

**HAYNSWORTH SINKLER BOYD, P.A.**

By:    /s/ Stanley H. McGuffin
       District ID No. 2833
       William H. Short, Jr.
       District ID No. 3831
       Lindsey Carlberg Livingston
       District ID No. 9518

Post Office Drawer 11889
Columbia, South Carolina 29211
(803) 779.3080 Tel
(803) 765.1243 Fax
bshortl@hsblawfirm.com
llivingston@hsblawfirm.com

June 24, 2010                   Attorneys for Connector 2000 Association,
Inc.

Columbia: 1216929 v.5

# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

In re:

Connector 2000 Association, Inc.,

Debtor.

Case No. 2010-
Chapter 9

DECLARATION OF PETER FEMIA

I, the undersigned Peter Femia do hereby declare and state on oath as follows:

1.      I am the Executive Vice President and General Manager of Connector 2000
Association, Inc. ("*Debtor*") and have been the Executive Vice President and General Manager
since October of 2000.   In my capacity as Executive Vice President and General Manager, I am
personally familiar with the operations of the Debtor and its financial condition.

2.      The Debtor is a South Carolina nonprofit corporation organized as a "public
benefit corporation" under the South Carolina Nonprofit Corporation Act of 1994.  The Debtor
was originally formed to assist the South Carolina Department of Transportation ("*SCDOT*") in
the financing, acquisition, construction, and operation of turnpikes, highway projects, and other
transportation facilities.

3.      The Debtor entered into a license agreement (the "*License Agreement*") with
SCDOT that granted the Debtor rights and obligations to finance, acquire, construct, and operate
an approximately 16 mile fully controlled access toll highway (the "*Southern Connector*") and
to construct the South Carolina Highway 153 Extension (the "*SC 153 Extension*") (collectively,
the "*Projects*").

4.      Under Section 13.1(a) of the License Agreement, the term of License Agreement
expires 50 years after the date of substantial completion of the Projects. SCDOT executed a

certificate of substantial completion dated March 29, 2001 resulting in an expiration date in

2051. SCDOT accepted the Southern Connector as a part of the State Highway System. SCDOT

is the State agency generally responsible for assuring that elements of the State Highway System

are safe for the travelling public and in good repair.

5.     To finance the Southern Connector, the Debtor issued $200,177,680 original

principal amount of Connector 2000 Association, Inc. Toll Road Revenue Bonds (Southern

Connector Project, Greenville, South Carolina), Series 1998A, B and C (the "*Bonds*") on

February 11, 1998 pursuant to a Master Indenture of Trust and a First Supplemental Indenture of

Trust, each dated as of February 1, 1998 (together, the "*Trust Indenture*"[1]) between the Debtor

and First Union National Bank, as predecessor in trust to U.S. Bank, National Association, as

trustee (the "*Trustee*"). The Debtor was only responsible for financing the Southern Connector

portion of the Projects.  SCDOT provided financing for the SC 153 Extension portion of the

Projects.

6.     The Bonds were sold in three series: (i) $66,200,000 principal amount of Senior

Current Interest Bonds, Series 1998A (the "*Series 1998A Bonds*"), (ii) $87,385,622 original

principal amount of Senior Capital Appreciation Bonds, Series 1998B (the "*Series 1998B*

*Bonds*" and, together with the Series 1998A Bonds, the "*Senior Bonds*") and (iii) $46,592,058

original principal amount of Subordinate Capital Appreciation Bonds, Series 1998C (the "*Series*

*1998C Bonds*" or the "*Subordinate Bonds*"). The Series 1998A Bonds consist of two term

bonds, $21,400,000 5.25% bonds maturing, subject to earlier mandatory sinking fund

redemption, on January 1, 2023 and $44,800,000 5.375% bonds maturing, subject to earlier

mandatory sinking fund redemption, on January 1, 2038. Interest on the Series 1998A Bonds is

---

[1] Capitalized terms not otherwise defined herein are intended to have the meaning assigned in the Trust Indenture, if
defined therein.

payable semi-annually on January 1 and July 1 of each year and the principal of the Series
1998A Bonds is subject to mandatory sinking fund redemption on January 1 of each year
commencing January 1, 2008 and continuing to January 1, 2038. The Series 1998B Bonds and
the Series 1998C Bonds (together, the "*Capital Appreciation Bonds*") consist of zero-coupon
obligations which accrete interest and mature serially starting January 1, 2008 and continuing
until January 1, 2038. Interest on a Capital Appreciation Bonds is not payable until such bond
matures. No interest has been paid on the outstanding Capital Appreciation Bonds. The accreted
value of the Capital Appreciation Bonds has increased from the original combined principal
amount of $133,977,680 to in excess of $250,000,000 today.

7.      The Articles of Incorporation of the Debtor stipulate that:

- upon the retirement or defeasance of any Project Debt issued by Debtor to
  provide the highway all property provided by such Project Debt, and any
  additions thereto, will be conveyed by the Debtor to SCDOT;

- no director of Debtor shall be deemed qualified as a director until the
  election or appointment of such director has been approved by the
  SCDOT. *See* Article 8(b).

- SCDOT has the power to remove any director of the Debtor for cause and
  to appoint a successor for the remainder of such director's term.

- the provisions of Article 8 of the Articles of Incorporation of the Debtor
  may not be amended without the approval of SCDOT.

8.      The rights and powers of SCDOT set forth in the Articles of Incorporation of the
Debtor are confirmed in Sections 3.9 and 9.2(b) of the By-laws of the Debtor.

3

9.      The License Agreement permits the Debtor to charge tolls of the users of the Southern Connector. The toll rates to be charged by the Debtor are set by SCDOT pursuant to Section 6.4 of the License Agreement. The initial approved schedule of toll rates for use of the Southern Connector throughout the term of the License Agreement is attached to the License Agreement as Exhibit 3.

10.     The State of South Carolina Office of Comptroller General has determined that the Debtor is a component unit of the State of South Carolina and of SCDOT because (i) SCDOT controls the governing body of the Debtor since all directors are subject to prior approval by SCDOT, and (ii) SCDOT sets the toll rates for the only means of revenue of the Debtor, making the Debtor fiscally dependent upon SCDOT.   The Southern Connector is included as a component unit of the State of South Carolina in the Consolidated Annual Financial Report of the State of South Carolina.

