**IN THE UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

In re:

Connector 2000 Association, Inc.,

Debtor.

Case No. 10-04467-dd
Chapter 9

**DISCLOSURE STATEMENT**

THE DEBTOR BELIEVES THAT THE PLAN IS FEASIBLE, AND IN THE BEST INTEREST OF THE CREDITORS OF THE DEBTOR. THE DEBTOR RECOMMENDS THAT YOU CAST YOUR BALLOT IN FAVOR OF THE PLAN.

This Disclosure Statement to the Plan of Adjustment ("Disclosure Statement"), is being furnished by Connector 2000 Association, Inc. ("Debtor") to its creditors pursuant to Sections 901 and 1125 of Title 11 of the United States Code (the "Bankruptcy Code") in connection with a solicitation by the Debtor of Ballots for the acceptance of the Plan of Adjustment, filed by the Debtor (the "Plan"). Capitalized terms in this Disclosure Statement not otherwise defined herein shall have their respective meanings set forth in the Plan.

On June 24, 2010, the Debtor filed a voluntary petition for relief under Chapter 9 of the Bankruptcy Code. On _____, 2010, the Debtor filed its Plan with this Disclosure Statement. On _____, 2010 (the "Approval Date"), the Court approved this Disclosure Statement and authorized the Debtor to solicit acceptances of the Plan.

CLAIMANTS SHOULD READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING ON THE PLAN. NO SOLICITATION OF VOTES FROM CREDITORS WITH RESPECT TO THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT. NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTOR OR ITS BUSINESS IN CONNECTION WITH THE SOLICITING OF VOTES FROM THE CLAIMANTS WITH RESPECT TO THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. CLAIMANTS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTOR AND ITS BUSINESS OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS AND SCHEDULES ATTACHED HERETO.

After carefully reviewing this Disclosure Statement and all exhibits and schedules attached hereto, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. All Ballots must be returned to _____, in the enclosed postage-paid, return envelope in sufficient time to be received no later than _____, 2010 (the "Voting Deadline").

ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED AND SHALL BE DEEMED INVALID AND INEFFECTIVE (UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT.)

Except to the extent allowed by the Bankruptcy Court, Ballots that are received after the Voting Deadline may not be used by or against the Debtor in connection with the Debtor's request for Confirmation of the Plan or any modification thereof.

THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO ENABLE THOSE PERSONS WHOSE CLAIMS AGAINST THE DEBTOR ARE IMPAIRED UNDER THE PLAN TO MAKE AN INFORMED DECISION WITH RESPECT TO THE PLAN BEFORE EXERCISING THEIR RIGHTS TO ACCEPT OR REJECT THE PLAN.   ON THE APPROVAL DATE, AFTER NOTICE AND A HEARING, THIS DISCLOSURE STATEMENT WAS APPROVED BY THE BANKRUPTCY COURT AS CONTAINING INFORMATION OF A KIND AND IN SUFFICIENT DETAIL ADEQUATE TO ENABLE PERSONS WHOSE VOTES ARE BEING SOLICITED TO MAKE AN INFORMED JUDGMENT WITH RESPECT TO ACCEPTANCE OR REJECTION OF THE PLAN.   A COPY OF THE ORDER APPROVING THE DISCLOSURE STATEMENT IS ENCLOSED HEREWITH.   THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN THE DISCLOSURE STATEMENT OR THE PLAN; NOR DOES IT CONSTITUTE AN ENDORSEMENT OF THE PLAN.

The Debtor will request Confirmation of the Plan at the Confirmation hearing to be scheduled by the Court, which shall be separately noticed.

## I.   DEFINITIONS

The defined terms set forth below and used in this Disclosure Statement are identical to those used in the Plan and are repeated here for convenience.

AECOM shall mean AECOM Technical Services, Inc.

Allowed Administrative Claim shall mean any right to payment constituting a cost or expense of administration of the Case allowed under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

Allowed Claim shall mean any prepetition Claim against the Debtor, proof of which was filed on or before any bar date fixed by the Court, or any Claim that appears in the list of creditors filed by the Debtor and is not listed by the Debtor as disputed, contingent, or unliquidated as to amount, and, in either case, a Claim as to which no objection as to the allowance thereof has been interposed by the Debtor on or before 60 days after the Effective Date or, if such objection has been interposed, on the date which there has been entered a Final Order allowing such Claim provided, however, that the claims represented by the Bonds are deemed Allowed Claims without the need to file a proof of Claim.

Amended and Restated Bonds shall collectively mean the Tier 1 Bonds, Tier 2 Bonds, and Tier 3 Bonds, the material terms and conditions of which will be set forth in the Amended Trust Indenture and filed with the Bankruptcy Court as part of the Plan Supplement.

Amended Trust Indenture shall mean the Original Trust Indenture as modified and amended by the Plan and in form and substance acceptable to the Senior Bonds Trustee.

Approval Date shall mean _____, 2010, the day the Court approved the Disclosure Statement and authorized the Debtor to solicit acceptances of the Plan.

Bankruptcy Code shall mean Title 11 of the United States Code, as amended.

Bar Date shall mean September 22, 2010, which was the last date set for the filing of Claims as provided in the Court's Order Upon Commencement of Chapter 9 Case Establishing Certain Deadlines and Notice of Commencement of Case, of the Automatic Stay and of the Order for Relief filed in the Case on June 25, 2010.

Bondholders shall mean beneficial owners of the Bonds.

Bonds shall collectively mean the Toll Road Revenue Bonds (Southern Connector Project, Greenville, South Carolina), Series 1998A, B and C issued on February 11, 1998 pursuant to the Original Trust Indenture, to finance the construction of the Southern Connector, including Capital Appreciation Bonds, Senior Bonds and Subordinate Bonds as defined below.

Capital Appreciation Bonds shall mean the Series 1998B Bonds and the Series 1998C Bonds which consist of zero-coupon obligations which accrete interest and mature serially starting January 1, 2008 and continuing until January 1, 2038, with interest accreting and payable at maturity or at such earlier time that it is otherwise payable.

Case shall mean the above-captioned Chapter 9 bankruptcy case.

Claim(s) shall mean Claim as defined in 11 U.S.C. §101(5).

Commencement Order shall mean the order the Court entered on June 28, 2010 entitled Amended Order Upon Commencement of Chapter 9 Case Establishing Certain Deadlines and Notice of Commencement of Case, of the Automatic Stay and of the Order for Relief.

Confirmation shall mean the entry by the Court of an order confirming the Plan in accordance with Section 943 of the Bankruptcy Code.

Confirmation Order shall mean that order entered by the Court confirming the Plan in accordance with Section 943 of the Bankruptcy Code.

Court shall mean the United States Bankruptcy Court for the District of South Carolina.

Debtor shall mean Connector 2000 Association, Inc.

Debtor's Pre-Petition Plan shall mean the debt adjustment plan prepared by the Debtor and its advisors dated August 13, 2009 and delivered to the Trustee, the Subordinate Trustee, SCDOT and the Restricted Owners, which was based on the Stantec Projected Net Revenues.

Debt Service Reserve Fund shall mean the account or fund maintained with the New Trustee for the benefit of the holders of the Tier 1 Bonds (and, if all Tier 1 Bonds have been redeemed, the holders of the Tier 2 Bonds, and if all Tier 2 Bonds have been redeemed, the holders of the Tier 3 Bonds).

Debt Service Reserve Requirement shall mean the initial amount, if any, deposited in the Debt Service Reserve Fund on the effective date of the Plan, if any, from amounts remaining in the Southern Connector Toll Road Revenue Bond Debt Service Fund and the Southern Connector Toll Road Revenue Bond Debt Service Reserve Fund (each as defined in the Original Trust Indenture).

Disclosure Statement shall mean this document, which is the disclosure document describing the Plan which was filed by the Debtor, approved by the Court, and distributed to the various Classes under the Plan as provided in Section 901 and 1125 of the Bankruptcy Code.

Disputed Claim shall mean any Claim which has been scheduled by the Debtor as disputed, contested, contingent, or unliquidated, or any Claim as to which an objection to the allowance thereof has been interposed and allowance or disallowance of such Claim has not been determined by a Final Order.

DTC shall mean the Depository Trust Corporation.

Effective Date shall mean that date upon which all of the covenants and conditions contained in Section VII D. of the Plan have been satisfied, which shall occur on or before sixty (60) days from entry of the Confirmation Order or such other date as extended by order of the Court.

Final Decree shall mean the order of the Court entered after the Effective Date and after the Case is fully administered, closing the Case.

Final Order shall mean an order of the Court as to which (a) the time for appeal has expired and no notice of appeal has been filed; (b) no stay, as provided by Rule 8005 of the Federal Rules of Bankruptcy Procedure, has been issued with respect to any timely filed appeal; or (c) any timely filed appeal in which a stay which has issued has been finally determined or dismissed.

Goldman shall mean Goldman Sachs & Co.

License Agreement shall mean the document entitled "License Agreement by and between South Carolina Department of Transportation, an agency of the State of South Carolina ("SCDOT") and Connector 2000 Association, Inc. A South Carolina Non-profit Corporation ("Association") Dated February 11, 1998," whereby SCDOT granted the Debtor rights and obligations to finance, acquire, construct, and operate an approximately 16 mile fully controlled

access toll highway known as the Southern Connector and to construct the South Carolina Highway 153 Extension.

List of Creditors shall mean the list of creditors that the Debtor has filed with the Court pursuant to Section 924 of the Bankruptcy Code as may be amended from time to time.

Macquarie shall mean Macquarie Securities (USA), Inc.

Macquarie Pre-Petition Plan shall mean an alternative plan to the Debtor's Pre-Petition Plan which was presented to the Debtor, SCDOT and the Restricted Owners on October 12, 2009, and based on the Stantec Projected Net Revenues.

Net Revenues shall have the meaning set forth in the Amended Trust Indenture.

New Trustee shall mean the U.S. Bank National Association as trustee of the Amended and Restated Bonds governed by the Amended Trust Indenture.

Original Trust Indenture shall collectively mean the Master Indenture of Trust and a First Supplemental Indenture of Trust, each dated as of February 1, 1998 between the Debtor and First Union National Bank, as predecessor in trust to U.S. Bank National Association, as trustee, pursuant to which the Bonds were issued to finance the construction of the Southern Connector, and the Second Supplement.

Petition Date shall mean June 24, 2010, the date on which the Debtor filed its petition under Chapter 9 of the Bankruptcy Code.

Plan Documents means the Plan and all related documents, including but not limited to the Amended Trust Indenture and all attachments, schedules and exhibits thereto, as the same may be amended, modified or supplemented, in accordance with the terms of the Confirmation Order.

Plan Supplement means the supplement to the plan containing any Plan Documents either not originally filed with the Plan or modified versions of Plan Documents originally filed with the Plan, which supplement will be filed with the Court no later than 14 days prior to the Voting Deadline.

Plan Term Sheet shall mean the debt adjustment plan developed in May and June 2010 by the Debtor, the Senior Bonds Trustee, Macquarie and the Restricted Owners, which could be implemented over the remaining term of the License Agreement without any extension.

Projected Net Revenues shall mean (i) projected revenues for the Southern Connector for the relevant year, as set forth in Figure 4.4.2 of the Traffic and Revenue Report for Southern Connector dated May 4, 2009, prepared by Stantec Consulting Services Inc., less (ii) the reorganized Debtor's projected Operating Costs for such year, as determined by increasing the aggregate amount of expenses set forth in the reorganized Debtor's Annual Budget for 2010 (less certain extraordinary expenses) by 3.0% per annum for each year after 2010, plus (iii) projected non-operating revenues and other income of the reorganized Debtor for such year, such as interest earned on invested funds.

Projects shall collectively mean the Southern Connector and the SC 153 Extension.

Restricted Owners shall mean the four institutional bondholders and one bond insurer which owned or insured, in the aggregate, a majority of the outstanding principal amount or future maturity value of the Senior Bonds.

Revised Traffic Study shall mean the May 4, 2009 Traffic and Revenue Study prepared by Stantec, a copy of which is available only at http://www.southernconnector.com/pdfs/Event%20Notice%202009-4%20w%20Study.pdf or upon written request made to the Debtor's attorney at the following address:    Stanley H. McGuffin, Haynsworth Sinkler Boyd, P.A., P.O. Box 11889, Columbia, SC 29211-1889.

SC 153 Extension  shall mean the South Carolina Highway 153 Extension which Debtor agreed to construct pursuant to the License Agreement.

SCDOT shall mean the South Carolina Department of Transportation.

Second Supplement shall mean the Second Supplemental Indenture of Trust dated October 16, 2002, which became effective January 1, 2008.

Senior Bonds Trustee shall mean U.S. Bank National Association, as the Trustee for the Connector 2000 Association, Inc. Toll Road Revenue Bonds (Southern Connector Project, Greenville, South Carolina), Series 1998A and Series 1998B Bonds.

Senior Bonds shall collectively mean the Series 1998A Bonds and the Series 1998B Bonds.

Series 1998A Bonds shall mean the Connector 2000 Association, Inc. Toll Road Revenue Bonds (Southern Connector Project, Greenville, South Carolina), $66,200,000 original principal amount of Senior Current Interest Bonds, Series 1998A.

Series 1998B Bonds shall mean the Connector 2000 Association, Inc. Toll Road Revenue Bonds (Southern Connector Project, Greenville, South Carolina), $87,385,622 original principal amount of Senior Capital Appreciation Bonds, Series 1998B.

Series 1998C Bonds or Subordinate Bonds shall mean the Connector 2000 Association, Inc. Toll Road Revenue Bonds (Southern Connector Project, Greenville, South Carolina), $46,592,058 original principal amount of Subordinate Capital Appreciation Bonds, Series 1998C.

Southern Connector shall mean the sixteen-mile, four-lane toll highway south of the City of Greenville that connects the I-85/I-185 interchange (exit 42) with the I-385/U.S. 276 interchange (exit 30) and is owned by SCDOT and operated by the Debtor under the License Agreement.

Stantec shall mean Stantec Consulting Services, Inc.

Subordinate Bonds shall mean the Series 1998C Bonds.

Subordinate Bonds Trustee shall mean HSBC Bank USA, NA, the trustee for the Subordinate Bonds appointed under the Second Supplement.

Tier 1 Bonds shall mean the Amended and Restated Bonds consisting of approximately $172,115,908 aggregate principal amount of (i) senior secured current interest bonds, accruing interest at 5.80% per annum payable semi-annually in cash, and maturing in 2051, (ii) senior secured capital appreciation bonds, accreting interest at 5.80 % per annum, maturing annually and with a final maturity in 2051, and/or (iii) senior secured current interest bonds, accruing interest and/or contingent interest at 5.80% per annum semi-annually, and maturing in 2051 as further described in the Plan Supplement.

Tier 2 Bonds shall mean the Amended and Restated Bonds consisting of approximately $29,805,074 aggregate principal amount of (i) senior subordinated secured capital appreciation bonds accreting interest at 5.80% per annum, payable in cash (but only if the Debtor is current in making all payments in respect of the Tier 1 Bonds), and maturing in 2051, and/or (ii) senior subordinated secured current interest bonds, accruing interest and/or contingent interest at 5.80% per annum semi-annually, and maturing in 2051 as further described in the Plan Supplement.

Tier 3 Bonds shall mean the Amended and Restated Bonds consisting of approximately $4,215,099 aggregate principal amount of (i) junior subordinated secured capital appreciation bonds accruing interest at 5.80% per annum, payable semi-annually (but only if the Debtor is current in making all payments in respect of the Tier 1 Bonds and the Tier 2 Bonds), and maturing in 2051, and/or (ii) junior subordinated secured current interest bonds, accruing interest and/or contingent interest at 5.80% per annum, semi-annually, and maturing in 2051 as further described in the Plan Supplement.

Trust Estate shall mean all assets that serve as collateral for the Amended and Restated Bonds, including the present collateral assignment of the Debtor's rights under the License Agreement and the Net Toll Revenues as more fully described in the Amended Trust Indenture.

URS shall mean URS Corporation.

Original Trust Indenture shall collectively mean the Master Indenture of Trust and a First Supplemental Indenture of Trust, each dated as of February 1, 1998 between the Debtor and First Union National Bank, as predecessor in trust to U.S. Bank National Association, as trustee, pursuant to which the Bonds were issued to finance the construction of the Southern Connector, and the Second Supplement.

Wilbur Smith 1997 Study shall mean the November 1997 Traffic and Revenue Study prepared by Wilbur Smith Associates to estimate the future utilization of the Southern Connector and the toll revenues and operating expenses of the Debtor.