11.     All of the net assets of the Debtor will revert to SCDOT upon the payment or defeasance of the Bonds.

12.     At the time the Bonds were issued, Wilbur Smith Associates prepared a Traffic and Revenue Study (the *Original Study*") to estimate the future utilization of the road and toll revenues and operating expenses of the Debtor.   The actual traffic on the highway and toll revenues received by the Debtor have been substantially less than projected in the Original Study.

13.     Currently, the Debtor is not receiving sufficient toll revenues to pay debt service on the Senior Bonds or the Subordinate Bonds.  Prior to January 1, 2010, such shortfalls had been covered by withdrawals from the Debt Service Reserve Accounts (funded by original sale

proceeds of the Bonds plus interest earnings thereon) maintained by the Trustee under the Trust Indenture.

14.    After the interest payment was made on July 1, 2009, the Trustee determined that it would not make a transfer from the Debt Service Reserve Accounts to fund a partial payment of debt service on the Bonds due on January 1, 2010.  The Trustee advised bondholders that unless a restructuring of the Bonds was implemented prior to January 1, 2010, no debt service payment would be made.

15.    On January 1, 2010 the Debtor defaulted in the payment of principal and interest on certain of the Bonds.

16.    As it became apparent to the Trustee that an Event of Default under the Trust Indenture was likely, the Trustee requested the Debtor enter into a Second Supplemental Indenture of Trust dated October 16, 2002 (the "*Second Supplement*") and a separate instrument appointing HSBC Bank USA, NA as standby co-trustee (the "*Subordinate Trustee*") for the Subordinate Bonds. The Second Supplement became effective January 1, 2008 and the interests of the Subordinate Bonds are represented by the Subordinate Trustee.

17.    In compliance with the provisions of its Continuing Disclosure Agreement under the Trust Indenture, the Debtor timely filed the required "Event Notices" notifying bondholders of the January 1, 2010 payment default, various downgrades in the published credit rating on the Bonds by Standard & Poor's Ratings Service and of each withdrawal from the Debt Service Reserve Accounts which withdrawals were used to pay a portion of the interest or principal payments.

18.    Due to these factors, the Debtor has experienced significant operating losses.  As of December 31, 2009, the Debtor's total accrued "net deficit" is ($173,302,626.00).

19.     As required under the Trust Indenture, the Debtor engaged a traffic and revenue consultant to prepare a series of toll rate studies to advise the Debtor regarding the toll rates necessary to maximize toll revenue from the Southern Connector.  Each such study concluded that, even if the recommendations of the consultant were effected, projected toll revenues would be insufficient to pay principal and interest on the Bonds in full.

20.     Despite the Debtor's implementation of the scheduled toll rate increase in 2005 and an additional toll increase effective November 1, 2009, the Debtor has been unable to comply with the Revenue Covenant under the Trust Indenture.  The Trustee notified the Debtor that as of January 1, 2008, the Debtor is in default under the Trust Indenture.

21.     The Bonds are secured by the Trust Estate, which includes (a) all bond funds except the Rebate Fund and the Renewal and Replacement Fund, (b) all Revenues as defined in the bond documents, (c) all of the Debtor's rights in its License Agreement with SCDOT, and (d) any other property assigned to the Trustee by the Debtor.

22.     The Trust Indenture operates similarly to a "lock box" obligating the Debtor to daily transfer toll revenues to the Trustee for deposit into the Revenue Fund to be applied by the Trustee monthly to pay the Debtor's obligations, including debt service. The Trustee is obligated to transfer money on a monthly basis from the Revenue Fund to the other various funds established under the Trust Indenture in the priority listed below (the "*Flow of Funds Schedule*"):

A. Operating costs budgeted for the next succeeding month shall be distributed to the Debtor.

B. The Debtor shall transfer amounts to the Rebate Fund so that the amounts deposited equal the required amounts (if any).

C.  The Trustee shall transfer to the Senior Bonds Debt Service Account amounts which, when added to other amounts in the Senior Bonds Debt Service Account, and available for such purposes, will provide for the accumulation, in substantially equal monthly installments, of the amounts required to pay the sum of: (i) any interest to become due and payable on each series of outstanding Senior Bonds on the next interest payment date (within the next six months) for such Series; and (ii) any principal installments to become due and payable on any series of outstanding Senior Bonds on or before the next date (within the next 12 months) on which such principal installment is payable.

D.  If the Senior Bonds Debt Service Reserve Account contains less than the Senior Bonds Debt Service Reserve Account Requirement, the Trustee shall transfer into the Senior Bonds Debt Service Reserve Account, an amount equal to 1/24 of the Senior Bonds Debt Service Reserve Account Requirement or the amount needed to attain the Senior Bonds Debt Service Reserve Account Requirement, whichever is less.  The transfers shall continue until the Senior Bonds Debt Service Reserve Account contains the Senior Bonds Debt Service Reserve Account Requirement.

E.  The Trustee shall transfer to the Subordinate Bonds Debt Service Account amounts which, when added to other amounts in the Subordinate Bonds Debt Service Account and available for such purposes, will provide for the accumulation, in substantially equal monthly installments, or otherwise as may be provided in any Supplemental Indenture, of the amounts required to pay the sum of: (i) any interest to become due and payable on each series of outstanding Subordinate Bonds (within the next six months) on the next interest payment date for such Series; and (ii) any principal installments to become due and payable on any series of outstanding Subordinate Bonds on or before the next date (within the next 12 months) on which such principal installment is payable.

F.  If the Subordinate Bonds Debt Service Reserve Account contains less than the Subordinate Bonds Debt Service Reserve Account Requirement, the Trustee shall transfer into the Subordinate Bonds Debt Service Reserve Account, an amount equal to 1/60 of the Subordinate Bonds Debt Service Reserve Account Requirement or the amount needed to attain the Subordinate Bonds Debt Service Reserve Account Requirement, whichever is less. All transfers shall continue until the Subordinate Bonds Debt Service Reserve Account contains the Subordinate Bonds Debt Service Reserve Account Requirement.

G.  After the date of Final Completion of the Southern Connector Project, the Trustee shall deposit into the Renewal and Replacement Fund the amounts included in the annual budget of the Association, which are required pursuant to the Renewal and Replacement Plan then in effect under the License Agreement.