## II.   INTRODUCTION

On June 24, 2010 (the "Petition Date"), the Debtor filed its voluntary petition under Chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the District of South Carolina. Pursuant to the Court's Order dated June 28, 2010, the Debtor published notice of the filing of its petition and request for the entry of an order for relief in The State, The

Greenville News, and the Bond Buyer, and in addition, mailed notice to all known creditors and parties in interest.

The Debtor has proposed the Plan, which the Debtor believes is in the best interests of the Debtor's creditors. A copy of the Plan is attached to this Disclosure Statement and is incorporated herein by reference.

### A.    Explanation of Chapter 9 of the Bankruptcy Code

Chapter 9 is a chapter of the Bankruptcy Code that permits a municipality (as such term is defined in the Bankruptcy Code) to adjust debts owed to creditors through a plan of adjustment while permitting the municipality to continue to operate. The Debtor has continued to manage and operate the Southern Connector as a toll road since the filing of the Chapter 9 Case.

The commencement of a Chapter 9 case creates an "estate" comprised of the legal and equitable interests of the debtor in property. Section 904 of the Bankruptcy Code provides that a municipal debtor may continue to operate the debtor's business. The Debtor has continued to operate since the commencement of this Chapter 9 case.

The filing of a Chapter 9 petition triggers the automatic stay provisions of the Bankruptcy Code. Sections 922 and 362 of the Bankruptcy Code provide for an automatic stay of all attempts to collect pre-petition claims from the chapter 9 debtor or otherwise interfere with its property or business. Except as otherwise ordered by the Court, the automatic stay remains in full force and effect in a Chapter 9 case until the confirmation of a plan of adjustment.

Formulation of a plan of adjustment is the principal purpose of a Chapter 9 case. The plan is the vehicle for satisfying the holders of claims against the debtor. The Debtor proposes in the Plan to restructure its obligations in order to pay creditors and continue operating as a going concern.

### B.    Filing Proofs of Claim

The Debtor filed a List of Creditors as required by Section 924 of the Code. A Proof of Claim is deemed filed for any Claim that appears in the List of Creditors that was filed in this case, except a Claim that is scheduled as disputed, contingent, or unliquidated as to amount. If a creditor agrees with the amount of the Claim as listed by the Debtor and such Claim was not listed as disputed, contingent, or unliquidated as to amount, the holder of that Claim need not have filed a Proof of Claim.

However, if (i) the Debtor did not list a holder's Claim, (ii) the Debtor listed such holder's Claim as disputed, contingent, or unliquidated, or (iii) the amount the Debtor listed for the holder's Claim varies from the amount claimed by the holder of such Claim, the holder of such Claim must have filed a Proof of Claim in the amount of such Claim. The Court will recognize and allow a Proof of Claim only if such Proof of Claim is timely filed and is not objected to by the Debtor or any party in interest. If an objection to a Proof of Claim is filed, after notice and hearing, the Court will determine to what extent, if any, such Claim will be allowed. The List of Creditors is on file with the Clerk of the Court and is available for

inspection during regular court hours or via the PACER system, which may be accessed on a subscription basis at the following internet address: https://ecf.scb.uscourts.gov/.

The Court established September 22, 2010 as the last date for filing Proofs of Claim, and any Claim filed after that date is subject to disallowance for untimely filing, unless otherwise ordered by the Court.

### C. Representations

NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY AS TO ITS FUTURE OPERATIONS, VALUE OF ITS ASSETS, OR THE VALUE OF ANY OTHER ASSETS TO BE CONSIDERED UNDER THE PLAN) ARE AUTHORIZED BY THE DEBTOR OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS MADE TO SECURE YOUR ACCEPTANCE, WHICH ARE OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON IN ARRIVING AT YOUR DECISION WHETHER TO VOTE FOR OR AGAINST THE PLAN. THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS WHATSOEVER AS TO ANY TAX CONSEQUENCES TO CREDITORS OR HOLDERS OF THE DEBTOR'S DEBT RESULTING FROM THE PLAN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN INDEPENDENTLY AUDITED FOR INCLUSION IN THIS DISCLOSURE STATEMENT. THE DEBTOR IS UNABLE TO WARRANT OR TO REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY OR OMISSION, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO BE ACCURATE. CREDITORS ARE URGED TO REVIEW THE PLAN IN FULL PRIOR TO VOTING ON THE PLAN TO ENSURE A COMPLETE UNDERSTANDING OF THE PLAN AND THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS OF THE DEBTOR TO ENABLE SUCH CREDITORS TO MAKE AN INFORMED DECISION ABOUT THE PLAN.

IF ANY IMPAIRED CLASS DOES NOT VOTE TO ACCEPT THE PLAN, THE DEBTOR INTENDS, PURSUANT TO SECTIONS 901(a) AND 943 OF THE BANKRUPTCY CODE, TO SEEK CONFIRMATION UNDER THE PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AND HEREBY GIVES NOTICE OF SUCH INTENT.

### D. Purpose of the Disclosure Statement

The Bankruptcy Code generally requires that the proponent of a plan of adjustment prepare and file with the Bankruptcy Code a "disclosure statement" that provides information that would enable a typical holder of claims in a class impaired under that plan to make an informed judgment with respect to the plan. This Disclosure Statement provides such information.

The Debtor is furnishing this Disclosure Statement to Classes of impaired creditors pursuant to the requirements of Sections 901(a) and 1125 of the Bankruptcy Code and

Bankruptcy Rule 3017 thereunder, for the purpose of soliciting Ballots for the acceptance of the Plan under Chapter 9 of the Bankruptcy Code. A successful reorganization under the Bankruptcy Code depends upon the receipt of sufficient numbers of votes in favor of the Plan or applications of Sections 901(a), 943 and 1129(b). Your vote, therefore, is important.

The Disclosure Statement describes various transactions contemplated under the Plan as well as certain transaction or settlements embodied in the Plan including, without limitation, the settlement and compromise between the Debtor and the Bondholders. This Disclosure Statement serves as notice to creditors and parties in interest of all such transactions, contracts or settlements as allowed or required by the Bankruptcy Code or Rule 9019 of the Federal Rules of Bankruptcy Procedure and the time fixed by the Court for the filing of objections to Confirmation shall likewise be deemed to be the time fixed for the filing of any objections to the foregoing transactions, contracts or settlements, even if such transactions, contracts or settlements will be documented or consummated after confirmation.

If the Debtor receives Ballots accepting the Plan from at least two-thirds in amount, and more than one-half in number, of at least one Class of impaired creditors voting on the Plan, the Debtor, subject to certain conditions described herein, intends to request confirmation of the Plan. Under the Bankruptcy Code, in order for the Plan to be confirmed, the Plan must be accepted by at least one impaired Class of Claims entitled to vote thereon.

Under the Bankruptcy Code, after the commencement of a bankruptcy case, the solicitation of acceptances of a plan of adjustment must be accompanied by disclosure materials containing information of a kind and in sufficient detail to enable solicited creditors to make informed judgments about the plan and the acceptance or rejection thereof. On the Approval Date, the Bankruptcy Court determined that this Disclosure Statement contains information that is in compliance with the "adequate information" requirement of Section 1125(a) of the Bankruptcy Code, as indicated by its Order Approving Disclosure Statement enclosed herewith.

### E.    Legally Binding Effect of Plan with Respect to Creditors

If confirmed, the provisions of the Plan will bind the Debtor and any creditor to the fullest extent permitted by the Bankruptcy Code, including Section 944, and, without limiting the foregoing, will (1) bind all creditors, whether or not they accept the Plan, and (2) discharge the Debtor from all debts that arose before the Effective Date, except as otherwise provided in the Plan.

### F.    Voting Requirements

The Classes of Claims that are impaired under the Plan and that are not deemed to have rejected the Plan, are entitled to vote to accept or reject the Plan. An impaired Class of Claims will be determined to have accepted the Plan if the holders of Allowed Claims in the Class casting votes in favor of the Plan (1) hold at least two-thirds of the Allowed amount of the Allowed Claims of the holders of such class who actually vote, and (2) constitute more that one-half in number of holders of the Allowed Claims in such class voting on the Plan. If a Class of impaired Claims does not receive or retain any property or interests in property under the Plan,

such class is deemed to have rejected the Plan and the votes of creditors in such Class need not be solicited.

## III.  HISTORY OF THE DEBTOR

### A.  History and Background of the Projects.

The construction of a major roadway around the southern perimeter of the City of Greenville, South Carolina had been proposed for over 30 years by the time the Southern Connector was built.  In September of 1964, the Greenville County Planning Commission, with the support of the Greenville County delegation in the State legislature and the cities of Greenville, Greer, Mauldin and City View, joined in a collaborative effort with the South Carolina Department of Highways and Public Transportation (the predecessor of SCDOT) relating to the development of a coordinated transportation system for the Greenville urban area. The planning area was later expanded to include the cities of Travelers Rest, Simpsonville and Fountain Inn.  In 1967, the participants in this planning effort published a two-volume report entitled *A Continuing Transportation Plan for the Greenville, S. C. Urban Area*.  The Southern Connector was included in the report and in updates to it that were published in 1978 and 1988.

On December 18, 1991, the United States Congress adopted Public Law 102-240, known as the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA").  Two separate sections of ISTEA specifically appropriated federal funds for the Southern Connector.  First, pursuant to Section 1106, the Southern Connector was listed as a project that would ensure better rural access and promote economic development in rural areas, and Congress authorized the appropriation of $3.6 million for the Southern Connector.  Second, under Section 1107, the Southern Connector was also included as a project demonstrating innovative techniques of highway construction and finance, and Congress allocated $11 million to three South Carolina projects, including the Southern Connector, with the funds to be equitably divided among the three projects.

On March 19, 1992, the SCDOT Commission authorized SCDOT to advertise for and select an engineering firm to prepare location, preliminary design and environmental studies for the Projects.  On December 17, 1992, the SCDOT Commission unanimously authorized SCDOT to enter into a contract with Florence & Hutcheson, Inc. to prepare a feasibility analysis, develop functional plans, hold public hearings and prepare preliminary and final environmental documents, which contract was signed on January 8, 1993.

In 1993, the SCDOT Commission created the Transportation 2000 Committee, composed of public officials and private citizens.  The Transportation 2000 Committee was charged with the responsibility of assessing the State's transportation needs and priorities and formulating funding plans to support those needs. In December 1993, the Transportation 2000 Committee issued a report identifying the Southern Connector as one of the State's critical needs for the next decade and recommending that the Southern Connector and four other major projects be built as toll roads, due to the unavailability of sufficient funds to construct these projects without tolls.

After the report of the Transportation 2000 Committee was formally accepted by the SCDOT Commission in early 1994, development activities for the Southern Connector

proceeded on the assumption that it would be a tolled facility. Florence & Hutcheson retained Wilbur Smith Associates to prepare a preliminary traffic and toll revenue analysis for inclusion in its Preliminary Feasibility Study for the Greenville Southern Connector. The Florence & Hutcheson study, which was completed in October 1994, served as the basis for the draft environmental impact statement for the Projects which was approved by SCDOT and the Federal Highway Administration in November 1994. On January 24, 1995, SCDOT held a public hearing on the proposed location of the Southern Connector.

On July 1, 1995, SCDOT issued a Request for Proposals seeking conceptual proposals from entities qualified to plan, design, finance, construct and operate the Projects. The Request for Proposals was issued pursuant to S.C. Code Ann. § 57-3-200 (1976 Supp.), as amended, which authorized SCDOT to enter into partnership agreements with political subdivisions and private entities to finance the cost of transportation improvements and was similar to one issued by SCDOT in November 1994 for the Conway Bypass Project in Horry County, South Carolina.

A group of citizens residing within Greenville County, working with the owners of the developer Interwest Carolina Transportation Group, LLC ("Developer"), caused the Debtor to be incorporated as a "public benefit corporation" under the South Carolina Nonprofit Corporation Act of 1994, as amended, in order to develop a response to SCDOT's Request for Proposals. On January 3, 1996, the Developer and the Debtor and two other groups submitted proposals in response to SCDOT's Request for Proposals. Each proposer was given an opportunity to make a presentation to the SCDOT Proposal Review Committee which was comprised of four SCDOT employees and one representative from the State of South Carolina's Office of the State Treasurer. On February 29, 1996, the SCDOT Commission adopted a resolution selecting the proposal submitted by the Debtor and directing SCDOT staff to begin negotiation of a contract.

### B.    Connector 2000 Association, Inc.

Although the Debtor was formed in 1996, its first financial activity occurred on or about February 1998. At that time, the Debtor entered into a License Agreement with SCDOT that granted the Debtor certain rights and obligations to finance, acquire, construct, and operate the Southern Connector and to construct for SCDOT the SC 153 Extension. Under Section 13.1(a) of the License Agreement, the term of License Agreement expires 50 years after the date of substantial completion of the Projects. SCDOT executed a certificate of substantial completion dated March 29, 2001, but the Trustee believes that substantial completion occurred on July 22, 2001. Regardless, a 2001 substantial completion date results in an expiration date in 2051 under the License Agreement.

SCDOT accepted the Southern Connector as a part of the State Highway System. SCDOT is the State agency generally responsible for assuring that elements of the State Highway System are safe for the travelling public and in good repair. The License Agreement permits the Debtor to charge tolls of the users of the Southern Connector. The toll rates to be charged by the Debtor must be set by SCDOT pursuant to Section 6.4 of the License Agreement.

To finance the construction of the Southern Connector, the Debtor issued $200,177,680 original principal amount of Connector 2000 Association, Inc. Toll Road Revenue Bonds

(Southern Connector Project, Greenville, South Carolina), Series 1998A, B and C (the "Bonds") on February 11, 1998 pursuant to a Master Indenture of Trust and a First Supplemental Indenture of Trust, each dated as of February 1, 1998 between the Debtor and First Union National Bank, as predecessor in trust to U.S. Bank National Association, as trustee (the "Trustee"). The Debtor was only responsible for financing the Southern Connector portion of the Projects. SCDOT provided financing for the SC 153 Extension portion of the Projects through the issuance of general obligation bonds.

The Southern Connector Bonds were issued as "63-20" bonds on behalf of SCDOT on a tax exempt basis and sold in three series: (i) $66,200,000 original principal amount of the Series 1998A Bonds, (ii) $87,385,622 original principal amount of the Series 1998B Bonds and, (iii) $46,592,058 original principal amount of Series 1998C Bonds.

The Series 1998A Bonds consisted originally of (i) $21,400,000 5.25% bonds maturing, subject to earlier mandatory sinking fund redemption, on January 1, 2023 and (ii) $44,800,000 5.375% bonds maturing, subject to earlier mandatory sinking fund redemption, on January 1, 2038. Interest on the Series 1998A Bonds is payable semi-annually on January 1 and July 1 of each year. The principal of the Series 1998A Bonds is subject to mandatory sinking fund redemption on January 1 of each year commencing January 1, 2008 and continuing to January 1, 2038.

The Series 1998B Bonds and the Series 1998C Bonds (together, the "Capital Appreciation Bonds") consist of zero-coupon obligations which accrete interest and mature serially starting January 1, 2008 and continuing until January 1, 2038. Interest on a Capital Appreciation Bond accretes and is payable at maturity or such earlier time that it is otherwise payable. The Series 1998B Bonds have yields between 5.30% and 5.85%. The Series 1998C Bonds have yields between 6.15% and 6.30%. No interest has been paid to date on the outstanding Capital Appreciation Bonds. The accreted value of the Capital Appreciation Bonds has increased from the original combined principal amount of $133,977,680 to in excess of $250,000,000 as of the Petition Date, reflecting such scheduled accretion since issuance of the Capital Appreciation Bonds.

C.    **Financial Issues facing the Debtor.**

The organizational purpose of the Debtor is to design, finance, acquire, construct and operate the Southern Connector during the term of the License Agreement. At the time the Bonds were issued, Wilbur Smith Associates prepared the Wilbur Smith 1997 Study to estimate the future utilization of the road and toll revenues and operating expenses of the Debtor. The actual traffic on the highway and toll revenues received by the Debtor have been substantially less than projected in the Wilbur Smith 1997 Study. Currently, the Debtor is not receiving sufficient toll revenues to pay debt service on the Senior Bonds or the Subordinate Bonds. Prior to January 1, 2010, such shortfalls had been covered by withdrawals from the Debt Service Reserve Accounts (as defined in the Original Trust Indenture) (funded by original sale proceeds of the Bonds plus interest earnings thereon) maintained by the Senior Bonds Trustee under the Original Trust Indenture. Insufficient funds existed for the Senior Bonds Trustee to fund the full payment of debt service on the Bonds due on January 1, 2010. The Senior Bonds Trustee advised Bondholders that unless a restructuring of the Bonds was implemented prior to January

1, 2010, no debt service payment would then be made.  On January 1, 2010, the Debtor defaulted in the payment of principal and interest due on certain of the Bonds.