H.  The Trustee shall pay to SCDOT amounts certified by an Authorized Debtor Representative as being due SCDOT for (i) the Maintenance Costs reimbursable to SCDOT under the License Agreement, together with any accruals from prior periods and interest owed thereon under the License Agreement and (ii) any reimbursements to

SCDOT for condemnation awards for rights of way for the Southern Connector Project in excess of the amounts reserved therefore on the Completion Date.

I.  The Trustee shall pay amounts certified by an Authorized Association Representative as being due SCDOT for the License Fee owing to SCDOT under the License Agreement, together with any accruals from prior periods and any interest owed thereon under the License Agreement.

J.  Money remaining in the Revenue Fund shall be used by the Trustee to make or provide for all deposits, payments, or transfers certified by an Authorized Association Representative as being required by any agreement or other instrument creating or evidencing any obligation of the Debtor which is not a Senior Bond or Subordinate Bond, at the time and in the amount provided for in such instrument.

K.  The Trustee shall transfer any money remaining in the Revenue Fund at the end of any fiscal year to the Program Fund.

The rights and obligations of the parties to the License Agreement which are to be satisfied from Toll Revenues are subject to the same Flow of Funds Schedule which is attached to the License Agreement as Exhibit 5.

23.    Due to the shortfall of Toll Revenues as described above, the Debtor has defaulted on the payment of principal and interest on certain of the Bonds, the funds remaining in the Debt Service Reserve Accounts have been frozen by the Trustee. there are no funds in the Renewal and Replacement Fund or the Program Fund and no License Fees or other amounts have been paid to SCDOT.

24.    The Trust Indenture provides that the Debtor is to receive a monthly payment equal to one twelfth of the budgeted cost of operating the Southern Connector ("*Operating Costs*"). Budgeted operating costs for 2010 total $2,940,000 resulting in a monthly distribution to the Debtor from the Trustee equal to $245,000. This amount is paid before any transfer is made for debt service on the Bonds but does not include any payment for Maintenance Costs, as defined in the Trust Indenture.

25.     Section 6.7(a) of the License Agreement provides: "Following Substantial Completion, SCDOT shall maintain in good operating condition, reasonable wear and tear excepted, S.C. 153 and the Southern Connector in accordance with applicable State and SCDOT standards and practices throughout the term of this License Agreement." *"Maintenance Costs"* is defined in Exhibit 1 to the License Agreement as "the reasonable expenses of SCDOT incurred in repairing and maintaining the Southern Connector in good condition, reasonable wear and tear excepted, calculated on a per mile basis in accordance with Section 6.7 hereof. Such expenses shall include, but shall not be limited to, mowing, debris removal, landscaping, planting of shrubs and vegetation, repair of and replacement of guardrails, signage, lighting, and bridge and roadway painting and repair, repairs and replacements to bridges or the roadway necessitated by damage or other casualty thereto and the costs of direct labor for such activities and any cost which would be accounted for by SCDOT as a maintenance cost for a State highway in accordance with standard SCDOT practice. Such costs shall not include any expense which is an Operating Cost.

26.     Under the License Agreement, SCDOT is to be reimbursed for Maintenance Costs from amounts remaining after debt service on the Bonds has been paid and scheduled deposits to the Renewal and Replacement Fund have been accomplished. The Debtor has had insufficient Toll Revenues to permit such reimbursement in the recent past and owes SCDOT in excess of $775,786 for reimbursement of its past maintenance costs and interest. Section 6.7(a) of the License Agreement provides: "To the extent any SCDOT expenses for maintenance are not reimbursed when due, and Toll Revenues are not available to pay the same . . . such failure to pay shall not be deemed to be an Event of Default by the Association under Section 14.1 hereof,

so long as any Project Debt remains outstanding, but the unreimbursed amounts shall bear interest at a rate equal to five (5%) percent per annum compounded annually."

27.     The Debtor also has agreed to pay SCDOT a License Fee under Section 5.1 of the License Agreement. Again, the Debtor has had insufficient Toll Revenues to fund the License Fee payment and owes SCDOT in excess of $7,500,000 for past due License Fees plus interest. Such Section 5.1 provides that: "To the extent any portion of the License Fee is not paid when due, and Toll Revenues are not available . . . . such failure to pay shall not be deemed to be an Event of Default by the Association under Section 14.1 hereof, so long as any Project Debt remains outstanding, but such unpaid amounts shall be deferred and shall be paid upon the next License Fee payment date with interest at a rate equal to five (5%) percent per annum compounded annually."

28.     Section 6.11 of the License Agreement requires Debtor to prepare a renewal and replacement plan for the renewal and replacement of the Southern Connector and to establish and fund the Renewal and Replacement Fund to provide monies to pay the cost of renewal and replacement of the Southern Connector. Debtor is obligated to maintain the balance in the Renewal and Replacement Fund sufficient to pay for the costs of implementing the Renewal and Replacement plan "subject to the availability of Toll Revenues for such purpose." As described in paragraph 22G above, deposits to the Renewal and Replacement Fund are to be made only after full payment of debt service owing on the Bonds and replenishment of the reserve funds securing the Bonds. Consequently, no deposits have been made to the Renewal and Replacement Fund. The Debtor has no source of funds with which to repair or resurface the Southern Connector.

29.    The Debtor's engineers estimate that the costs of the first resurfacing of the Southern Connector, which may be necessary within the next 7 years, will exceed $15,000,000.

30.    Under Section 14.1(d) of the License Agreement provides that SCDOT may terminate the License Agreement in the event that the Debtor is insolvent, but only if it complies with the terms of the License Agreement, including the rights of the holders of Project Debt, as defined therein.

31.    By letter dated June 12, 2009, SCDOT informed the Debtor that it was in default under Section 14.1(d) of the License Agreement.

32.    Due to its continuing financial difficulties, the Debtor requested SCDOT not to terminate the License Agreement unless SCDOT gives the Debtor at least 90 days prior notice of its intention to terminate the License Agreement. SCDOT delivered a letter dated June 12, 2009 and supplemented October 1, 2009 (together, the "*Forbearance Letter*") agreeing to such request. The Forbearance Letter does not waive any claims that SCDOT may have against the Debtor.

33.    To date, SCDOT has not given notice of its intent to terminate the License Agreement and SCDOT does not have the right to terminate the License Agreement during the pendency of this bankruptcy proceeding without Court approval. If the License Agreement is terminated, Debtor will have no revenue and be unable to pay any creditors.