Previously, the Senior Bonds Trustee had requested that the Debtor enter into the Second Supplement and a separate instrument appointing HSBC Bank USA, NA as standby co-trustee (the "Subordinate Trustee") for the Subordinate Bonds. The Second Supplement became effective January 1, 2008 and the interests of the Subordinate Bonds are represented by the Subordinate Trustee.

Under the provisions of its Continuing Disclosure Agreement under the Original Trust Indenture, the Debtor timely filed the required "Event Notices" notifying Bondholders of the January 1, 2010 payment default, various downgrades in the published credit rating on the Bonds by Standard & Poor's Ratings Service and each withdrawal from the Debt Service Reserve Accounts (which withdrawals were used to pay a portion of the interest or principal payments). Due to the factors noted above, the Debtor has experienced a loss of ($22,181,833) and ($22,156,181) for 2009 and 2008, respectively, resulting in an increase in the Debtor's net deficit to a total of ($173,302,626.00) and ($151,120,793) as of December 31, 2009 and 2008, respectively.  Debt service on the Bonds increased sharply in January 2008 as principal began to mature.

Previously, as required under the Original Trust Indenture, the Debtor engaged a traffic and revenue consultant to prepare a series of toll rate studies in 2005, 2006 and 2007 to advise the Debtor regarding the toll rates necessary to maximize toll revenue from the Southern Connector. Each such study concluded that toll rates could be increased to maximize revenue, but even if the recommendations of the consultant were effected, projected toll revenues would be insufficient to pay principal and interest on the Bonds in full.

Despite the Debtor's implementation of the scheduled toll rate increase effective January 3, 2005 and the additional toll increase effective November 1, 2009, the Debtor has been unable to comply with the Revenue Covenant under the Original Trust Indenture.  The Senior Bonds Trustee notified the Debtor that as of January 1, 2008, the Debtor was in default under the Trust Indenture.  The bond documents provide the Trustee, upon the written request of 25% or more of the bondholders, with certain specific remedies in the event of such default.  Such remedies include allowing the Trustee to (a) take legal action to require the Debtor to perform covenants with respect to the Bonds, (b) take legal action to require the Debtor to account for revenues as if it were the trustee of an express trust for the holders of Senior Bonds, (c) take legal action to prohibit any acts or things that may be unlawful or in violation of the rights of holders of the Senior Bonds, (d) prohibit the Debtor from withdrawing monies from any bond accounts (other than the Rebate Fund and Renewal and Replacement Fund Accounts (each as defined in the Original Trust Indenture)), without the Trustee's written consent, (e) take legal action to request that a court appoint a receiver of the trust estate (as defined in the Original Trust Indenture) and the Debtor's income, revenues, and use of profits, and (f) take legal action to protect and enforce its rights and those of holders of the Senior Bonds to enforce payment of the principal, redemption price and interest due on the Senior Bonds.  The bond documents do not provide for the remedy of accelerating the due date of any debt service payments due on the outstanding bonds.

**D.      Costs of Operating the Southern Connector.**

The Bonds are secured by the trust estate (as defined in the Original Trust Indenture), which includes (a) all bond funds except the Rebate Fund and the Renewal and Replacement Fund, (b) all Revenues as defined in the Original Trust Indenture, (c) all of the Debtor's rights in its License Agreement with SCDOT and certain related documents, and (d) any other property assigned to the Trustee by the Debtor or which may come into the possession or control of the Senior Bonds Trustee.

The Original Trust Indenture operates similarly to a "lock box" arrangement obligating the Debtor to daily transfer toll revenues to the Trustee for deposit into the Revenue Fund to be applied by the Senior Bonds Trustee monthly to pay the Debtor's obligations, including debt service in the priority specified under the Original Trust Indenture.  Except as and to the extent otherwise provided in the Original Trust Indenture, amounts in the Revenue Fund are applied for the following purposes in the priority listed below (the "Flow of Funds Schedule"):

A. Operating costs budgeted for the next succeeding month shall be distributed to the Debtor.

B. Amounts shall be transferred to the Rebate Fund so that the amounts deposited equal the required amounts (if any).

C. The Trustee shall transfer to the Senior Bonds Debt Service Account amounts which, when added to other amounts in the Senior Bonds Debt Service Account, and available for such purposes, will provide for the accumulation, in substantially equal monthly installments, of the amounts required to pay the sum of: (i) any interest to become due and payable on each series of outstanding Senior Bonds on the next interest payment date (within the next six months) for such Series; and (ii) any principal installments to become due and payable on any series of outstanding Senior Bonds on or before the next date (within the next 12 months) on which such principal installment is payable.

D. If the Senior Bonds Debt Service Reserve Account contains less than the Senior Bonds Debt Service Reserve Account Requirement, the Trustee shall transfer into the Senior Bonds Debt Service Reserve Account, an amount equal to 1/24 of the Senior Bonds Debt Service Reserve Account Requirement or the amount needed to attain the Senior Bonds Debt Service Reserve Account Requirement, whichever is less.  The transfers shall continue until the Senior Bonds Debt Service Reserve Account contains the Senior Bonds Debt Service Reserve Account Requirement.

E. The Trustee shall transfer to the Subordinate Bonds Debt Service Account amounts which, when added to other amounts in the Subordinate Bonds Debt Service Account and available for such purposes, will provide for the accumulation, in substantially equal monthly installments, or otherwise as may be provided in any Supplemental Indenture, of the amounts required to pay the sum of: (i) any interest to become due and payable on each series of outstanding Subordinate Bonds (within the next six months) on the next interest payment date for such Series; and (ii) any principal installments to become due

and payable on any series of outstanding Subordinate Bonds on or before the next date (within the next 12 months) on which such principal installment is payable.

F. If the Subordinate Bonds Debt Service Reserve Account contains less than the Subordinate Bonds Debt Service Reserve Account Requirement, the Trustee shall transfer into the Subordinate Bonds Debt Service Reserve Account, an amount equal to 1/60 of the Subordinate Bonds Debt Service Reserve Account Requirement or the amount needed to attain the Subordinate Bonds Debt Service Reserve Account Requirement, whichever is less.  All transfers shall continue until the Subordinate Bonds Debt Service Reserve Account contains the Subordinate Bonds Debt Service Reserve Account Requirement.

G. After the date of Final Completion of the Southern Connector Project, the Trustee shall deposit into the Renewal and Replacement Fund the amounts included in the annual budget of the Association, which are required pursuant to the Renewal and Replacement Plan then in effect under the License Agreement.

H. The Trustee shall pay to SCDOT amounts certified by an Authorized Association Representative (as defined in the Original Trust Indenture) as being due SCDOT for (i) the Maintenance Costs reimbursable to SCDOT under the License Agreement, together with any accruals from prior periods and interest owed thereon under the License Agreement and (ii) any reimbursements to SCDOT for condemnation awards for rights of way for the Southern Connector Project in excess of the amounts reserved therefor on the Completion Date.

I. The Trustee shall pay amounts certified by an Authorized Association Representative as being due SCDOT for the License Fee owing to SCDOT under the License Agreement, together with any accruals from prior periods and any interest owed thereon under the License Agreement.

J. Money remaining in the Revenue Fund shall be used by the Trustee to make or provide for all deposits, payments, or transfers certified by an Authorized Association Representative as being required by any agreement or other instrument creating or evidencing any obligation of the Debtor which is not a Senior Bond or Subordinate Bond, at the time and in the amount provided for in such instrument.

K. The Trustee shall transfer any money remaining in the Revenue Fund at the end of any fiscal year to the Program Fund.

The rights and obligations of the parties to the License Agreement which are to be satisfied from Toll Revenues are subject to the same Flow of Funds Schedule.

Due to the shortfall of Toll Revenues as described above, the Debtor has defaulted on the payment of principal and interest on certain of the Bonds, the funds remaining in the Debt Service Reserve Accounts have been reserved by the Trustee as set forth in its past bondholder notices, there are no funds in the Renewal and Replacement Fund or the Program Fund and no

License Fees or any other material amounts due under the Flow of Funds Schedule have been paid to SCDOT, other than initial maintenance reimbursements totaling less than $300,000.00.

The Original Trust Indenture generally provides that the Debtor is to receive a monthly payment equal to one twelfth of the budgeted annual cost of operating the Southern Connector ("Operating Costs"). Budgeted operating costs to be paid by the Debtor for 2010 total $2,940,000 resulting in a monthly distribution to the Debtor from the Trustee equal to $245,000 (which does not include amounts paid directly by the Trustee for its fees and expenses). This amount is paid before any transfer is made for debt service on the Bonds but does not include any payment for Maintenance Costs, as defined in the Original Trust Indenture.

Section 6.7(a) of the License Agreement provides: "Following Substantial Completion, SCDOT shall maintain in good operating condition, reasonable wear and tear excepted, S.C. 153 and the Southern Connector in accordance with applicable State and SCDOT standards and practices throughout the term of this License Agreement." "Maintenance Costs" is defined in Exhibit 1 to the License Agreement as "the reasonable expenses of SCDOT incurred in repairing and maintaining the Southern Connector in good condition, reasonable wear and tear excepted, calculated on a per mile basis in accordance with Section 6.7 hereof. Such expenses shall include, but shall not be limited to, mowing, debris removal, landscaping, planting of shrubs and vegetation, repair of and replacement of guardrails, signage, lighting, and bridge and roadway painting and repair, repairs and replacements to bridges or the roadway necessitated by damage or other casualty thereto and the costs of direct labor for such activities and any cost which would be accounted for by SCDOT as a maintenance cost for a State highway in accordance with standard SCDOT practice. Such costs shall not include any expense which is an Operating Cost, as defined in the License Agreement."

Under the License Agreement, SCDOT is to be reimbursed for Maintenance Costs on a subordinated basis from amounts remaining after debt service on the Bonds has been paid and scheduled deposits to the Renewal and Replacement Fund have been accomplished. The Debtor has had insufficient Toll Revenues to permit such reimbursement in the recent past. SCDOT claims that it is owed in excess of $775,786 for reimbursement of its past Maintenance Costs and interest thereon. Section 6.7(a) of the License Agreement provides: "To the extent any SCDOT expenses for maintenance are not reimbursed when due, and Toll Revenues are not available to pay the same . . . such failure to pay shall not be deemed to be an Event of Default by the Association under Section 14.1 hereof, so long as any Project Debt remains outstanding, but the unreimbursed amounts shall bear interest at a rate equal to five (5%) percent per annum compounded annually."

The Debtor also has agreed to pay SCDOT a License Fee under Section 5.1 of the License Agreement. As described above, payment of the License Fee is to be made only after full payment of debt service owing on the Bonds, replenishment of the reserve funds securing the Bonds, deposits of the scheduled amounts in the Renewal and Replacement Fund, and reimbursement of Maintenance Costs and associated interest. The Debtor has had insufficient Toll Revenues to fund the subordinated License Fee payment. SCDOT claims that it is owed in excess of $7,500,000 for past due License Fees plus interest thereon. Such Section 5.1 provides that: "To the extent any portion of the License Fee is not paid when due, and Toll Revenues are not available . . . . such failure to pay shall not be deemed to be an Event of Default by the Association

under Section 14.1 hereof, so long as any Project Debt remains outstanding, but such unpaid amounts shall be deferred and shall be paid upon the next License Fee payment date with interest at a rate equal to five (5%) percent per annum compounded annually."

Section 6.11 of the License Agreement requires Debtor to prepare a renewal and replacement plan for the renewal and replacement of the Southern Connector and to establish and fund out of any available toll revenues (after paying items that are senior in the Flow of Funds Schedule) the Renewal and Replacement Fund to provide monies to pay the cost of renewal and replacement of the Southern Connector. Specifically, Debtor is supposed to maintain the balance in the Renewal and Replacement Fund sufficient to pay for the costs of implementing the Renewal and Replacement plan but "subject to the availability of Toll Revenues for such purpose." As described above, deposits to the Renewal and Replacement Fund are to be made only after full payment of debt service owing on the Bonds and replenishment of the reserve funds securing the Bonds. Because toll revenues have been insufficient to pay such senior obligations, no deposits have been made to the Renewal and Replacement Fund. The Debtor has no source of funds other than the toll revenues with which to fund the renewal or replacement of the Southern Connector. The Debtor's engineers estimate that the costs of the first resurfacing of the Southern Connector, which may be necessary within the next 7 years, will exceed $15,000,000.

       E.     **Forbearance Agreement.**

Section 14.1(d) of the License Agreement provides for an event of default that SCDOT asserts allows it to terminate the License Agreement in the event that the Debtor is insolvent, but only if it complies with the terms of the License Agreement, including the rights of the holders of Project Debt, as defined in the License Agreement (e.g., the holders of the Bonds). By letter dated June 12, 2009, SCDOT informed the Debtor that Debtor was in default under Section 14.1(d) of the License Agreement. The Debtor requested SCDOT not to terminate the License Agreement unless SCDOT gives the Debtor at least 90 days prior notice of its intention to terminate the License Agreement. SCDOT delivered a letter dated June 12, 2009 and supplemented October 1, 2009 (together, the "Forbearance Letter") agreeing to such request. SCDOT asserts that the Forbearance Letter does not waive any claims that SCDOT may have against the Debtor. To date, SCDOT has not given notice of its intent to terminate the License Agreement. SCDOT does not have the right to terminate the License Agreement during the pendency of this bankruptcy proceeding without seeking and obtaining Court approval. However, if the Court were to allow the License Agreement to be terminated, Debtor would have no revenue and be unable to pay any creditors.

## IV.    CONDENSED FINANCIAL INFORMATION

Although Debtor continues to collect enough revenues to pay operating expenses each year, revenues are not sufficient to cover all of the debt service payments and other non-operating expenses, including amortization and the subordinated SCDOT-related maintenance fees, license fees and interest. During the year ended December 31, 2009, Debtor's net deficit increased by $22,181,833 to $173,302,626. Total assets decreased approximately 7.2% to $158,362,486, while total liabilities increased approximately 3.1% to $331,665,112. For the year ended December 31, 2008, the Association's net deficit increased by $22,156,181 to

$151,120,793.   Total assets decreased by approximately 6.1% to $170,610,456, and total liabilities increased by approximately 3.5% to $321,731,249.

The net decrease in total assets for both years 2009 and 2008 resulted primarily from the fact that total revenues in these years were not sufficient to completely offset such non-operating expenses as amortization of the Debtor's interest in its License Agreement with SCDOT.

The increase in total liabilities for both years 2009 and 2008 was due mainly to accretions on the Capital Appreciation Bonds.   These accretions caused the Bonds payable (both current and noncurrent) portions of total liabilities to increase by approximately 2.6% in both years 2009 and 2008.   Capital appreciation bonds, or zero coupon bonds, are issued and initially recorded at amounts significantly less than their maturity values.   Interest on capital appreciation bonds is not paid annually.   Instead, interest accretions increase the balance due on such bonds and are generally paid at maturity.   Accordingly, such accretions are recorded as increases in interest expense and the corresponding Bonds payable liability.

In 2009 and 2008, other liabilities increased by approximately 18.4% and 40.3%, respectively, mainly due to accruals for license fees, maintenance costs and related interest payable to SCDOT.