34.    The Original Study forecast that the Debtor would realize approximately 21,000 paid toll transactions per day within several months after the completion of the highway. A transaction consists of a single payment by a single motorist using the Southern Connector, so a vehicle driving the length of the highway in one direction would pay two tolls, resulting in two transactions.

35.    Actual paid transactions after completion in 2001 were less than 7,500. Many reasons have been put forward for the disappointing traffic on the Southern Connector, however, it became increasingly clear to the Debtor over the years that despite growth rates in excess of those projected in the Original Study, Toll Revenues would not be adequate to meet all of the Debtor's obligations under the License Agreement and Indenture.

36.    In 2005, the Debtor interviewed international companies engaged in the acquisition of concessions for the financing and operation of toll facilities worldwide. The Debtor executed phase one and phase two agreements with Macquarie Securities (USA), Inc. After over a year of negotiations and joint effort, the Debtor discontinued this effort.

37.    Subsequently, the Debtor engaged Goldman Sachs & Co. ("*Goldman*") as its special financial advisor to investigate the ability of the Debtor to restructure its obligations outside of bankruptcy. Possibilities which were considered included consensual restructuring, a tender and exchange of new securities for the Bonds, and a sale of the Debtor's interest in the License Agreement to a third party. The Debtor was advised that any restructuring of its obligations within the remaining term of the License Agreement would require a substantial reduction in the principal amount of the Bonds.

38.    After an extensive procurement process, in March 2005 the Debtor engaged URS Corporation ("*URS*") as the Debtor's traffic and revenue consultant for purposes of performing a toll rate study as required by the Trust Indenture after the first withdrawal from the Senior Bonds Debt Service Reserve Account.

39.    In 2006 and 2007, URS performed two additional annual toll rate studies for the Debtor. Goldman advised that any successful restructuring of the Bonds, either as part of a bankruptcy proceeding or otherwise, would require an "investment grade" traffic and revenue

study. The Debtor undertook a qualification analysis to engage a new traffic and revenue consultant to provide an investment grade traffic and revenue study.

40.     The Debtor selected Stantec Consulting Services, Inc. ("*Stantec*") which investigated the Debtor's operation of the Southern Connector, regional development trends and projected traffic growth. Stantec submitted to the Debtor its "investment grade" traffic and revenue study as of May 4, 2009 (the "*Revised Traffic Study*").

41.     In response to the Revised Traffic Study the Debtor petitioned SCDOT for a toll rate increase that was approved by SCDOT and implemented in November 2009. However, based on the Revised Traffic Study, Goldman's analyses, a preliminary valuation for a concession, and the decline in traffic on the Southern Connector, it became apparent that defeasance of the Bonds was not possible, and that neither a long-term concession agreement with a new toll road operator nor a conventional refunding of the Debtor's existing Bonds by issuance of new debt was feasible. Goldman informed the Debtor that restructuring the Debtor's debt outside of bankruptcy would be extremely difficult.

42.     Neither the Debtor nor the Trustee know the identity of all of the beneficial owners of the Bonds. The Bonds are "book entry" securities without investment certificates, the ownership of which is administered by the Depository Trust Corporation ("*DTC*") and its direct and indirect participating broker-dealers. If an individual customer of a broker or dealer requests that his or her identity not be disclosed to DTC, such information is generally not available without a subpoena.

43.     In November 2008 Goldman investigated the ownership of the Debtor's Bonds and was advised that beneficial ownership information was available for approximately 60% of the Senior Bonds and 40% of the Subordinate Bonds. Such 60% of the Senior Bonds were held

by 330 different accounts. Such 40% of the Subordinate Bonds were held by 84 different accounts. The Debtor concluded that, since each of the hundreds of beneficial owners of the Bonds would be required to individually agree to a reduction in the principal amount of their holdings, a restructuring outside of bankruptcy was not feasible.

44.    The Trustee had undertaken an effort to locate beneficial owners of the Bonds to invite them to participate in informal discussions regarding the future restructuring of the Bonds.

45.    The Debtor negotiated confidentiality agreements among the Debtor, the Subordinate Trustee and certain beneficial owners of the Senior Bonds which permitted the Debtor to share non-public information with the Restricted Owners and engage in discussions regarding the adjustment of the Debtor's debts.

46.    Since August 2009, the Debtor has entered into confidentiality agreements with four institutional bondholders and one bond insurer owning or insuring, in the aggregate, approximately 68% of the outstanding principal amount or future maturity value of the Senior Bonds (the "*Restricted Owners*").

47.    The Debtor has been advised that the Subordinate Trustee reached out to some of its constituent bondholders to solicit their involvement in the negotiation process, including becoming subject to a confidentiality agreement, but none of the subordinate bondholders elected to participate in the process.

48.    The Debtor and its advisors delivered to the Trustee, the Subordinate Trustee, SCDOT and the Restricted Owners a draft debt adjustment plan (the "*Debtor's Plan*") dated August 13, 2009.

49.    The Debtor's Plan was structured to return the greatest value to the owners of the Senior Bonds as possible under the constraints of the remaining term of the License Agreement

(2051), the obligation to repair and resurface the road, and the projected toll revenues and operating expenses in the Revised Traffic Study.

50.      The Debtor's Plan used the August 5, 2009 estimate provided by AECOM Technical Services, Inc. ("*AECOM*") as the basis for the projected repair and resurfacing needs of the road.

51.      Under the Debtor's Plan, since the Senior Bonds would not receive full payment, the Subordinate Bonds would receive no payment.

52.      The Trustee and their counsel engaged Macquarie Capital (USA), Inc. ("*Macquarie*") as financial advisor to the Trustee's counsel to review the Debtor's Plan, consult with the Trustee and their representatives, and propose revisions to the Debtor's Plan. The Debtor's Plan was ultimately rejected by the Trustee, the Subordinate Trustee and the Restricted Owners.

53.      Macquarie met with the Debtor, SCDOT and others and developed an alternative plan (the "*Macquarie Plan*"), which was presented to the Debtor, SCDOT and the Restricted Owners on October 12, 2009.   The Macquarie Plan was based on the Stantec projections contained in the Revised Traffic Study, proposed to exchange two series of securities for the outstanding principal and interest owing on the Debtor's Senior Bonds, called for a 35-year extension of the License Agreement and included provisions to fund a substantial portion of the projected road resurfacing and repair costs out of Toll Revenues under the extended License Agreement. Although the Macquarie Plan did not address repayment of the Subordinate Bonds, implementation of that plan under the assumptions set forth therein would permit the Debtor to use toll revenues to repay a portion of the amounts currently owing to the Subordinate

Bondholders during the remaining term of the extended License Agreement after the securities exchanged for the Senior Bonds were repaid.