**Net Assets (Deficit)**

**December 31, 2009**

|  | 2009 | 2008 | 2007 |
|---|---|---|---|
| Current and Other Assets | $          9,656,519 | $         18,350,020 | $         24,248,633 |
| Capital Assets | 148,705,967 | 152,260,436 | 157,499,730 |
| Total Assets | 158,362,486 | 170,610,456 | 181,748,363 |
| Long-term Liabilities (Bonds Payable): |  |  |  |
| Senior Bonds | (223,689,067) | (218,848,600) | (213,954,640) |
| Subordinate Bonds | (88,026,222) | (85,502,926) | (82,944,424) |
| Total Long-Term Liabilities | (311,715,289) | (304,351,526) | (296,899,064) |
| Other Liabilities: |  |  |  |
| Senior Bonds, current portion | (4,400,000) | (4,000,000) | (3,600,000) |
| Subordinate Bonds, current portion | (2,900,000) | (2,700,000) | (2,600,000) |
| Interest Payable to Bondholders | (1,718,502) | (1,742,127) | (1,765,754) |
| Potential Excess Collateral Liability | (1,117,498) | (1,153,823) | - |
| Accounts Payable, Deferred Revenue and Deposits | (375,417) | (352,104) | (351,319) |
| Amounts Payable to SCDOT | (9,438,406) | (7,431,669) | (5,496,838) |
| Total Other Liabilities | (19,949,823) | (17,379,723) | (13,813,911) |
| Total Liabilities | (331,665,112) | (321,731,249) | (310,712,975) |
| Net Assets (Deficit): |  |  |  |
| Invested in Capital Assets, Net of Related Debt | (55,505,123) | (57,079,587) | (51,715,907) |
| Restricted for Debt Service | - | 7,514,277 | 6,277,665 |
| Restricted for Capital and Other Projects | - | - | 28 |
| Unrestricted | (117,797,503) | (101,555,483) | (83,526,398) |
| Total Net Assets (Deficit) | $       (173,302,626) | $      (151,120,793) | $     (128,964,612) |

## V.    THE CHAPTER 9 CASE

### A.    Reason for Chapter 9 Filing

The Wilbur Smith 1997 Study forecast that the Debtor would realize approximately 21,000 paid toll transactions per day within several months after the completion of the Southern Connector. A transaction consists of a single payment by a single motorist using the Southern Connector, so a vehicle driving the length of the highway in one direction would pay two tolls, resulting in two transactions. Actual paid transactions per day after completion in 2001 were less than 7,500. Many reasons have been put forward for the disappointing traffic on the Southern Connector; however, it became increasingly clear to the Debtor over the years that Toll Revenues would not be adequate to meet all of the Debtor's obligations under the License Agreement and Original Trust Indenture. This shortfall is compounded by the financial structure of the Bonds, which include the Capital Appreciation Bonds to "back-load" debt service, a structure which was intended to allow the Debtor a ramp-up period to grow toll revenues to meet future debt service

obligations.  Total annual debt service on the Bonds was initially approximately $3.5 million.  In 2008 it increased to approximately $9.7 million and is scheduled to increase each year to be nearly $59 million in 2038 according to the Revised Traffic Study, as further discussed below.

In 2005, the Debtor interviewed international companies engaged in the acquisition of concessions for the financing and operation of toll facilities worldwide. The Debtor executed phase one and phase two agreements with Macquarie.  After over a year of negotiations and joint effort, the Debtor discontinued this effort. Subsequently, the Debtor engaged Goldman on January 31, 2008 as its special financial advisor to investigate the ability of the Debtor to restructure its obligations outside of bankruptcy. Possibilities which were considered included consensual restructuring, a tender and exchange of new securities for the Bonds, and a sale of the Debtor's interest in the License Agreement to a third party. The Debtor was advised that any restructuring of its obligations within the remaining term of the License Agreement would require a substantial reduction in the principal amount of the Bonds.

After an extensive procurement process, in March 2005, the Debtor engaged URS as the Debtor's traffic and revenue consultant for purposes of performing a toll rate study as required by the revenue covenant contained in Section 717 of the Original Trust Indenture after the first withdrawal from the Senior Bonds Debt Service Reserve Account. In 2006 and 2007, URS performed two additional annual toll rate studies for the Debtor and in 2007 provided a traffic and earnings report.

When Goldman was retained, Goldman advised that any successful restructuring of the Bonds, either as part of a bankruptcy proceeding or otherwise, would require an "investment grade" traffic and revenue study. The Debtor undertook a qualification analysis and solicited proposals to engage a new traffic and revenue consultant to provide an investment grade traffic and revenue study. The Debtor selected Stantec, which then investigated the Debtor's operation of the Southern Connector, regional development trends and projected traffic growth. Stantec submitted to the Debtor the Revised Traffic Study dated May 4, 2009.

In response to the Revised Traffic Study, the Debtor petitioned SCDOT for a toll rate increase that was approved by SCDOT and implemented in November 2009.  However, based on the Revised Traffic Study, Goldman's analyses, a preliminary valuation for a concession, and the traffic levels on the Southern Connector, the Debtor determined that defeasance of the Bonds was not possible, and that neither a long-term concession agreement with a new toll road operator nor a conventional refinancing of the Debtor's existing Bonds by issuance of new debt was feasible. Goldman informed the Debtor that restructuring the Debtor's debt outside of bankruptcy would be extremely difficult.

Neither the Debtor nor the Trustee knows the identity of all of the beneficial owners of the Bonds. The Bonds are "book entry" securities without investment certificates, the ownership of which is administered by the DTC and its direct and indirect participating broker-dealers. If an individual customer of a broker or dealer requests that his or her identity not be disclosed to DTC, such information is generally not available without a subpoena. In November 2008, Goldman investigated the ownership of the Debtor's Bonds and was advised that beneficial ownership information was available for approximately 60% of the Senior Bonds and 40% of the Subordinate

Bonds. Such 60% of the Senior Bonds were held by 330 different accounts. Such 40% of the Subordinate Bonds were held by 84 different accounts. The Debtor concluded that, since each of the hundreds of beneficial owners of the Bonds would be required to individually agree to a reduction in the principal amount of their holdings, a restructuring outside of bankruptcy was not feasible.   The Debtor's engagement of Goldman gave Goldman the right to serve as special financial consultant in connection with future restructuring of the Debtor's debt. By letter dated January 22, 2010 the Association offered to engage Goldman as its special financial consultant in anticipation of this bankruptcy proceeding but Goldman declined such engagement. This concluded Goldman's engagement.

The Trustee had undertaken an effort to locate beneficial owners of the Bonds to invite them to participate in informal discussions regarding the future restructuring of the Bonds. The Debtor negotiated confidentiality agreements among the Debtor, the Subordinate Trustee and certain beneficial owners of the Senior Bonds which permitted the Debtor to share non-public information with such owners and engage in discussions regarding the adjustment of the Debtor's debts. Since August 2009, the Debtor has entered into confidentiality agreements with four institutional bondholders and one bond insurer (the "Restricted Owners") owning or insuring, in the aggregate, a majority of the outstanding principal amount or future maturity value of the Senior Bonds.

The Debtor and its advisors delivered to the Trustee, the Subordinate Trustee, SCDOT and the Restricted Owners a draft debt adjustment plan (the "Debtor's Pre-Petition Plan") dated August 13, 2009. The Debtor's Pre-Petition Plan was structured to attempt to return the greatest value to the owners of the Senior Bonds possible given the constraints of the remaining term of the License Agreement (2051), SCDOT's request that the Debtor include a provision for renewing and resurfacing the road out of toll revenues, and the projected toll revenues and operating expenses in the Revised Traffic Study. The Debtor's Pre-Petition Plan used the August 5, 2009 estimate provided by AECOM Technical Services, Inc. ("AECOM") as the basis for the projected repair and resurfacing needs of the road.   Under the Debtor's Pre-Petition Plan, since the Senior Bonds would not receive full payment, the Subordinate Bonds would receive no payment.

The Senior Bonds Trustee and its counsel thereafter engaged Macquarie as financial advisor to the Senior Bonds Trustee's counsel to review the Debtor's Pre-Petition Plan, consult with the Senior Bonds Trustee and their representatives, and respond to the Debtor's Pre-Petition Plan.   The Debtor's Pre-Petition Plan was ultimately rejected by the Trustee, the Subordinate Trustee and the Restricted Owners.   Macquarie met with the Debtor, SCDOT and others and developed an alternative plan (the "Macquarie Pre-Petition Plan"), which was presented to the Debtor, SCDOT and the Restricted Owners on October 12, 2009.  The Macquarie Pre-Petition Plan was based on the Stantec projections contained in the Revised Traffic Study, proposed to exchange two series of securities for the outstanding principal and interest owing on the Debtor's Senior Bonds, called for a 35-year extension of the License Agreement and included provisions to fund a substantial portion of the projected road resurfacing and repair costs out of Toll Revenues under the extended License Agreement. Although the Macquarie Pre-Petition Plan did not address repayment of the Subordinate Bonds, implementation of that plan under the assumptions set forth therein would permit the Debtor to use toll revenues to repay a portion of the amounts currently

owing to the holders of Subordinate Bonds during the remaining term of the extended License Agreement after the securities exchanged for the Senior Bonds were repaid.

SCDOT advised the Debtor that SCDOT required legislative clarification of its authority to grant an extension of the License Agreement's term under South Carolina law. At an October 12, 2009 meeting among the parties, it was determined that effectuating a consensual restructuring plan would be aided by the passage of legislation in the 2010 session of the South Carolina General Assembly. Negotiations on the detailed terms of a restructuring plan were held in abeyance while the parties pursued legislation in the South Carolina General Assembly to clarify or confirm SCDOT's authority regarding the extension of the License Agreement and its ability to enter into other revisions necessary to restructure the Bonds and the Debtor's obligations to SCDOT.

On January 20, 2010, the Board of Directors of the Debtor adopted a resolution authorizing the Debtor's management, when management so deemed it appropriate, to file a petition for bankruptcy protection under the United States Bankruptcy Code and to take related actions in connection with the bankruptcy. This resolution was authorized, among other purposes, in order for the Debtor to be in a position to effectuate a consensual restructuring through a bankruptcy plan. Notwithstanding this resolution, efforts continued to obtain a consensus among the major creditor constituents for a debt adjustment plan.

In late May of 2010, Debtor was informed by SCDOT that it did not expect to obtain approval of legislation deemed by SCDOT to be necessary to clarify SCDOT's authority to extend the term of the License Agreement. Since an extension was central to the Macquarie Pre-Petition Plan, further discussion of the Macquarie Pre-Petition Plan became fruitless. Based upon these developments, Debtor then pursued discussions with the Senior Bonds Trustee, Macquarie and the Restricted Owners regarding a debt adjustment plan which could be implemented over the remaining term of the License Agreement without any extension. These efforts resulted in the Restricted Owners developing the terms of a debt adjustment plan ("Plan Term Sheet").

In an effort to obtain consent from all interested parties, the Debtor presented the Plan Term Sheet to SCDOT. SCDOT informed the Debtor on June 16, 2010 that SCDOT would not agree to the debt adjustment plan described in the Plan Term Sheet. Efforts to solicit or negotiate acceptable changes to the Plan Term Sheet that might be acceptable to SCDOT failed.

Accordingly, on June 24, 2010, the Debtor filed its chapter 9 petition at the direction of its Executive Vice President and General Manager, Peter Femia.

### B.    Eligibility of Debtor in Chapter 9 Case.

Section 109(c) of the Bankruptcy Code sets forth the statutory criteria for eligibility as a chapter 9 debtor. The debtor must: (1) be a municipality; (2) be specifically authorized to be a chapter 9 debtor; (3) be insolvent; (4) be willing to effect a plan to adjust its debts; and (5) also meet one of the following four requirements: (i) the debtor has obtained the agreement of creditors holding at least a majority in the amount of claims of each class that the debtor intends to impair through its plan; (ii) the debtor has negotiated in good faith but failed to obtain the agreement of creditors holding at least a majority in the amount of claims of each class that the debtor intends to impair under its plan; (iii) the debtor is unable to negotiate with its creditors

because such efforts are impracticable; or (iv) the debtor reasonably believes that a creditor may attempt to obtain a preference.  11 U.S.C. § 109(c).

Section 109(c)(1) requires that the debtor filing a petition under chapter 9 must be a municipality.  A "municipality" is defined in section 101 of the Bankruptcy Code to mean "political subdivision or public agency or instrumentality of a State."  11 U.S.C. § 101(40).

While the Code does not define the terms "public agency, or instrumentality of a State," a legal test to determine public agency status was established in *Ex parte York County Natural Gas Authority,* 238 F. Supp. 964, 976 (W.D. S.C. 1965), modified on other grounds, 362 F.2d 78 (4th Cir. 1965), cert. denied, 383 U.S. 970 (1966), stating "the legal test between a private or public authority or agency is whether the authority or agency is subject to control by public authority, state or municipal."  *Id.* (holding a gas authority with the power to issue revenue bonds was a "municipality" for purposes of Chapter 9).

In this case, the Debtor is a non-profit corporation which is subject to the control by and formed on behalf of the State of South Carolina to, among other things, issue tax exempt debt on behalf of SCDOT to finance the Southern Connector project.  For instance, the License Agreement provides:

Recitals, Section 2.

The people of Greenville County, South Carolina in particular, and the people of the State of South Carolina in general, stand to benefit from the construction of two highway projects in the southern area of Greenville County, South Carolina, namely, the Southern Connector and the extension of South Carolina Route 153 ("S.C. 153").  SCDOT, as a servant of the People of the State of South Carolina, wishes to see these strategic projects completed, but limitations imposed by traditional methods of financing, designing, and constructing highways would mean that the Southern Connector and an extension of S.C. 153 could be completed only after an unacceptable delay, if at all.  SCDOT, working with other agencies of the State of South Carolina, has devised an innovative plan to allow the commencement and completion of the Southern Connector and the extension of S.C. 153 in a timely and cost-effective manner; and after a competitive process, the Association and Interwest Carolina Transportation Group, LLC ("ICTG") were selected to participate in this venture by being responsible for the study, financing, design, construction, and operation of the Southern Connector (the "Southern Connector Project") and design and building of an extension of S.C. 153 (the "S.C. 153 Project") (collectively, the "Projects").  SCDOT wishes to avail itself of and rely on the Association and ICTG's resources and capabilities in coordinating the financing, design and construction of such complex projects, on time and within a fixed budget.  The Association desires to provide its expertise and to participate in this venture for the good of the people of Greenville County and the State of South Carolina.

Article III, Section 3.1 Development of the Projects.
…

In furtherance of these premises, conditions, and understandings, but subject to the limitations and conditions set forth in this Agreement, SCDOT hereby grants to the Association, in accordance with this License Agreement, the exclusive right and the Association hereby agrees:

(a)      to acquire, in the name of SCDOT, the appropriate rights of way and other real property necessary to the development and operation of the Projects in accordance with the provisions of Article III hereof;

Article III, Section 3.8, Substantial Completion and Acceptance.
…
(c)      Upon issuance of the Certificate of Substantial Completion for the Projects, the Projects shall immediately be opened to public traffic, and SCDOT shall be deemed to have accepted the Projects as a part of the South Carolina State Highway System.

Article III, Section 3.12, Responsibility for Right of Way Acquisition.  Title to the rights of way for the Projects (the "Rights of Way") shall be acquired in the name of SCDOT.   …  With regard to Rights of Way for which the Association is responsible, SCDOT hereby appoints the Association and its employees, agents, servants and contractors as its agent to acquire such Rights of Way for SCDOT and to carry out all responsibilities associated therewith.   These responsibilities shall be carried out as follows:

(a)      Title in fee simple to properties acquired through negotiation (except that SCDOT may in its sole discretion direct the Association to acquire a right of way easement, in lieu of fee simple title, with respect to any portion of the Rights of Way) shall be conveyed to "The South Carolina Department of Transportation" by general warranty deed, free and clear of all liens and encumbrances except Permitted Encumbrances.  The Association shall cause its agents and consultants to prepare, obtain execution of, and record documents conveying title to such properties to SCDOT.

(b)      In the event that the Association shall advise SCDOT that the Association has been unable to negotiate the acquisition of a parcel of land for the Rights of Way, the Association shall prepare and deliver to SCDOT a Declaration of Taking and an Annotated Notice of Condemnation (as more particularly described in Section 3.12(c)(3) hereof), and SCDOT shall proceed to acquire such parcel (at the sole cost and expense of the Association) by condemnation under the South Carolina Eminent Domain Procedure Act and pursuant to the procedures more particularly described in Section 3.13 hereof.

Article III, Section 3.13, Condemnation Authority.

Because these acquisitions are being made by the Association as agent on behalf of the State of South Carolina, SCDOT shall exercise the State's power of eminent

domain where the Association or its agents and consultants reasonably determines that condemnation proceedings are necessary to timely acquire a portion of the rights of way. The Association and its agents and consultants shall assist in prosecuting or defending any actions involving issues of just compensation, SCDOT's right to take any property located within the Rights of Way and in resolving such actions as timely as practicable. At the sole cost and expense of the Association, the Association shall cause its agents and consultants to prepare in the name of SCDOT, file on behalf of SCDOT, serve appropriate condemnation documents, and prosecute condemnation proceedings to settle final judgment in compliance with the procedures required by the South Carolina Eminent Domain Procedure Act (provided that all pleadings will be signed by the attorney or attorneys selected by SCDOT and approved by the Association, which approval shall not be unreasonably withheld.)