54.    SCDOT advised the Debtor that SCDOT required legislative clarification of its authority to grant an extension of the License Agreement's term under South Carolina law.  At the October 12, 2009 meeting, it was determined that effectuating a consensual restructuring plan would be aided by the passage of legislation in the 2010 session of the South Carolina General Assembly.  Negotiations on the detailed terms of a restructuring plan were held in abeyance while the parties pursued legislation in the South Carolina General Assembly to clarify SCDOT's authority regarding the extension of the License Agreement and its ability to enter into other revisions necessary to restructure the Bonds and the Debtor's obligations to SCDOT.

55.    The Debtor has been advised that, given the broad ownership of the Bonds, it is likely the Debtor will be required to file a bankruptcy petition to implement any plan of adjustment of its debts.  On January 20, 2010. the Board of Directors of the Debtor adopted a resolution authorizing the Debtor's management, when management so deems it appropriate, to file a petition for bankruptcy protection under the United States Bankruptcy Code and to take related actions in connection with the bankruptcy.  This resolution was authorized, among other purposes, in order for the Debtor to be in a position to effectuate a consensual restructuring plan.  Notwithstanding this vote. efforts continued to obtain a consensus among the major creditor constituents for a debt adjustment plan.

56.    In late May of 2010. Debtor was informed by the Trustee and SCDOT that they did not expect to obtain approval of legislation deemed by SCDOT to be necessary to authorize SCDOT to extend the term of the License Agreement.  Since an extension was central to the Macquarie Plan. further discussion would be fruitless.  Based upon these developments, Debtor

then pursued discussions with the Trustee, Macquarie and the Restricted Owners regarding a debt adjustment plan which could be implemented over the remaining term of the License Agreement without any extension. These efforts resulted in the Restricted Owners and Debtor developing the terms of a debt adjustment plan as set forth in Attachment 1 hereto ("*Plan Summary*").

57.    In an effort to obtain consent from all interested parties. the Debtor presented the Plan Summary to SCDOT. SCDOT informed the Debtor on June 16, 2010 that SCDOT would not agree to the debt adjustment plan described in the Plan Summary. Efforts to solicit or negotiate acceptable changes to the Plan Summary that might be acceptable to SCDOT have failed. Notwithstanding the rejection by SCDOT of the Plan Summary. Debtor intends to proceed with assistance and input from the Restricted Owners to prepare a Disclosure Statement and Debt Adjustment Plan containing the provisions of the Plan Summary. Upon completion of this effort. and subject to approval of the final language of the Debt Adjustment Plan by the Debtor's Board of Directors, Debtor intends to file such Debt Adjustment Plan and seek approval of such plan by its creditors and the Court. During the course of finalizing the Debt Adjustment Plan, as outlined in the Plan Summary. Debtor intends to continue its efforts to persuade the SCDOT to support the Plan Summary or, in the alternative, negotiate modifications to provisions of the Plan Summary that SCDOT, the Restricted Owners and the Trustee find acceptable and would result in a consensual plan. It is uncertain at this time whether SCDOT will agree to the terms of the Plan Summary or any acceptable alternative thereto.

WITNESS my hand this 2⁴ᵗʰ day of June , 2010. at Grooruille . South Carolina.

_____
Peter Femia

17

# EXHIBIT 1 TO PETER FEMIA DECLARATION

Draft -- 6/11/10

## BANKRUPTCY PLAN TERM SHEET

This term sheet summarizes certain terms and conditions of a bankruptcy plan (the "Plan") to be proposed by Connector 2000 Association, Inc. (the "Association"). This term sheet is intended solely to provide an overview of the general terms of the Plan, to provide a framework for the parties as they proceed with discussions of the proposed transaction, and does not constitute an agreement with respect to the definitive terms for any transaction.

| PRINCIPAL PARTIES TO PROPOSED PLAN SUPPORT AGREEMENT | |
|---|---|
| The Association | Connector 2000 Association, Inc. |
| Series A Bondholders | Holders of Current Interest Bonds, Series 1998A (the "Series A Bonds") issued under that certain Master Indenture of Trust dated as of February 1, 1998 (the "Master Indenture") between the Association and U.S. Bank National Association, as Trustee (the "Trustee") |
| Series B Bondholders | Holders of Senior Capital Appreciation Bonds, Series 1998B (the "Series B Bonds") issued under the Master Indenture |
| [South Carolina Department of Transportation ("SCDOT")[1] | Party to that certain License Agreement dated as of February 11, 1998, between SCDOT and the Association (the "License Agreement")] |
| **POST-CONSUMMATION CAPITAL STRUCTURE** | |
| | • Up to $172,115,908 aggregate principal amount of (i) senior secured current interest bonds, accruing interest at 5.80% per annum payable semi-annually in cash, and maturing in 2051, (ii) senior secured capital appreciation bonds, accreting interest at 5.80 % per annum, maturing annually and with a final maturity in 2051, and/or (iii) senior secured current interest bonds, accruing interest at 5.80% per annum payable semi-annually in kind for a fixed period to be determined by the Majority Bondholders (as defined herein) reasonably acceptable to the Association and set forth in the Plan, and thereafter in cash, and maturing in 2051 (collectively, the "Tier 1 Bonds").[2] The Association's |

---

[1] SCDOT may be a signatory to the Plan Support Agreement in its sole discretion, but that Agreement shall become effective upon its execution by the other parties thereto, regardless of whether and when SCDOT executes the Agreement.

[2] The type, principal amount and interest rate of the Tier 1 Bonds are subject to revision (e.g. reduced principal amount but increased interest rate) based on advice of bond counsel, but in any case shall provide for semi-annual payments that aggregate annually 83.5% of the Association's Projected Net Revenues in such year. The principal amount of the Tier 1 Bonds may also be reduced with the prior written consent of the Majority Bondholders to the extent the Majority Bondholders determine advisable, including to try to cause the Tier 1 Bonds to be treated as investment grade debt, in which case the principal amount of the Tier 2 Bonds shall be increased to the extent the Majority Bondholders determine (but not more than a dollar for dollar increase). As used in this Plan Term Sheet, "Projected Net Revenues" means (i) projected revenues for the Southern Connector for the relevant year, as set forth

obligations in respect of the Tier 1 Bonds will be secured by a first lien on all of the Association's properties and assets, including the present collateral assignment of the Association's rights under the amended License Agreement.