Article IV, Section 6.1, Use.

…

The Association shall operate the Southern Connector Project during the term of this License, and agrees to keep the Southern Connector open to vehicular traffic at all times, unless otherwise approved by SCDOT. The right to operate the Southern Connector is hereby specifically permitted, authorized and granted by SCDOT. Notwithstanding the foregoing, SCDOT shall have the authority in its reasonable discretion to exercise police powers over the Southern Connector, including the right to require toll free travel in emergency or evacuation situations and close the Southern Connector temporarily if required to do so by executive order of the Governor of South Carolina.

Article IV, Section 6.4. Toll Rates.

Pursuant to Section 57-5-1340 of the Code, SCDOT hereby fixes the toll rates for the Southern Connector at those rates as set forth on Exhibit 3. The SCDOT Commission, after consultation with the Association, shall have the right (but not the obligation) to revise such toll rates from time to time to rates which are not less than 90% and not more than 120% of the optimum toll rates as estimated by an independent traffic consultant retained by the Association. Notwithstanding the foregoing, SCDOT acknowledges and agrees that all toll rates must satisfy the applicable revenue covenants contained in the Association's financing documents with the Lender(s) or otherwise applicable to any Project Debt, and SCDOT hereby agrees to maintain all toll rates in compliance with such revenue covenants at all times during the term of this License Agreement. All maintenance, supervisory and incident response vehicles owned or operated by SCDOT or its agents, and all police vehicles providing public health or safety services for the Southern Connector, shall be exempt from tolls.

Article IV, Section 6.5 Toll Collection Facilities, Systems and Methods; Enforcement of Collections

…

(b)    The Association and SCDOT acknowledge that Section 57-5-1490 of the S.C. Code currently provides for fines, punishment, and liens imposed with respect to failures to pay tolls.  SCDOT agrees to cooperate with the Association in encouraging the enactment of new and/or revised statutes which may enhance enforcement for toll violations and proper disposition of fines or penalties.  SCDOT agrees to cooperate with the Association in securing the enactment of legislation to enhance enforcement procedures for toll violations and to pay to the Association any fines or penalties collected by SCDOT as part of the Toll Revenues.

(c)    SCDOT hereby acknowledges that the Association may employ, to the extent permitted by law, private security officers, at the Association's expense, to respond to toll violations on the Southern Connector, provided that the activities of such employees shall not interfere with the actions or operations of the SCHP.

Article IV, Section 6.7.  Operations and Maintenance Responsibility.

(a) During the term of the License, unless otherwise mutually agreed by the parties, SCDOT shall be responsible for all maintenance repair, renewal, and replacement of S.C. 153.  SCDOT is responsible only for the maintenance of, and not the repair, renewal, or replacement of, the Southern Connector.  SCDOT will be reimbursed for performing all maintenance activities for the Southern Connector.  The Association shall be responsible for all repair, renewal, and replacement activities and costs of the Southern Connector.  Following Substantial Completion, SCDOT shall maintain in good operating condition, reasonable wear and tear excepted, S.C. 153 and the Southern Connector in accordance with applicable State and SCDOT standards and practices throughout the term of this License Agreement.  The Association agrees to reimburse SCDOT for its costs and expenses incurred in maintaining the Southern Connector based upon the average fully allocated cost for maintenance of the Southern Connector during the preceding fiscal year ending June 30, said reimbursements to be made solely from the Toll Revenues paid in accordance with Item 1 of Exhibit 5 attached hereto.

(b)    ….  SCDOT shall, have the right to approve (which approval shall not be unreasonably withheld or delayed) any operations manager proposed to be retained by the Association to manage the operation of the Southern Connector on behalf of the Association and the terms of any contract with respect thereto, subject to applicable law.  The Association shall be required to modify operations of the Southern Connector upon the issuance of a Compliance Order by SCDOT in accordance with Exhibit 4.

In summary, the Debtor was set up to benefit the people of South Carolina under the control of and on behalf of the SCDOT as described in the License Agreement.  Specifically, SCDOT owns the Southern Connector, SCDOT has authorized the Debtor to exercise the State's power of eminent domain, and SCDOT has the power to approve or disapprove all the members

of the Board of Directors of the Debtor, as well as the right to approve the operations manager of the Debtor. In addition, SCDOT sets the toll rates, which gives SCDOT control of the financial operation of the Debtor. Under the License Agreement, SCDOT is obligated to maintain the Southern Connector and the Association is obligated to reimburse SCDOT for such maintenance and pay a License Fee and fund the repair and resurfacing of the highway. The ability or inability of Debtor to provide such payments to SCDOT have a material affect on SCDOT's budget. The Debtor is very much like a "highway authority" with the exception that it was formed as a privately incorporated entity rather than a statutory corporation. Moreover, the State of South Carolina Office of Comptroller General has determined that the Debtor should be included and reported as a component unit of the State in the State's Consolidated Annual Financial Report.

Accordingly, the Debtor believes it is a public agency or instrumentality of the State of South Carolina and is a municipality within the meaning of Section 109(c)(1).

Section 109(c)(2) also requires that a municipality be "specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter." 11 U.S.C. § 109(c)(2).

South Carolina has adopted measures which expressly enable municipalities to file bankruptcy under federal law, without further restriction. S.C. Code Ann. § 6-1-10 provides:

> Power of political subdivisions to proceed under legislation dealing with bankruptcy or composition of indebtedness.

> The consent of the State is hereby granted to, and all appropriate powers are hereby conferred upon, any county, municipal corporation, township, school district, drainage district or other taxing or governmental unit organized under the laws of the State to institute any appropriate action and in any other respect to proceed under and take advantage of and avail itself of the benefits and privileges conferred, and to accept the burdens and obligations created, by any existing act of the Congress of the United States and any future enactment of the Congress of the United States relating to bankruptcy or the composition of indebtedness on the part of the counties, municipal corporations, townships, school districts, drainage districts and other taxing or governmental units or any of them.

This statute is applicable to the Debtor as the Debtor is a "governmental unit." While the term "governmental unit," is not defined in Title 6 of the South Carolina Code or by case law, under the Bankruptcy Code, "governmental unit" is defined to include a "municipality" and an "instrumentality of a … State." 11 U.S.C. § 101(27). Accordingly, because the Debtor is a municipality under 11 U.S.C. § 101(40) and for purposes of 11 U.S.C § 109 as detailed above, the Debtor is a "governmental unit" for purposes of S.C. Code Ann. § 6-1-10.

As further discussed in section V D. below, SCDOT is contesting the eligibility of the Debtor to file a Chapter 9 case and has asserted that the Debtor is not a governmental unit.

Section 6-1-10 of the South Carolina Code meets the "specific authorization"

requirement under 11 U.S.C. § 109(c)(2) and authorizes the Debtor to bring its petition under Chapter 9. *See In re Orange County*, 183 B.R. 594 (Bankr. C.D. Cal. 1995) (holding that under § 109(c), the enabling or other legislation governing the debtor must show such specific authorization by exact, plain and direct language). Additionally, on January 10, 2010, the Board of directors of the Debtor adopted a resolution to authorize the commencement and prosecution of this case. SCDOT disagrees with the Debtor's interpretation of Section 6-1-10.

Section 109(c)(3) requires that the chapter 9 petitioner be insolvent. 11 U.S.C. § 109(c)(3). Section 101 of the Bankruptcy Code provides that a municipality is insolvent when its financial condition is such that it is (i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due. 11 U.S.C. § 101(32)(C). Insolvency is determined based on the debtor's financial condition as of the date the petition is filed. As described in detail above, the Debtor is unable to pay its debts as they become due.

As of the Petition Date, it is clear the Debtor was unable to pay its bills as they became due in the upcoming year. 11 U.S.C. § 101(32)(C). On January 1, 2010 the Debtor defaulted in the payment of principal and interest on certain of the Bonds.

Section 109(c)(4) requires that a chapter 9 petitioner desire to effect a plan to adjust its debts. As certified by the Debtor in its Statement of Qualifications Under 11 U.S.C. § 109(c), and demonstrated by the pre-petition efforts of the Debtor, the Debtor desires to effect a plan of adjustment with respect to its debts in this case.

Section 109(c)(5) requires that a chapter 9 petitioner demonstrate that it has satisfied or is excused from certain pre-petition negotiation standards with respect to its creditors. *See* 11 U.S.C. § 109(c)(5). A debtor must satisfy one of the following four options to satisfy Section 109(c)(5):

> (1) The debtor has obtained the agreement of creditors holding at least a majority in the amount of claims of each class that the debtor intends to impair through its plan;
> (2) The debtor has negotiated in good faith but failed to obtain the agreement of creditors holding at least a majority in the amount of claims of each class that the debtor intends to impair under its plan;
> (3) The debtor is unable to negotiate with its creditors because such efforts are impracticable; or
> (4) The debtor must reasonably believe that a creditor may attempt to obtain a preference.

11 U.S.C. § 109(c)(5). The Debtor satisfies the second and third requirements: it has negotiated in good faith with creditors but has failed to obtain an agreement as described more fully above; and additionally, it is unable to negotiate with its creditors because such negotiation is impracticable due to the inability to indentify the Bondholders.

Accordingly, Debtor believes it is eligible to be a "debtor" under Chapter 9 of the Bankruptcy Code.

### C.    Notice of the Chapter 9 Case

The Debtor filed a mailing matrix listing the names and addresses of its creditors and other parties-in-interest on June 24, 2010. Debtor served notices to those persons listed on this mailing matrix concerning the filing of the Chapter 9 case. Additionally, Notice of Commencement of Case Under Chapter 9 of the Bankruptcy Code was published locally and nationally three times in The State, The Greenville News and the Bond Buyer as required by the Court.

### D.    Events Since the Filing of the Chapter 9 Case

Since the filing of the Chapter 9 case, Debtor has continued to pay its non-Bondholder and non-SCDOT creditors in the ordinary course, and Debtor anticipates that the only creditors holding any claims on which there exist any payment defaults are the Bondholders and SCDOT. Additionally, Lehman Brothers Inc. asserts a right to a return of funds being held by the Senior Trustee on behalf of the Debtor (which claim is disputed). A list of the creditors that filed proofs of claim by the Bar Date is attached as Exhibit 1 hereto. To the extent any individual bondholder filed a claim, it is believed to be included as part of or duplicative of the claims of the Senior Bonds Trustee and Subordinate Bonds Trustee.

After the filing of the Petition the Court entered its Amended Order Upon Commencement of Chapter 9 Case Establishing Certain Deadlines and Notice of Commencement of Case, of the Automatic Stay and of the Order for Relief ("Commencement Order") which stated that unless there was objection to the Petition filed July 30, 2010, the Commencement Order would be deemed the Order for Relief in the case. On July 30, 2010, SCDOT filed its objection to Debtor's Chapter 9 Petition, asserting that Debtor is not an eligible Chapter 9 debtor. The issues raised by this objection will be considered by the Court. Unless and until the Court determines the Debtor is eligible for Chapter 9 relief, the Plan cannot be confirmed in the Case.

### E.    Current Board of Directors for the Debtor.

Attached as Exhibit 2 is a list of the current members of the Board of Directors of the Debtor.

### F.    Post Confirmation Operation of the Debtor

Following plan confirmation, current management and the current Board of Directors will remain in place, subject to future re-election in accordance with the By-Laws of the Debtor. As stated above, SCDOT must approve members of the Board of Directors and may remove members for cause.

### G.    Retention of Professionals

Debtor contemplates the continued need for the retention of professionals in the ordinary course of business and will retain and pay such professionals in the ordinary course of business after the Effective Date.

### H.   Non-Bankruptcy Court Litigation

There is no material non-bankruptcy court litigation pending at this time.

### I.   Ordinary Course of Business Creditors and Employees.

The Debtor's ordinary course of business creditors and the Debtor's employees have been paid in the ordinary course of business on a current basis. Accordingly, there are no ordinary course of business or employee claims.

## VI.   CAPITAL ASSETS OF THE DEBTOR

Capital assets of the Debtor as of December 31, 2009 and 2008 consisted of equipment and an intangible asset, Debtor's interest in a License Agreement with SCDOT. As of December 31, 2009, the Debtor had $148,705,967 invested in capital assets. This amount represents a net decrease of $3,554,469, or approximately 2.3%, from the 2008 amount. The amount invested at December 31, 2008, was $152,260,436, a net decrease of $5,239,294, or approximately 3.3%, from the 2007 amount. Debtor's primary asset is its interest in the License Agreement with SCDOT. In 2009, its book value decreased by approximately 2.3% to $148,490,159. This decrease consisted of $3,570,908 of amortization taken during the year. The 2008 carrying amount of the Debtor's interest in the License Agreement had decreased approximately 3.3% to $152,061,067. The net decrease was composed of $6,152 of electric heat strips placed in service during 2008 offset by amortization of $5,243,468 taken during the year. Amortization of the Debtor's interest in the License Agreement decreased in 2009 from 2008 because of a change in the estimated life of the License Agreement to 2051.

**Changes in Capital Assets at Year-End**

**(Net of Depreciation)**

|  | 2009 | 2008 | 2007 |
|---|---|---|---|
| Equipment, Net | $        215,808 | $        199,369 | $        201,347 |
| Interest in License Agreement with SCDOT, Net | 148,490,159 | 152,061,067 | 157,298,383 |
| Total Capital Assets, Net | $   148,705,967 | $   152,260,436 | $   157,499,730 |

## VII.   DISCUSSION OF THE PLAN

### A.   Purpose of the Plan and General Plan Requirements

The purpose of the Plan is to implement a fair and equitable repayment plan for all creditors' claims and to put the Debtor on sound financial footing. The Plan separates creditors' Claims into 6 classes, exclusive of the Allowed Administrative Claims arising from the Case.

In order for the holder of a Claim to participate in the Plan and receive the treatment afforded to the applicable Class, such holder's Claim must be Allowed. A Claim will be allowed

if it is filed or deemed filed, unless an objection to the allowance of the Claim is made. Generally, in order for a Claim to be Allowed, a proof of Claim must be filed prior to the Bar Date on behalf of the holder thereof with the Court. However, a Claim will be deemed to be filed if it is listed on the Schedules filed with the Court, unless it is listed as disputed, contingent or unliquidated. If an objection to a Claim is made, the Court must make a determination with respect to the allowance of such Claim. Only holders of Allowed Claims are entitled to vote upon, participate in and receive distributions in accordance with the Plan.

B.    **Summary of Plan Terms**

The Plan contemplates the amendment and restatement by the Debtor of the terms of the Bonds. The material terms and conditions of the Amended and Restated Bonds will be set forth in the Amended Trust Indenture that will be filed with the Court as part of the Plan Supplement. Generally, the Amended and Restated Bonds will consist in parts of approximately $172,115,908 aggregate principal amount of (i) senior secured current interest bonds, accruing interest at 5.80% per annum payable semi-annually, and maturing in 2051, (ii) senior secured capital appreciation bonds, accreting interest at 5.80 % per annum, maturing annually and with a final maturity in 2051, and/or (iii) senior secured current interest bonds, accruing interest and/or contingent interest at 5.80% per annum semi-annually, and maturing in 2051.[1] The Debtor's obligations in respect of the Tier 1 Bonds will be secured by a first lien on the Trust Estate, including the present collateral assignment of the Debtor's rights under the License Agreement. It is estimated that payments on the Tier 1 Bonds will equal approximately 83.5% of the Debtor's Projected Net Revenues in each year.

The Amended and Restated Bonds will also include approximately $29,805,074 aggregate principal amount of (i) senior subordinated secured capital appreciation bonds accreting interest at 5.80% per annum, payable in cash (but only if the Debtor is current in making all payments in respect of the Tier 1 Bonds), and maturing in 2051, and/or (ii) senior subordinated secured current interest bonds, accruing interest and/or contingent interest at 5.80% per annum semi-annually, and maturing in 2051. The Debtor's obligations in respect of the Tier 2 Bonds will be secured by a second lien on the Trust Estate. The Tier 2 Bonds will be subordinated to the Tier 1 Bonds in all respects, including in right of payment and priority of liens. It is estimated that payments on the Tier 2 Bonds will equal approximately 14.5% of the Debtor's Projected Net Revenues in each year.