- $19,496,961 aggregate principal amount of (i) senior subordinated secured capital appreciation bonds accreting interest at 5.80% per annum, payable at the option of the Association in cash (but only if the Association is current in making all payments in respect of the Tier 1 Bonds), and maturing in 2051, and/or (ii) senior subordinated secured current interest bonds, accruing interest at 5.80% per annum payable semi-annually in kind for a fixed period to be determined by the Majority Bondholders reasonably acceptable to the Association and set forth in the Plan, and thereafter in cash, and maturing in 2051 (collectively, the "Tier 2 Bonds").[3] The Association's obligations in respect of the Tier 2 Bonds will be secured by a second lien on all of the Association's properties and assets, including the present collateral assignment of the Association's rights under the amended License Agreement. The Tier 2 Bonds will be subordinated to the Tier 1 Bonds in all respects, including in right of payment and priority of liens.

- $4,215,099 aggregate principal amount of (i) junior subordinated secured capital appreciation bonds accruing interest at 5.80% per annum, payable at the option of the Association in cash (but only if the Association is current in making all payments in respect of the Tier 1 Bonds and the Tier 2 Bonds), and maturing in 2051, and/or (ii) junior subordinated secured current interest bonds, accruing interest at 5.80% per annum, payable semi-annually in kind, and maturing in 2051 (collectively, the "Tier 3 Bonds", and together with the Tier 1 Bonds and the Tier 2 Bonds, the "New Bonds").[4] The Association's obligations in respect of the Tier 3 Bonds will be secured by a third lien on all of the Association's properties and assets, including the present collateral assignment of the Association's rights under the amended License Agreement. The Tier 3 Bonds shall be subordinated to the Tier 1 Bonds and Tier 2 Bonds in all respects, including in right of payment and priority of liens, and such subordination provisions shall be subject to the approval (not to be unreasonably withheld) of the Trustee for the Series A Bonds and the Series B Bonds.[5]

---

in Figure 4.4.2 of the Traffic and Revenue Report for Southern Connector dated May 4, 2009, prepared by Stantec Consulting Services Inc. (the "Stantec Report"), less (ii) the Association's projected Operating Costs for such year, as determined by increasing the aggregate amount of expenses set forth in the Association's Annual Budget for 2010 (less certain extraordinary expenses) by 3.0% per annum for each year after 2010, plus (iii) projected non-operating revenues and other income of the Association for such year, such as interest earned on invested funds.

[3] The type, principal amount and interest rate of the Tier 2 Bonds are subject to revision (i.e. reduced principal amount but increased interest rate) based on advice of bond counsel, but in any case shall provide for semi-annual payments that aggregate annually 9.5% of the Association's Projected Net Revenues in such year. The principal amount of the Tier 2 Bonds may also be increased under the circumstances described in footnote 2.

[4] The type, principal amount and interest rate of the Tier 3 Bonds are subject to revision (i.e. reduced principal amount but increased interest rate) based on advice of bond counsel, but in any case shall provide for semi-annual payments that aggregate annually 2.0% of the Association's Projected Net Revenues in such year.

[5] The Tier 3 Bonds will be issued only if the holders of the Series C Bonds vote by the requisite percentages to accept the Plan and holders of at least __% of the outstanding accreted amount of the Series C Bonds do not object to confirmation of the Plan.

HSB 1361649 v9

|  | <ul><li>The New Bonds will be governed by a New Master Indenture of Trust (the "New Master Indenture") between the Association and U.S. Bank National Association, as Trustee (the "New Trustee")</li><li>The New Bonds will be expressly non-recourse to the Association and payable solely from the Net Revenues. For the purposes of this Plan Term Sheet, "Net Revenues" and "Operating Costs" have the respective meanings currently provided in the Master Indenture. As used herein, "Maintenance Costs" has the meaning currently provided in the Master Indenture but also includes the cost of repairing, resurfacing, renewing and replacing the Southern Connector highway and bridges, approaches and other associated assets owned by SCDOT.</li></ul> |

### PLAN TIMELINE

|  | <ul><li>By no later than [June 21], 2010: Association to commence a bankruptcy case and to file motion seeking an order approving the assumption of the Plan Support Agreement</li><li>By no later than [July 15], 2010: Association to file the Plan and accompanying disclosure statement in support of the Plan (the "Disclosure Statement")</li><li>_____, 2010: Hearing to consider approval of Disclosure Statement</li><li>_____, 2010: Plan confirmation hearing</li><li>_____, 2010: Plan consummation</li></ul> |

### TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

| Holders of Series A Bonds and Holders of Series B Bonds | Tier 1 Bonds and Tier 2 Bonds. The allocation of the Tier 1 Bonds and the Tier 2 Bonds to the holders of the Series A Bonds and the Series B Bonds will be determined by the Trustee and the holders of a majority of the aggregate principal amount of the Series A Bonds and accreted value of the Series B Bonds (the "Majority Bondholders"), and will be set forth in the Plan. |
| --- | --- |
| Holders of Subordinate Capital Appreciation Bonds, Series 1998C (the "Series C Bonds") issued under the Master Indenture | If holders of the Series C Bonds vote to accept the Plan in the requisite percentages, and holders of at least __% of the outstanding accreted amount of the Series C Bonds do not object to confirmation of the Plan, the holders of the Series C Bonds shall receive their pro rata share of the Tier 3 Bonds. The holders of the Series C Bonds will not receive any distribution if they do not so vote to accept the Plan, or if holders of more than __% of the aggregate principal (accreted) amount of Series C Bonds object to confirmation of the Plan. |
| SCDOT | If SCDOT agrees to amend and restate the License Agreement, as and to the extent provided below, and votes to accept the Plan, then it shall receive the benefits of (i) the amended and restated License Agreement, including without limitation the payment (as and to the extent, and on the terms and conditions, provided herein) of specified annual amounts set forth in the Plan equal to 5.0% of Projected Net Revenues for the relevant years (the "SCDOT Annual Amounts"), and (ii) the release contemplated by this Plan Term Sheet.<br><br>If SCDOT does not so agree or so vote, then the Plan shall (i) provide for the assumption of the License Agreement as of the effective date of the Plan under section 365 of the Bankruptcy Code, (ii) provide for the retention by the |

| | Association and the Trustee of all of their respective rights against SCDOT, and (iii) subordinate all claims of SCDOT arising under the License Agreement to the extent such subordination is consistent with the terms thereof, regardless of how such claims may be characterized or asserted. The Association shall not take a position regarding the Trustee's ability to enforce, or the Trustee's enforcement of, any rights of the Trustee or the Association against SCDOT, including under the License Agreement. |
|---|---|