If holders of the Series C Bonds vote to accept the Plan in the requisite percentages, and holders of at least ____% of the outstanding accreted amount of the Series C Bonds do not object to Confirmation of the Plan, the holders of the Series C Bonds shall receive their pro rata share of approximately $4,215,099 aggregate principal amount of (i) junior subordinated secured capital appreciation bonds accruing interest  at 5.80% per annum, payable semi-annually (but only if the Debtor is current in making all payments in respect of the Tier 1 Bonds and the Tier 2

---

[1] The type, principal amount and interest rate of the Amended and Restated Bonds are subject to revision (e.g., reduced principal amount but increased interest rate) but in any case shall provide for semi-annual payments that aggregate annually:  (i) 83.5% of the post-Effective Date Debtor's Projected Net Revenues in such year for the Tier 1 Bonds; (ii) 14.5% of the post-Effective Date Debtor's Projected Net Revenues in such year for the Tier 2 Bonds; and (iii) 2.0% of the post-Effective Date Debtor's Projected Net Revenues in such year for the Tier 3 Bonds.

Bonds), and maturing in 2051, and/or (ii) junior subordinated secured current interest bonds, accruing interest and/or contingent interest at 5.80% per annum, semi-annually, and maturing in 2051. The Debtor's obligations in respect of the Tier 3 Bonds will be secured by a third lien on the Trust Estate. Tier 3 Bonds shall be subordinated to the Tier 1 Bonds and Tier 2 Bonds in all respects, including in right of payment and priority of liens, and such subordination provisions shall be subject to the approval  not to be unreasonably withheld of the Trustee for the Series 1998A Bonds and the Series 1998B Bonds. It is estimated that payments on the Tier 3 Bonds will equal approximately 2.0% of the Debtor's Projected Net Revenues in each year.

The Amended and Restated Bonds will be governed by the Amended Trust Indenture between the Debtor and U.S. Bank National Association, as Trustee (the "New Trustee"). The position of the Subordinate Bond Trustee will be eliminated. A copy of the Amended Trust Indenture and the terms of the Amended and Restated Bonds will be filed as part of the Plan Supplement.

The Amended and Restated Bonds will be expressly non-recourse to the Debtor and payable solely from the Trust Estate.

As stated above, if holders of the Series C Bonds vote to accept the Plan in the requisite percentages, and holders of at least __% of the outstanding accreted amount of the Series C Bonds do not object to confirmation of the Plan, the holders of the Series C Bonds shall receive their pro rata share of the Tier 3 Bonds. The holders of the Series C Bonds will not receive any distribution if they do not so vote to accept the Plan, or if holders of more than __% of the aggregate principal (accreted) amount of Series C Bonds object to confirmation of the Plan.

The Amended Trust Indenture shall govern the Amended and Restated Bonds. The Amended Trust Indenture is substantially similar in form and substance to the Original Trust Indenture, except that it includes the following terms:

- Mandatory Redemption:  If in any year (i) the Debtor is current in making all payments in respect of the Amended and Restated Bonds for such year and for all previous years, (ii) the Debtor is otherwise in compliance with the Amended Trust Indenture, including without limitation funding and maintaining the Debt Service Reserve Fund, and (iii) the Debtor has excess Net Revenues, then the Debtor shall apply such excess Net Revenues in such year to redeem Tier 1 Bonds and, if all Tier 1 Bonds have been redeemed, Tier 2 Bonds, and if all Tier 2 Bonds have been redeemed, Tier 3 Bonds. The redemption price shall be 105% of the par value or 105% of the accreted value of the relevant Bonds, plus accrued and unpaid interest thereon to the redemption date.

- Optional Redemption:  Prior to the tenth anniversary of the effective date of the Plan, the Debtor may, from time to time, redeem any of the Tier 1 Bonds (and, if all Tier 1 Bonds have been redeemed, Tier 2 Bonds, and if all Tier 2 Bonds have been redeemed, Tier 3 Bonds) at a redemption price of 105% of the par value or 105% of the accreted value of such Bonds, plus accrued and unpaid interest thereon to the redemption date. At any time after the tenth anniversary of the effective date of the Plan, the Debtor may, from time to time, redeem any of the Tier 1 Bonds (and, if all Tier 1 Bonds have been redeemed, Tier

2 Bonds, and if all Tier 2 Bonds have been redeemed, Tier 3 Bonds), without premium or penalty, at a price of 100% of the par value or 100% of the accreted value of such Bonds, plus accrued and unpaid interest thereon to the redemption date.

- Remedies.  To the extent the Debtor fails to make any payment required to be made in cash in respect of the Amended and Restated Bonds solely because the Net Revenues are less than the Projected Net Revenues, the Trustee and the holders of the Amended and Restated Bonds (i) shall have the right to retain, or cause the Debtor to retain, (x) an independent consultant to recommend the optimum toll rates for the Southern Connector, on the terms and conditions set forth herein, and (y) a management consultant or other third party to examine and make recommendations regarding the Debtor's Operating Costs, and except to the extent holders of a majority of the aggregate principal amount of the Tier 1 Bonds object to the recommendations of such consultant or third party, the Debtor shall promptly implement all recommendations of such consultant or other third party to the extent within its power to do so; and (ii) shall not have the right to accelerate the maturity of the Amended and Restated Bonds or to foreclose on the Debtor's assets.

- Debt Service Reserve Fund:  The Debtor shall maintain with the New Trustee an account or fund (the "Debt Service Reserve Fund") for the benefit of the holders of the Tier 1 Bonds (and, if all Tier 1 Bonds have been redeemed, the holders of the Tier 2 Bonds, and if all Tier 2 Bonds have been redeemed, the holders of the Tier 3 Bonds).  The Debt Service Reserve Fund shall be funded on the effective date of the Plan with any proceeds of the Southern Connector Toll Road Revenue Bond Debt Service Fund and the Southern Connector Toll Road Revenue Bond Debt Service Reserve Fund (each as defined in the Original Trust Indenture) that are under the control of the Trustee as of the effective date of the Plan (the initial amount deposited in the Debt Service Reserve Fund being referred to herein as the "Debt Service Reserve Requirement").  If the New Trustee applies any amounts in the Debt Service Reserve Fund, the Debt Service Reserve Fund shall be fully replenished to the Debt Service Reserve Requirement before any payments or other distributions shall be made in respect of the Tier 2 Bonds or the Tier 3 Bonds, as applicable.

- Toll Rates:  The New Trustee, as the collateral assignee of the Debtor under the Amended Trust Indenture, shall have the right to retain an independent consultant to recommend the optimum toll rates for the Southern Connector (i) one time between the first and second anniversaries of the effective date of the Plan, (ii) from time to time, but no more frequently than annually, (iii) if holders of a majority of the aggregate outstanding principal amount of the Tier 1 Bonds determine that Net Revenues may be inadequate to enable the Debtor to make any semi-annual payment required to be made in respect of the Amended and Restated Bonds, and (iv) if the Debtor fails to make any payment required to be made in respect of any of the Amended and Restated Bonds.  In each case where an independent consultant is retained by the New Trustee pursuant to clauses (i), (iii) or (iv) of the immediately preceding sentence, (x) the independent consultant shall make its recommendation for the purpose of maximizing revenue generated by the Southern Connector to enable the Debtor to satisfy (to the maximum extent possible) its obligations under the Amended and Restated Bonds and the Amended Trust Indenture,

(y) except to the extent holders of a majority of the aggregate principal amount of the Tier 1 Bonds object to the recommendations of such consultant, the Debtor shall use reasonable commercial efforts to cause SCDOT to promptly set all toll rates on the Southern Connector in accordance with all recommendations of such consultant, and otherwise to comply promptly with such recommendations, and (z) the New Trustee shall have the right to enforce the Debtor's rights under the License Agreement in respect of such recommendations. Notwithstanding the foregoing, the final determination of Toll Rates will remain subject to the terms of the License Agreement.

The Plan provides for the release by the holders of the Series 1998A, Series 1998B and Series 1998C Bonds, the Senior Bonds Trustee and Subordinate Bonds Trustee of all of their claims (if any) against current and former officers, directors and agents of the Debtor existing as of the effective date of the Plan.

The Plan provides for the release by the Debtor of all of its claims (if any) against the holders of the Series 1998A, Series 1998B and Series 1998C Bonds, the Senior Bonds Trustee and Subordinate Bonds Trustee existing as of the effective date of the Plan.

The Plan contemplates that the Senior Bonds Trustee, Subordinate Bonds Trustee and the Bondholders retain all of their respective rights and claims against SCDOT, including those arising under the License Agreement, Original Trust Indenture and any other related documents. Debtor does not contest and will not in any way oppose or interfere with the rights of the Senior Bonds Trustee to enforce for itself, for the Bondholders, or by assignment from the Debtor, any such rights, claims or causes of action against SCDOT, including under the License Agreement, Original Trust Indenture and any other related documents.

The Senior Bonds Trustee has indicated that it intends to commence an action seeking damages and/or other relief from SCDOT arising from, among other things, SCDOT's failure to maintain toll rates on the Southern Connector as specifically promised in the License Agreement (the "SCDOT Rate Covenant").  The Senior Bonds Trustee asserts that the License Agreement provides that at all times SCDOT, which retains sole authority to adjust the toll rates, will maintain all toll rates in compliance with the Trust Indenture.  The Trust Indenture provides that there shall be fixed, charged and collected such tolls and other charges in respect of the Southern Connector as shall be sufficient to generate revenues to repay the Bonds and finance the highway's operations, pursuant to a formula set forth therein.  The Senior Bonds Trustee asserts that since at least 2005, toll rates on the Southern Connector have been far too low to maximize revenue and fulfill SCDOT's legally enforceable promise.  The Senior Bonds Trustee contends that SCDOT has failed to raise toll rates in fulfillment of SCDOT's covenant under the License Agreement, despite several independent traffic studies, published beginning in 2005, concluding that toll rates could be significantly increased to maximize revenue.

Debtor has previously informed the Senior Bonds Trustee that the earlier toll rate studies concluded that such toll rate increases would not result in Debtor satisfying the SCDOT Rate Covenant.  SCDOT has promptly agreed to toll modification requested by the Debtor.

Debtor expects that SCDOT will contest and defend the claims and allegations of the

Senior Bond Trustee as set forth above.

### C.    Summary of the Plan Classes and Treatment of Claims

The following is a summary of the Classes of creditors of the Debtor under the Plan, an estimation of the dollar amounts of such Classes and a summary of the provisions made in the Plan for the treatment of each Class.

### 1.    Classification of Claims

a.    Administrative Claims.  Allowed Administrative Claims are not classified under the Plan and are unimpaired.

b.    Class 1.  Class 1 consists of the claims of the holders of the Senior Bonds.  This class is impaired.

c.    Class 2.  Class 2 consists of the claims of the holders of the Subordinate Bonds.  This class is impaired.

d.    Class 3.  Class 3 consists of the claims of the Senior Bonds Trustee and Subordinate Bonds Trustee.  This class is unimpaired.

e.    Class 4.  Class 4 consists of the claims of the SCDOT.  This class is unimpaired.

f.    Class 5.  Class 5 consists of all claims arising from the rejection of executory contracts, if any.  This class is impaired.

g.    Class 6.  Class 6 consists of Lehman Brothers, Inc.  This class is impaired.

### 2.    Estimation of Claims.

Exhibit 3 is an estimate of the Allowed Claims in Classes 1 through 4 under the Plan as of September 22, 2010.

### 3.    Treatment of Classes

**Administrative Claims.**    Allowed Administrative Claims are claims of the kind described in sections 503(b) and 507(a)(2) of the Bankruptcy Code.  Throughout the course of the Chapter 9 Case, the Debtor has endeavored to satisfy administrative expenses as they became due.  Accordingly, the Debtor believes that all claims that otherwise would constitute Allowed Administrative Claims previously have been or will be satisfied in the ordinary course of business prior to or within ten (10) days of the Effective Date, by the Debtor unless such Claim or Claims are not yet an Allowed Claim(s) by order of the Court where required.

### 3.1    Class 1.  Senior Bondholders Claims.

Holders of the Senior Bonds will be issued Tier 1 Bonds in the aggregate principal amount of approximately $172,115,908 on the terms set forth in the Amended Trust Indenture and which will generally include (i) senior secured current interest bonds, accruing interest at 5.80% per annum payable semi-annually in cash, and maturing in 2051, (ii) senior secured capital appreciation bonds, accreting interest at 5.80 % per annum, maturing annually and with a final maturity in 2051, and/or (iii) senior secured current interest bonds, accruing interest and/or contingent interest at 5.80% per annum semi-annually, and maturing in 2051. The Debtor's obligations in respect of the Tier 1 Bonds will be secured by a first lien on the Trust Estate.

Debtor will also issue to Class 1 creditors approximately $29,805,074 in aggregate principal amount of Tier 2 Bonds on the terms set forth in the Amended Trust Indenture and which will generally include (i) senior subordinated secured capital appreciation bonds accreting interest at 5.80% per annum, payable at the option of the Debtor in cash (but only if the Debtor is current in making all payments in respect of the Tier 1 Bonds), and maturing in 2051, and/or (ii) senior subordinated secured current interest bonds, accruing interest and/or contingent interest at 5.80% per annum semi-annually, and maturing in 2051. The Debtor's obligations in respect of the Tier 2 Bonds will be secured by a second lien on the Trust Estate. The Tier 2 Bonds will be subordinated to the Tier 1 Bonds in all respects, including in right of payment and priority of liens.

### 3.2    Class 2. Subordinate Bondholders Claims.

If holders of the Series C Bonds vote to accept the Plan in the requisite percentages, and holders of at least __% of the outstanding accreted amount of the Series C Bonds do not object to confirmation of the Plan, the holders of the Series C Bonds shall receive their pro rata share of Tier 3 Bonds in the aggregate principal amount of approximately $4,215,099 on the terms set forth in the Amended Trust Indenture and which will generally include (i) junior subordinated secured capital appreciation bonds accruing interest at 5.80% per annum, payable at the option of the Debtor in cash (but only if the Debtor is current in making all payments in respect of the Tier 1 Bonds and the Tier 2 Bonds), and maturing in 2051, and/or (ii) junior subordinated secured current interest bonds, accruing interest and/or contingent interest at 5.80% per annum, semi-annually, and maturing in 2051. The Debtor's obligations in respect of the Tier 3 Bonds will be secured by a third lien on the Trust Estate. The Tier 3 Bonds shall be subordinated to the Tier 1 Bonds and Tier 2 Bonds in all respects, including in right of payment and priority of liens, and such subordination provisions shall be subject to the approval not to be unreasonably withheld of the Senior Bonds Trustee for the Series 1998A Bonds and the Series 1998B Bonds.

### 3.3    Class 3. Bond Trustee Claims.   The claims of the Senior Bonds Trustee and Subordinate Bonds Trustee for administrative fees and expenses due under the Original Trust Indenture have been paid in the ordinary course of business. Debtor does not believe there are any claims past due amounts outstanding to these creditors. To the extent such ongoing fees have not been paid, they will be paid in the ordinary course, they will be paid in cash prior to the Effective Date or at such later time as provided for by agreement between the Trustees and such creditors. Accordingly, holders of Class 3 claims are not impaired under or entitled to vote on the Plan.

**3.4**   **Class 4. SCDOT Claims.**  The claims of SCDOT are general unsecured claims arising under the License Agreement.  Such claims will be paid in the priority established by the License Agreement which is being assumed under the Plan.  Accordingly, SCDOT as a Class 4 claimant is not impaired under or entitled to vote on the Plan.  Based upon the projected revenues and priority of payments established by the Original Trust Indenture as restated in the Amended Trust Indenture, it is expected that the distributions to SCDOT will be $0.

**3.5**   **Class 5. Executory Contract Claims.**  This class consists of any claims arising from the rejection of an executory contract.  However, the Debtor does not believe there are any claims within this class, as set forth in Section VII(C)(4) below.

**3.6**   **Class 6. Lehman Brothers, Inc. Claims**.  Debtor intends to object to the claim of Lehman Brothers.  If the claim is deemed valid, Debtor will seek an order or judgment declaring that any funds being held by the Trustee in escrow which were derived from the liquidation of assets pledged by Lehman Brothers pursuant to the terms of a Repurchase Agreement dated February 12, 2008 issued in connection with the Bonds are property of the Debtor and not subject to any trust or security interest in favor of Lehman Brothers.  However, should the Court rule that the funds being held by the Trustee in escrow are subject to any constructive trust or security interest in favor of Lehman Brothers, then to the extent the claim of Lehman Brothers exceeds the escrowed funds, it will be a general unsecured claim.  Debtor does not expect to have sufficient funds to make any distribution to the general unsecured portion of this claim should it be determined Lehman Brothers has a valid claim which exceeds the escrowed funds.   Accordingly, the holder of the Class 6 Claim is impaired under and entitled to vote on the Plan.