## PRINCIPAL TERMS OF RESTRUCTURING

| | |
|---|---|
| **Amendment and Restatement of License Agreement** | The Plan will provide for the amendment and restatement of the License Agreement to reflect the following:<br><br>• Renewal and Replacement Responsibilities: SCDOT will maintain, repair, renew and replace the Southern Connector in same manner as any other State-owned interstate roads and in accordance with applicable State and SCDOT standards and practices. The Association will not be responsible for any repair, renewal or replacement of the Southern Connector arising out of wear or tear or any casualty or damage thereto, and shall not be responsible for maintaining insurance against any such casualty or damage.<br><br>• Operating Costs: The Association will be responsible for paying all Operating Costs incurred in operating the Southern Connector. Reimbursement will generally follow the existing Master Indenture.<br><br>• Maintenance Costs: The Association will not be obligated to pay or reimburse SCDOT for any Maintenance Costs or for any other costs or expenses incurred by SCDOT in maintaining, repairing, renewing or replacing the Southern Connector.<br><br>• License Fee: The Association will not be obligated to pay any License Fees or other amounts for the License.<br><br>• Toll Rates: The Association and the New Trustee, as the collateral assignee of the Association under the New Master Indenture, shall have the right to retain an independent consultant to recommend the optimum toll rates for the Southern Connector (i) one time between the first and second anniversaries of the effective date of the Plan, (ii) from time to time, but no more frequently than annually, (iii) if the Association or holders of a majority of the aggregate outstanding principal amount of the Tier 1 Bonds determine that Net Revenues may be inadequate to enable the Association to make any semi-annual payment required to be made in cash in respect of the New Bonds, or (iv) if the Association fails to make any payment required to be made in cash in respect of any of the New Bonds. In each case where an independent consultant is retained by the Association or the New Trustee pursuant to clauses (i), (iii) or (iv) of the immediately preceding sentence, (x) the independent consultant shall make its recommendation for the purpose of maximizing revenue generated by the Southern Connector to enable the Association to satisfy (to the maximum extent possible) its obligations under the New Bonds and the New Master Indenture, and (y) except to the extent holders of a majority of the aggregate principal amount of the Tier 1 Bonds object to the recommendations of such consultant, SCDOT shall promptly set all toll rates on the Southern Connector in accordance with such recommendations, and shall otherwise promptly comply with such recommendations. |

HSB 1361649 v9

| | |
|---|---|
| | • Payments for the Benefit of SCDOT. If in any year (i) the Association is current in making all payments in respect of the New Bonds for such year and for all previous years, (ii) the Association is otherwise in compliance with the New Master Indenture, including without limitation funding and maintaining the Debt Service Reserve (as defined herein), (iii) SCDOT is in compliance with the amended and restated License Agreement, and (iv) the Association has excess Net Revenues, then within a reasonable period after the end of such year, the Association shall pay to the New Trustee for deposit in the Renewal and Replacement Fund (as defined herein), to the extent of such excess Net Revenues, all unpaid SCDOT Annual Amounts due for any prior periods and for that year. |
| | • Renewal and Replacement Fund. The Association shall not be required to maintain the existing Southern Connector Toll Road Revenue Bond Renewal and Replacement Fund. The Association shall maintain with the New Trustee a new Southern Connector Toll Road Revenue Bond Renewal and Replacement Fund (the "Renewal and Replacement Fund"), which shall not be subject to the lien of the New Master Indenture, into which the New Trustee will deposit the SCDOT Annual Amounts. The proceeds of the Renewal and Replacement Fund shall be dedicated exclusively to reimbursing SCDOT for costs it incurs in repairing, renewing and replacing the Southern Connector. |
| | • Insolvency. Neither the Association nor SCDOT shall have any right to terminate the license or the License Agreement based on the insolvency of the Association. |
| | • Association Property. Mechanism to reserve cash to fund replacement of Association property used in operation of Southern Connector to be discussed. Addition of funded depreciation to definition of Operating Costs to be considered. |
| New Master Indenture of Trust | The Plan will provide for the execution and delivery of the New Master Indenture to govern the New Bonds, which shall be substantially similar in form and substance to the Master Indenture, except that it shall (i) to the extent relevant, reflect the amendment and restatement of the License Agreement described herein (e.g. responsibility for repairs, renewals and replacements of the Southern Connector, no reimbursement of Maintenance Costs, no License Fees, retention of independent consultant to determine toll rates) and (ii) include the following terms:<br><br>• Mandatory Redemption: If in any year (i) the Association is current in making all payments in respect of the New Bonds for such year and for all previous years, (ii) the Association is otherwise in compliance with the New Master Indenture, including without limitation funding and maintaining the Debt Service Reserve, (iii) the Association is current in making all payments in respect of the SCDOT Annual Amounts for such year and for all previous years (except that this condition shall not be relevant if SCDOT is not in compliance with the amended and restated License Agreement), and (iv) the Association has excess Net Revenues, then the Association shall apply such excess Net Revenues in such year to redeem Tier 1 Bonds and, if all Tier 1 Bonds have been redeemed, Tier 2 Bonds, and if all Tier 2 Bonds have been redeemed, Tier 3 Bonds. The redemption price shall be 105% of the par value or 105% of the accreted value of the relevant Bonds, plus accrued and unpaid interest thereon to the redemption date. |

HSB 1361649 v9

- Optional Redemption: Prior to the tenth anniversary of the effective date of the Plan, the Association may, from time to time, redeem any of the Tier 1 Bonds (and, if all Tier 1 Bonds have been redeemed, Tier 2 Bonds, and if all Tier 2 Bonds have been redeemed, Tier 3 Bonds) at a redemption price of 105% of the par value or 105% of the accreted value of such Bonds, plus accrued and unpaid interest thereon to the redemption date. At any time after the tenth anniversary of the effective date of the Plan, the Association may, from time to time, redeem any of the Tier 1 Bonds (and, if all Tier 1 Bonds have been redeemed, Tier 2 Bonds, and if all Tier 2 Bonds have been redeemed, Tier 3 Bonds), without premium or penalty, at a price of 100% of the par value or 100% of the accreted value of such Bonds, plus accrued and unpaid interest thereon to the redemption date.