**4.**   **Treatment of Executory Contracts and Unexpired Leases.**

As discussed in Section V above, Debtor engaged Goldman to advise Debtor in connection with the potential restructuring of Debtors obligations ("Goldman Contract"). Debtor asserts that such engagement has concluded and the Goldman Contract terminated. However, Goldman's engagement gave certain rights to Goldman that, under certain conditions, could be exercised at Goldman's option in the future. Debtor is listing the Goldman engagement as an executory contract which is being specifically rejected under the Plan to eliminate the possibility of any assertion by Goldman of subsequent claims thereunder.

All contracts and leases of the Debtor that may constitute executory contracts or unexpired leases as of the Petition Date shall be assumed except for the Goldman Contract or such contracts and leases that (a) have been rejected pursuant to Order of the Court entered prior to the Effective Date, (b) have been renegotiated and either assumed or rejected on renegotiated terms pursuant to Order of the Court entered prior to the Effective Date, (c) are the subject of a motion to reject that is pending before the Bankruptcy Court on the Effective Date, (d) are the subject of a motion to assume on renegotiated terms that is pending before the Court on the Effective Date, or (e) are specifically treated otherwise in the Plan or in the Confirmation Order. Contracts rejected or assumed pursuant to (a) - (e) above shall be rejected or assumed, as the case may be, as of the date set forth in the operative motion, agreement or order arising therewith. The Debtor intends to assume all known executory contracts to which the Debtor is a party, including but not limited to the License Agreement, but excluding the Goldman Contract.

Attached as Exhibit 4.1 is a list of the known executory contracts being assumed by the Debtor, including but not limited to the License Agreement.  Attached as Exhibit 4.2 is a list of the known executory contracts being rejected by the Debtor, specifically, the Goldman Contract.

Any contract or lease that expired pursuant to its terms prior to the Effective Date, and that has not been assumed or rejected by Final Order prior to the Effective Date, shall be deemed rejected.

### D.    Conditions Precedent to Confirmation

Confirmation of this Plan shall not occur unless each of the following conditions precedent has occurred:

1.    The Court shall have approved the Disclosure Statement by a Final Order; and

2.    The Plan Documents shall be in form and substance satisfactory to the Debtor and the Senior Bonds Trustee; and

3.    The Confirmation Order, in form and substance acceptable to the Debtor and the Senior Bond Trustee, shall have been entered by the Court; and

4.    It has been determined that the Debtor is eligible for Chapter 9 relief and the Court enter an Order of Relief.

### E.    Effectiveness of the Plan

The following conditions precedent must be satisfied or waived as set forth herein on or prior to the Effective Date:

1.    The Confirmation Order shall have been entered in form and substance reasonably satisfactory to the Debtor and the Senior Bonds Trustee, and shall, among other things, (i) provide for the distribution of the Amended and Restated Bonds, (ii) provide for the assumption of the License Agreement and find that there are no defaults requiring cure thereunder and (iii) provide that notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan; and

2.    The Court shall have entered an order or judgment declaring that (i) in the event there are insufficient Net Revenues to fund the Renewal and Replacement Fund in order to permit Debtor to pay the costs of the repair and replacement of the Southern Connector, SCDOT is obligated to repair, renew and replace the Southern Connector as part of the State Highway System and to advance  the cost of such repair, renewal and replacement on an ongoing basis pursuant to the License Agreement and under general South Carolina law; (ii) that any failure by the Debtor to cause the repair, renewal and the replacement of the Southern Connector due to the insufficiency of toll revenues shall not give rise to a right of SCDOT to terminate the License Agreement; (iii) that Debtor's obligation to pay funds to SCDOT or to the Renewal and Replacement Fund or to perform obligations under the License Agreement, the performance of

which are subject to the availability of adequate Net Revenues from the operation of the Southern Connector, will not be considered to cause the Debtor to be in violation of Section 14.1(d) of the License Agreement and will not permit SCDOT to terminate the License Agreement under that section or otherwise; and (iv) that applicable law, including Section 12-28-2920 Code of South Carolina, 1976, as amended, does not require or permit SCDOT to remove the tolls from the Southern Connector or other cessation of tolls by virtue of the restructuring and transactions contemplated under the Plan, specifically including of the amendments to the Bonds effected by the Plan.

3. The Confirmation Order shall not then be stayed, vacated or reversed; and

4. The Confirmation shall be a Final Order and no request for revocation of the Confirmation Order shall have been made or, if made, remain pending; and

5. The Amended Trust Indenture and Amended and Restated Bonds have been executed and delivered and the Trustee shall have (as a condition to acceptance of delivery of the Amended and Restated Bonds) received opinions of counsel acceptable to the Trustee, subject to customary assumptions and exceptions, to the effect that (A) the Amended and Restated Bonds and the Amended Trust Indenture and other bond documents have been duly authorized by the Debtor, have been validly executed and delivered by the Debtor, and represent the legal and binding obligations of Debtor under South Carolina law, enforceable in accordance with their terms, and (B) interest on the Amended and Restated Bonds is excludable from gross income of the owners thereof for federal and state of South Carolina income tax purposes and is not a specific item of tax preference for purposes of the federal alternative minimum tax.

F.     **Waiver of Conditions to Effectiveness**

Each of the conditions set forth in Section VIII of the Plan may be waived in whole or in part by the Debtor and the Senior Bonds Trustee without notice to parties in interest or the Court and without a hearing.

G.     **Amount and Method of Payment of Administrative Claims**

The distributions to holders of Administrative Claims will be made prior to or within ten (10) days of the Effective Date, by the Debtor unless such Claim or Claims are not yet an Allowed Claim(s) by order of the Court where required.

## VIII.   FEASIBILITY OF THE PLAN

A.     **Availability of Revenue to Satisfy the Debtor's Obligations Pursuant to the Plan**

The Plan and the Debtor's satisfaction of its obligations as provided therein are conditioned on the restructuring of its obligations, in particular, the obligations arising under the Original Trust Indenture.  Upon the Confirmation of the Plan, the Debtor expects to be able to satisfy its obligations required under the Plan because the amounts necessary to implement the Plan and continue the business of the Debtor will be made available by future revenues from the operation of the Southern Connector.  The amount of the restructured debt is at a level that

allows it to be serviced in accordance with its terms if the revenue projections of the Revised Traffic Study are achieved.  Implementation of the Plan is feasible such that consummation of the Plan will occur on or about the Effective Date.

Post Effective Date operation of the Debtor's business is also feasible based upon the restructured debt obligations and anticipated revenues.  The Debtor intends to seek a declaration from the Court prior to, or in connection with Confirmation, that (i) in the event there are insufficient Net Revenues to fund the Renewal and Replacement Fund or to permit Debtor to pay the costs of the repair and replacement of the Southern Connector, SCDOT is obligated to repair, renew and replace the Southern Connector as part of the State Highway System and to advance the cost of such repair, renewal and replacement on an ongoing basis pursuant to the License Agreement and under general South Carolina law; (ii) any failure by the Debtor to cause the repair, renewal and the replacement of the Southern Connector due to the insufficiency of Net Revenues shall not give rise to a right of SCDOT to terminate the License Agreement; (iii) that Debtor's obligation to pay funds to SCDOT or to the Renewal and Replacement Fund or to perform obligations under the License Agreement, the performance of which are subject to the availability of adequate Net Revenues from the operation of the Southern Connector, will not be considered to cause the Debtor to be in violation of Section 14.1(d) of the License Agreement and will not permit SCDOT to terminate the License Agreement under that section or otherwise; and (iv) that applicable law, including Section 12-28-2920 Code of South Carolina, 1976, as amended, does not require or permit SCDOT to remove the tolls from the Southern Connector or other cessation of tolls by virtue of the restructuring and transactions contemplated under the Plan, specifically including the amendments to the Bonds effected by the Plan..

## IX.    ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Debtor believes that the Plan affords all creditors the potential for the greatest economic return from the Debtor's assets; therefore, it is in the best interest of creditors.  The Debtor has considered alternatives to the Plan.  In the opinion of the Debtor, such alternatives would not afford creditors as great a return as achieved under the Plan.

The Debtor is unaware of any feasible alternative to this Plan.  If this Plan is not confirmed then the possible alternatives are discussed below.  These alternatives are bleak for the creditors of this Debtor.

### A.    Analysis of Dismissal of the Case

The Debtor could dismiss the Case.  In the event of a dismissal of the Case, SCDOT may attempt to terminate the License Agreement which could result in the Debtor's operations being shut down leaving no revenue to pay the Bonds or other creditors of the Debtor and likely resulting in further litigation.

### B.    Alternative Plan under Chapter 9

In the event the Plan is not confirmed, the Debtor could attempt to formulate a different plan.  However, the Debtor believes that the Plan represents the best alternative for Claimants within the current License Agreement term and without SCDOT's agreement to amendments to the License Agreement.  The Debtor believes that confirmation and implementation of the Plan

is preferable to any of the alternatives to the Plan described herein because it should provide greater and more certain recoveries of the Debtor's assets to the holders of Claims. In addition, other alternatives would involve delay, uncertainty and substantial administrative costs.

## X.    CERTAIN FACTORS TO BE CONSIDERED

### A.    Factors Relating to Chapter 9 and the Plan

#### 1.    Preferences

Under federal bankruptcy law, an estate representative may avoid transfers of assets of a debtor as a "preferential transfer." To constitute a preferential transfer, the transfer must be (1) of an interest of the debtor in property; (2) to or for an antecedent debt; (3) made while the debtor was insolvent; (4) made within 90 days before the filing of a bankruptcy petition or made within one year if to an "insider" and (5) a transfer that enables the creditor to receive more that it would receive under a Chapter 7 liquidation of the debtor's assets. The Bankruptcy Code creates a rebuttable presumption that the debtor was insolvent during the 90 days immediately before the filing of the bankruptcy petition. The Debtor does not believe that any pre-petition transfers made by the Debtor are avoidable "preferential transfers."

#### 2.    Fraudulent Transfers

Generally speaking, fraudulent transfer law is designed to avoid two types of transactions: (i) conveyances that constitute "actual fraud" upon creditors, and (ii) conveyances that constitute "constructive fraud" upon creditors. In the bankruptcy context, fraudulent transfer liability arises under Sections 548 and 544 of the Bankruptcy Code. Section 548 permits the estate representative or debtor-in-possession to "reach back" for a period of two years and avoid fraudulent transfers made by the Debtor or fraudulent obligations incurred by the Debtor during the two year prior to the Petition Date. Section 544 permits the trustee or debtor-in-possession to apply applicable state fraudulent transfer law. Assuming that South Carolina law were to apply, the estate representative could challenge conveyances, transfers or obligations made or incurred by the Debtor within at least three (3) years prior to the Petition Date. However, under Section 544 of the Bankruptcy Code, it is necessary to establish that at the time of the challenged conveyance or obligation, there in fact existed a creditor whose Claim remains unpaid on the Petition Date. The Debtor does not believe there are any fraudulent transfers to recover in this case.

### B.    Risk Factors Attendant to the Implementation of the Plan and Relating to the Repayment of Claims and Other Considerations

Prior to deciding whether to accept the Plan, each solicited person should carefully consider all of the information contained in this Disclosure Statement, including the factors described or cross-referenced in the following paragraphs.

#### 1.    Limited Obligation.

The Amended and Restated Bonds are payable from and secured by the same sources of payment as the Bonds. No additional guarantees, security or collateral will be provided or

pledged to the payment of the Amended and Restated Bonds. The Debtor is dependent on the Net Revenues to pay debt service on the Amended and Restated Bonds. The Amended and Restated Bonds are subject to the same risks that existed prior to the date of filing of the Petition with respect to the Bonds including, without limitation, the following:

The Debtor has no assets with which to pay Debt Service on the Amended and Restated Bonds except its right to collect and apply tolls for the use of the Southern Connector. The Debtor's ability to derive Net Revenues from the use and operation of the Southern Connector in amounts sufficient to pay Debt Service on the Amended and Restated Bonds depends upon numerous factors, many of which are not within the control of the Debtor. Further, additional and as-yet-unforeseeable considerations may develop in the future that may significantly affect the operation of the Southern Connector.

### 2.      No Right to Accelerate Debt Service on the Amended and Restated Bonds.

The Amended Trust Indenture does not permit the Trustee or the owners of the Amended and Restated Bonds to accelerate the maturity of or the payment of debt service due on the Amended and Restated Bonds upon the occurrence of an Event of Default under the Amended Trust Indenture or for any other reason. Owners of the Amended and Restated Bonds will, therefore, be required to collect debt service due after an Event of Default on an annual basis from Net Revenues or other property included in the Trust Estate as that Debt Service is scheduled to be paid.

The Amended and Restated Bonds are special, limited obligations of the Debtor payable solely from Net Revenues and moneys held in certain Funds and Accounts included in the Trust Estate. Any factor that adversely affects the receipt of Net Revenues, therefore, creates a risk that Debt Service on the Amended and Restated Bonds will not be paid when due. Net Revenues are Revenues minus Operating Costs. The principal source of Revenues will be tolls paid by the users of the Southern Connector. The primary risk associated with the receipt of toll revenues is the level of traffic on the Southern Connector. Other risks associated with the receipt of toll revenues include the effectiveness of the toll collection system and toll collection enforcement. Because Operating Costs are paid from Revenues before Debt Service on the Amended and Restated Bonds, any factor that increases Operating Costs creates a risk that Debt Service on the Amended and Restated Bonds will not be paid when due.

### 3.      Revised Traffic Study.

The Plan pursuant to which the Amended and Restated Bonds are being delivered is based on the level of toll revenues projected in the Revised Traffic Study prepared by Stantec. The Revised Traffic Study is based on numerous assumptions, some or all of which may not prove to be correct. The history of the operation of the Southern Connector demonstrates that accurate forecasts of traffic and revenues are difficult. Some of the assumptions in the Revised Traffic Study will not occur. For example, in January 2010, SCDOT closed the northbound lanes of I-385 in connection with resurfacing I-385. Such lanes were re-opened in July 2010. Much of the traffic on the Southern Connector originates or terminates on I-385 and such closure had a material adverse affect on the traffic on the Southern Connector during such closure. Since it had not been decided by SCDOT to close I-385 at the time the Revised Traffic Study was completed,

the Revised Traffic Study did not forecast such closure. If any one or more of the assumptions in the Revised Traffic Study proves to be incorrect, the toll revenues projected in the Revised Traffic Study may not be achieved and the Net Revenues may not be sufficient to pay the Debt Service on the Amended and Restated Bonds when due. Claimants must read the Revised Traffic Study in full and reach their own conclusion regarding the reasonableness of the assumptions on which it is based. Some of the events or conditions that could adversely affect the projections in the Revised Traffic Study are discussed below. The material below should be read in conjunction with the Revised Traffic Study.

### 4. Demographic and Development Trends.

The Revised Traffic Study assumes that population, household, employment and other development activity within the influence area of the Southern Connector will be in accordance with revised estimates developed by the Greenville County Planning Commission. Although the estimates developed by the Greenville County Planning Commission were reviewed by the Stantec and found to be reasonable, there is no assurance that the estimates developed by the Greenville Planning Commission will prove to be accurate.

The Revised Traffic Study also assumes that there will be no reduced growth initiatives or related controls which would significantly inhibit normal development patterns. There can be no assurance, however, that one or more growth initiatives or related controls will not be imposed by Greenville County, the City of Greenville, the State, the federal government or another governmental authority. The imposition of any such initiatives or related controls could reduce the amount of toll revenues available to pay Debt Service on the Amended and Restated Bonds.

### 5. Competing Highways or Other Transportation Improvements.

The Revised Traffic Study assumes that no competing major highway or other transportation improvements other than those currently programmed and funded will be constructed or implemented in the service corridor during the forecast period. Construction or implementation of highway or other transportation improvements that compete with the Southern Connector could reduce the amount of toll revenues available to pay debt service on the Amended and Restated Bonds.