- Remedies. To the extent the Association fails to make any payment required to be made in cash in respect of the New Bonds solely because the Net Revenues are less than the Projected Net Revenues, the Trustee and the holders of the New Bonds (i) shall have the right to retain, or cause the Association to retain, (x) an independent consultant to recommend the optimum toll rates for the Southern Connector, on the terms and conditions set forth herein, and (y) a management consultant or other third party to examine and make recommendations regarding the Association's Operating Costs, and except to the extent holders of a majority of the aggregate principal amount of the Tier 1 Bonds object to the recommendations of such consultant or third party, the Association shall promptly implement all recommendations of such consultant or other third party to the extent within its power to do so; and (ii) shall not have the right to accelerate the maturity of the New Bonds or to foreclose on the Association's assets.

- Debt Service Reserve: The Association shall maintain with the New Trustee an account or fund (the "Debt Service Reserve") for the benefit of the holders of the Tier 1 Bonds (and, if all Tier 1 Bonds have been redeemed, the holders of the Tier 2 Bonds, and if all Tier 2 Bonds have been redeemed, the holders of the Tier 3 Bonds). The Debt Service Reserve shall be funded on the effective date of the Plan with all proceeds of the Southern Connector Toll Road Revenue Bond Debt Service Fund and the Southern Connector Toll Road Revenue Bond Debt Service Reserve Fund (each as defined in the Master Indenture) that are under the control of the Trustee as of the effective date of the Plan (the initial amount deposited in the Debt Service Reserve being referred to herein as the "Debt Service Reserve Requirement"). If the New Trustee applies any amounts in the Debt Service Reserve, the Debt Service Reserve shall be fully replenished to the Debt Service Reserve Requirement before any payments or other distributions shall be made in respect of the Tier 2 Bonds, the Tier 3 Bonds or the SCDOT Annual Amounts.

- Toll Rates: The New Trustee, as the collateral assignee of the Association under the New Master Indenture, shall have the right to retain an independent consultant to recommend the optimum toll rates for the Southern Connector (i) one time between the first and second anniversaries of the effective date of the Plan, (ii) from time to time, but no more frequently than annually, (iii) if holders of a majority of the aggregate outstanding principal amount of the Tier 1 Bonds determine that Net Revenues may be inadequate to enable the Association to make any semi-annual payment required to be made in cash in respect of the New Bonds, and (iv) if the Association fails to make any payment

| | |
|---|---|
| | required to be made in cash in respect of any of the New Bonds. In each case where an independent consultant is retained by the New Trustee pursuant to clauses (i), (iii) or (iv) of the immediately preceding sentence, (x) the independent consultant shall make its recommendation for the purpose of maximizing revenue generated by the Southern Connector to enable the Association to satisfy (to the maximum extent possible) its obligations under the New Bonds and the New Master Indenture, (y) except to the extent holders of a majority of the aggregate principal amount of the Tier 1 Bonds object to the recommendations of such consultant, the Association shall use reasonable commercial efforts to cause SCDOT to promptly set all toll rates on the Southern Connector in accordance with all recommendations of such consultant, and otherwise to comply promptly with such recommendations, and (z) the New Trustee shall have the right to enforce the Association's rights under the License Agreement or the amended and restated License Agreement, as the case may be, in respect of such recommendations. |
| **Releases** | • The Plan will provide for the release by the holders of the Series A, Series B and Series C Bonds, the Trustee and SCDOT of all of their claims (if any) against current and former officers, directors and agents of the Association existing as of the effective date of the Plan.<br><br>• If SCDOT agrees to the amendment of the License Agreement, as described herein, and votes to accept the Plan, the Plan will provide for the release by the Association, the Trustee and the holders of the Series A, Series B and Series C Bonds of all of their claims (if any) against SCDOT existing as of the effective date of the Plan.<br><br>• The Plan will provide for the release by the Association and SCDOT (if SCDOT receives a release under the Plan) of all of their claims (if any) against the Trustee and all holders of Series A, Series B or Series C Bonds existing as of the effective date of the Plan. |
| **Conditions** | Confirmation and effectiveness of the Plan will be conditioned on:<br><br>• If SCDOT agrees to the amendment and restatement of the License Agreement, the release of all claims of SCDOT arising under or in connection with the License Agreement or otherwise (including License Fees, reimbursement of Maintenance Costs, and all repair, renewal and replacement costs), and all claims and causes of action arising in connection therewith. If SCDOT does not so agree, subordination of all claims of SCDOT arising under the License Agreement to the extent such subordination is consistent with the terms thereof, regardless of how such claims may be characterized or asserted (including License Fees and reimbursement of Maintenance Costs as currently defined in the Master Indenture), and all claims and causes of action arising with respect thereto.<br><br>• If SCDOT agrees to the amendment and restatement of the License Agreement, as described herein, the amendment and restatement of the License Agreement, as and to the extent provided herein, in form and substance acceptable to the Association and the Majority Bondholders; and if SCDOT does not so agree or so vote, then (i) the entry of an Order of the Bankruptcy Court, reasonably acceptable to the Trustee, approving the assumption of the License Agreement as of the effective date of the Plan under section 365 of the Bankruptcy Code, (ii) the retention by the Association and the Trustee of all of their respective rights against SCDOT, including those arising under the License Agreement, (iii) the |

HSB 1361649 v9

| | neutrality of the Association regarding the Trustee's ability to enforce, and the Trustee's enforcement of, any rights of the Trustee or the Association against SCDOT, including under the License Agreement, and (iv) the subordination of all claims of SCDOT arising under the License Agreement to the extent such subordination is consistent with the terms thereof, regardless of how such claims may be characterized or asserted. |
| | • Execution and delivery of New Master Indenture and all customary closing documents, in each case in form and substance acceptable to the Association and the Trustee. |
| | • Confirmation Order is in form and substance acceptable to the Association and the Trustee and has not been reversed, stayed, vacated, modified or amended. |

HSB 1361649 v9