SCDOT has agreed, in the License Agreement, to refrain from initiating, authorizing, franchising or financing Competitive Transportation Facilities within a Competitive Transportation Facilities Zone extending 10 miles west and south of the Southern Connector which have a material adverse impact on the ability of the Debtor to operate and maintain the Southern Connector; to cover costs of debt service on the Amended and Restated Bonds or to observe its covenants with respect to the Amended Trust Indenture; and to exercise all discretionary authority available to it under applicable law to prevent any other governmental or private entity from developing Competitive Transportation Facilities within the Competitive Transportation Facilities Zone which could reasonably be foreseen to have adverse impacts on the ability of the Debtor to cover costs of debt service on the Amended and Restated Bonds or to observe its covenants with respect to the Amended Trust Indenture. There are, however, a number of exceptions to the State's agreement regarding Competitive Transportation Facilities,

including, but not limited to, any State highway improvement, enhancement or modification necessary for improved safety or emergency purposes, any State project listed in the approved State Transportation Improvement Plan, the distribution of federal or State funds to local agencies for Competitive Transportation Facilities to the extent required as a non-discretionary act under federal law and the rendering of advice and the making of recommendations as the State may deem to be in the best interests of the State. In addition, the provisions of the License Agreement do not restrict Greenville County, any city, the South Carolina State Infrastructure Bank, the federal government or any other unit of the State or federal government from constructing competing highways or other transportation systems or improving existing highway or transportation that would compete with the Southern Connector. Construction or implementation of other highway or other transportation improvements that compete with the Southern Connector could reduce the amount of toll revenues available to pay Debt Service on the Amended and Restated Bonds.

### 6.    Toll Rates.

The Revised Traffic Study assumes that toll rates for the Southern Connector will be set at the levels and adjusted at periodic intervals as set forth in the Revised Traffic Study. Although SCDOT, which is responsible for setting the toll rates, has fixed the toll rates at the level assumed in the Revised Traffic Study, there can be no assurance that toll rates will continue to be fixed at the levels assumed in the Revised Traffic Study or that the toll rates that are fixed (whether at the levels assumed in the Revised Traffic Study or otherwise) will produce sufficient toll revenues to permit the Debtor to pay Debt Service on the Amended and Restated Bonds. An increase in toll rates may, for example, result in reduced traffic and a consequent reduction in toll revenues available to pay Debt Service on the Amended and Restated Bonds.

### 7.    Maintenance.

The Revised Traffic Study assumes that the Southern Connector will be well maintained and efficiently operated to encourage maximum usage. SCDOT is responsible for maintaining the Southern Connector in good operating condition, reasonable wear and tear excepted. Although the License Agreement requires the Debtor to reimburse SCDOT for such costs, after the confirmation of the Plan it is unlikely Net Revenues sufficient to permit any such reimbursement will be earned. No assurance can be given that SCDOT will timely maintain the Southern Connector in good condition on an unfunded basis.

### 8.    Repair and Resurfacing of the Southern Connector.

Debtor was advised by SCDOT that SCDOT had no obligation to repair or resurface the Southern Connector. Subsequently, Debtor was advised by SCDOT that SCDOT had the obligation to repair or resurface the Southern Connector under general South Carolina statutes, subject to the discretion of the South Carolina Department of Transportation Commission relating to priority of competing resurfacing and repair projects. The Plan does not provide funds for the repair or resurfacing of the Southern Connector and no assurance can be given that (i) SCDOT will apply State or federal funds to keep the Southern Connector in good repair while Amended and Restated Bonds are outstanding, or (ii) Debtor can successfully maintain an action

to force SCDOT to apply State or federal funds to keep the Southern Connector in good repair while Amended and Restated Bonds are outstanding.

### 9.    Fuel Supply and Pricing.

The Revised Traffic Study assumes that motor fuel will remain in adequate supply during the forecast period and fuel price increases will not significantly exceed the overall rate of inflation. Over the past 35 years, the price and availability of crude oil has been negatively impacted three times to the point of disrupting normal travel patterns on the nation's highways. There can be no assurance that the supply and/or price of motor fuel during the forecast period will not change, either temporarily or permanently, in a manner that would result in a reduction of traffic on the Southern Connector and a consequent reduction in the toll revenues available to pay Debt Service on the Amended and Restated Bonds.

### 10.    Limited Term of License Agreement. The term of the License Agreement pursuant to which the Debtor has the right to use the Southern Connector expires in 2051. If any Debt Service on the Amended and Restated Bonds is not paid when due and is not paid before expiration of the License Agreement, it may not be paid at all.

### 11.    Subordinated Amended and Restated Bonds.

Payment of Debt Service on the Tier 2 Bonds is subordinate to payment of Debt Service on the Tier 1 Bonds and the replenishment of the Debt Service Reserve Fund. Payment of Debt Service on the Tier 3 Bonds is subordinate to payment of Debt Service on the Tier 1 Bonds and on the Tier 2 Bonds and the replenishment of the Debt Service Reserve Fund. Timely payment of Debt Service on the Tier 2 and Tier 3 Bonds is dependent upon Revenues being available in sufficient amounts after all claims on such Revenues that are payable prior to the payment of Debt Service thereon.

### 12.    Secondary Market Risk.

At this time, no credit rating for the Amended and Restated Bonds has been applied for, and no representation is made concerning the existence of any secondary market for the Amended and Restated Bonds. No assurance can be given that any secondary market will develop following the confirmation of the Plan and delivery of the Amended and Restated Bonds. No assurance can be given that the Amended and Restated Bonds may be resold at a price equal to the principal amount thereof or that the value of the Amended and Restated Bonds at the confirmation of the Plan will continue for any length of time. The Amended and Restated Bonds will not be readily liquid. Recipients of Amended and Restated Bonds should be prepared to hold the Amended and Restated Bonds to their stated maturity date.

The foregoing description of risks attendant with the Plan is a summary only of significant risks associated with the implementation of the Plan that the Debtor has identified. There may exist other risks which the Debtor has been unable to identify or which are not deemed significant by the Debtor.

## XI.    INCOME TAX CONSEQUENCES OF THE PLAN

The federal, state and local and other tax consequences of the Plan to the holders of Claims may vary based upon the individual circumstances of each holder, including as to tax issues peculiar to certain types of taxpayers (such as life insurance companies, S corporations, financial institutions, tax exempt organizations and foreign taxpayers). The Debtor urges each creditor to seek and obtain its own careful tax planning and advice based upon the individual circumstances of each holder of a Claim. Accordingly, holders of Claims are urged to consult their own tax advisors for the federal, state, local and other tax consequences peculiar to them under the Plan.

## XII.    VOTING PROCEDURES

### A.    Ballots and Voting Deadline

A Ballot to be used to accept or reject the Plan for creditors whose Claims are impaired under the Plan and who are not deemed to reject the Plan accompanies this Disclosure Statement.

Pursuant to Rule 3018 of the Federal Rule of Bankruptcy Procedure, _____, 2010 is the record date for the determination of the identity of the impaired Creditors from whom acceptances or rejections of the Plan will be solicited. The solicitation period for Ballots with respect to the Plan will expire at 5:00 p.m. Eastern Time on the Voting Deadline. Except to the extent allowed by the Bankruptcy Court, Ballots received after the Voting Deadline may not be accepted or used by or against the Debtor in connection with the Debtor's request for Confirmation of the Plan or any modification thereof.

### B.    Claimants Entitled Vote to Accept or Reject The Plan.

1.    _Allowance for Voting Purposes._  All creditors holding Allowed Claims in an impaired Class that is not deemed to reject the Plan may vote to accept or reject the Plan. Generally, a claim is deemed "allowed" for voting purposes if a proof of claim was timely filed, and no objection to the claim has been filed that has not been resolved. If such an objection has been filed, the Claimant cannot vote on the Plan unless the Court, after notice and hearing, either overrules the objection or temporarily allows the claim for voting purposes pursuant to Bankruptcy Rule 3018(a).

2.    _Impaired Classes of Claims._  As noted above, the holder of a claim has the right to vote on the Plan if that claim is allowed and classified into a Class that is *impaired* under the Plan and that is not deemed to reject the Plan. A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class with respect to their claims or interests. The Debtor believes that Classes 1, 2, 5 and 6 are impaired under the Plan.

3.    _Claimants Not Entitled to Vote._  The holders of the following types of claims are not entitled to vote on the Plan:  (a) claims that have been disallowed; (b) claims that are subject to a pending objection and which have not been allowed for voting purposes pursuant to Bankruptcy Rule 3018(a); (c) claims that are not impaired or are deemed to reject the plan; and (d) claims entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code (defined as "Administrative Expense Claims" in the Plan). Holders of Administrative Claims are not entitled to vote because such claims are not classified and are required to receive certain

treatment specified by the Bankruptcy Code. Any party that disputes the characterization of its claim as unimpaired, however, may request that the Court find that its claim is impaired in order to obtain the right to vote on the Plan.

### C.    Vote Required for Class Acceptance.

As part of the Confirmation Hearing, the Court will determine whether the impaired voting classes have accepted the Plan by determining whether sufficient acceptances have been received from the holders of Allowed Claims in such Classes. An impaired Class of Claims will be determined to have accepted the Plan if the holders of Allowed Claims in the Class casting votes in favor of the Plan (i) hold at least two-thirds of the allowed amount of the Allowed Claims of the holders in such Class who vote, and (ii) constitute more than one-half in number of holders of the Allowed Claims in such Class voting on the Plan. Ballots of holders of impaired Claims that are signed and returned, but not expressly voted either for acceptance or rejection of the Plan, may be counted as Ballots for the acceptance of the Plan if permitted by the Court. Except as may be allowed by the Court, a Ballot accepting the Plan may not be revoked.

### D.    Possible Reclassification of Creditors

The Debtor is required pursuant to Section 1122 of the Bankruptcy Code to place Claims in Classes that contain Claims substantially similar to each other. While the Debtor believes it has classified all Claims in compliance with Section 1122, it is possible a creditor may challenge the Debtor's classification of such creditor's Claim. If the Debtor is required to reclassify any Claims under the Plan, the Debtor, to the extent permitted by the Court, intends to continue to use the acceptances received from any creditor pursuant to the solicitation of acceptance using this Disclosure Statement for the purpose of obtaining the approval of the Class or Classes of which such creditor is ultimately deemed a member. Any reclassification of Claims could adversely affect the Class in which such Claims were initially a member, or any other Class under the Plan, by changing the composition of such Class and the required vote thereof on approval of the Plan. Further, a reclassification of Claims could necessitate the re-solicitation of votes.

## XIII.  CONFIRMATION OF THE PLAN

### A.    Confirmation Hearing

The Bankruptcy Code requires that the Court, after notice, hold a Confirmation hearing. The Confirmation hearing will be separately noticed. The Bankruptcy Court may adjourn the Confirmation hearing from time to time without further notice except for an announcement made at the Confirmation hearing.

### B.    Requirements for Confirmation of the Plan

At the Confirmation hearing, the Bankruptcy Court will determine whether the requirements of Section 943 of the Bankruptcy Code have been satisfied in which event the Bankruptcy Court will enter an order confirming the Plan. Some of the principal requirements include:

1.   Best Interest Test

One of the determinations that the Court must make before confirming the Plan is whether the Plan is in the best interest of creditors and is feasible.  There are very few authorities on what constitutes the best interests of creditors under chapter 9 of the Bankruptcy Code.  One leading commentator notes that the proposed plan must be better than the alternative available to creditors:

> In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds.  Clearly, such a result is chaos, especially in those cases where the debt burden of the municipality is too high to support the taxes that the lands of the municipality will bear or the taxes or fees that the inhabitants or the users of municipal services will pay.

See 6 Collier on Bankruptcy § 943.03 [a] (15th ed. Rev. 2002).  This test does not contemplate the Bankruptcy Court considering the liquidation test commonly used in Chapter 11 proceedings.  The Debtor believes that the Plan is in the best interest of creditors because the Plan maximizes the economic return to the Debtor's creditors.

2.   Acceptance by Impaired Classes

Section 1129(a)(8) of the Bankruptcy Code requires that, unless the Plan satisfies the "cramdown" provisions of Section 1129(b) as discussed below, each impaired Class must accept the Plan by their requisite vote for Confirmation to occur.  As more fully described herein, a Class of Claims will have accepted the Plan if holders of at least two-thirds in amount and more than one-half in number of Allowed Claims in such Class voting to accept or reject the Plan have voted in favor of acceptance.

It is important to recognize that the majorities required by Section 1126(b) of the Bankruptcy Code are calculated based on those creditors in a Class that actually vote on a plan.  Thus, for example, if there were 100 creditors, and only five creditors voted to accept or reject the plan, such creditors could determine the acceptance or rejection of the plan for the entire class of creditors.  Thus it is important that each holder of Claims in Classes 1, 2, 5, and 6, votes on the Plan.

The Bankruptcy Code provides that the Court may confirm a plan of adjustment that is not accepted by all impaired classes if at least one impaired Class of Claims accepts the Plan and the "cramdown" provisions set for in Section 1129(b)(1) and 1129(b)(2) are satisfied.  The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of Section 943(b) of the Bankruptcy Code, the Plan is (i) fair and equitable; and (ii) does not discriminate unfairly with respect to each Class of claims that is impaired under and has not accepted the Plan.

Among other things, the "fair and equitable" standard requires that unless a dissenting unsecured class of claims receives payment in full for its allowed claims, no holder of allowed claims in any class junior to that class may receive or retain any property on account of such claims.  Additionally, the "fair and equitable" standard has been interpreted to prohibit any class

senior to a dissenting class from receiving under a plan more than 100% of its allowed claims. The Debtor believes the that the Plan satisfies the "fair and equitable" standard because, among other things, no impaired classes junior to any other impaired classes are receiving or retaining property under the Plan, and those classes senior to a dissenting unsecured class are not receiving more than 100% payment of their allowed claims.

The requirement that the plan not "discriminate unfairly" means that a dissenting class must be treated substantially equally with respect to other classes of equal rank. The Debtor does not believe that the Plan unfairly discriminates against any class that may not accept or otherwise consent to the Plan.

### C.      Conditions Precedent to Confirmation

At the Confirmation hearing, the Court will determine whether the Plan meets all of the requirements of Section 943 of the Bankruptcy Code governing the confirmation of a plan of adjustment. Among the conditions precedent to the Court's Confirmation of the Plan are: (i) a finding that the Plan was solicited upon disclosure of adequate information as defined in Section 1125(a) of the Bankruptcy Code; and (ii) a finding that at least one of the impaired Classes of Claims that is voting in the Chapter 9 Case has accepted the Plan by the affirmative vote of Claimants that hold at least two-thirds in amount and not less than one-half in number of the Allowed Claims of such Classes that have voted on such Plan, but excluding any Claimants designated under Section 1126(e) of the Bankruptcy Code.

### D.      Effect of Confirmation; Discharge of Debtor

Pursuant to Section 944 of the Bankruptcy Code, except as otherwise provided in the Plan, the entry of the Confirmation Order, as of the Effective Date, will act as a full and complete discharge of all Claims against the Debtor, the post-Effective Date Debtor, or the post-Effective Date Debtor's assets of any nature whatsoever, including, without limitation, any liability of a kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, that arose or have been asserted against the Debtor at any time before the entry of the Confirmation Order or that arise from any pre-Confirmation conduct of the Debtor whether or not the Claim(s) are known to or knowable by the Claimant. The discharge of the Debtor will become effective as to each Claim, whether or not the Claim constituted an Allowed Claim and whether or not the holder of the Claim voted to accept the Plan. In addition, the Confirmation Order will operate as a general resolution with prejudice, as of the Effective Date, of all pending legal proceedings against the Debtor and its respective assets and properties as well as any proceedings not yet instituted against the Debtor or its respective assets and properties, except as otherwise provided in this Plan. As provided in section 524 of the Bankruptcy Code, the discharge provided in the Plan operates as an injunction against the prosecution of any Claim so discharged.

## XIV. SOURCES OF INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT

The information contained in this Disclosure Statement has been compiled from various sources including: (1) management of the Debtor; (2) the books and records of the Debtor; and

(3) the Debtor's general counsel and bankruptcy counsel, which has provided to management the discussion of the procedures applicable in a Chapter 9 bankruptcy case and other legal matters.

## XV.    RECOMMENDATION FOR ACCEPTANCES

The Debtor believes that the Plan is feasible, and in the best interest of the Creditors of the Debtor.  Accordingly, the Debtor recommends that you vote for acceptance of the Plan.

A Ballot for acceptance or rejection of the Plan is enclosed.  It is important that you vote.

Respectfully submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

**By:**    _s/Stanley H. McGuffin__
Stanley H. McGuffin
District ID No. 2833
William H. Short, Jr.
District ID No. 3831
Lindsey Carlberg Livingston
District ID No. 9518

Post Office Drawer 11889
Columbia, South Carolina 29211
(803) 779.3080 Tel
(803) 765.1243 Fax
smcguffin@hsblawfirm.com
bshort@hsblawfirm.com
llivingston@hsblawfirm.com

Attorneys for Debtor Connector 2000
October 22, 2010                                        Association, Inc.